THE  JUDGES'  CASES.

McCULLY *v.* STATE.

(*Jackson.*    August 29, 1899.)

FROM  HENDERSON.

Appeal in error from the Criminal Court of Henderson County.  JNO. M. TAYLOR, J.

AND

THORNTON *v.* STATE.

(*Jackson.*    August 29, 1899.)

FROM  SHELBY.

Appeal in error from the Circuit Court of Shelby County.  L. H. ESTES,  J.

L. B. McFARLAND, S. J. SHEPHERD, A. B. PITTMAN, JOHN C. MYERS, E. L. BULLOCK, C. G. BOND,

---

---

W. G. TIMBERLAKE, W. M. TAYLOR, McCALL & LANCASTER, F. M. DAVIS, and D. E. SCOTT for the Judges.

Attorney-general PICKLE, H. D. MINOR, and BARHAM & TIMBERLAKE *contra.*

1. JUDGES. *Removal of, by concurrent resolution.*

The removal of a Judge by concurrent vote of the two houses of the General Assembly, as authorized by Art. VI., Sec. 6, of the Constitution, cannot be justified or sustained where the resolution of removal negatives the existence of any cause of removal personal to the Judge or affecting the administration of his office, and recites as the sole cause for his removal a superfluity of Judges, and the necessity to reduce their number and judicial expenses to subserve the public welfare. The removal contemplated by the provision is for "cause" affecting the official personally or the administration of his office, to be effected after notice and trial. (*Post, pp. 512–531.*)

Constitution construed: Art. VI., Sec. 6.

Acts construed: Acts 1899, Chs. 64, 155.

Cases cited: Hawkins *v.* Kercheval, 10 Lea, 535; 72 N. Y., 449; 39 N. J. L., 14; 1 Burr, 517; 57 Mo. App., 203.

2. COURTS. *Abolition of circuits and chancery divisions.*

It is the law of this State, established by repeated adjudications, that the Legislature has the constitutional power to abolish a circuit or chancery division and reassign the counties composing it, and thereby deprive the incumbent Judge or Chancellor of his official character and powers, and of his right to draw a salary from the State. (*Post, pp. 531–575.*)

Constitution construed: Article VI., Secs. 1, 4, 7.

Act construed: Acts 1899, Chs. 64, 155.

Cases cited and approved: State, *ex rel., v.* Campbell, 3 Shan., 335; Halsey *v.* Gaines, 2 Lea, 316; State *v.* McConnell, 3 Lea, 332; State *v.* Algood, 87 Tenn., 163; 30 L. R. A., 153; 30 Ark., 566; 72 Iowa, 401.

Cited and distinguished: State *v.* Leonard, 86 Tenn., 485; Keys *v.* Mason, 3 Sneed, 6; Cross and Mercer, *ex parte,* 16 Lea, 489; Powers *v.* Hurst, 2 Hum., 24; Pope *v.* Phifer, 3 Heis., 682; State *v.* Cummings, 98 Tenn., 667; State *v.* Glenn, 7 Heis.,

472; Normant *v.* Smith, 5 Yer., 270; Venable *v.* Curd, 2 Head, 586; Brewer *v.* Davis, 9 Hum., 208; State *v.* McKee, 8 Lea, 24.

3. CONSTITUTIONAL LAW. *Use of journal in construing Constitution.*

While the proceedings of a Constitutional Convention may be properly looked to, and are of value in ascertaining the mischief designed to be remedied and the purpose sought to be accomplished by a particular provision, still, if the meaning of the language used is clear, it must be assumed that the Constitution was adopted by the people in its obvious sense. and not as having some other secret or abstruse meaning, deducible alone from the proceedings of the Convention. (*Post, pp. 518–521.*)

Case cited and approved: State *v.* Wilson, 12 Lea, 259.

4. SAME. *Stare decisis in construction of.*

The rule of *stare decisis* applies with peculiar force in the construction of Constitutions. "A principal share of the benefit expected from written Constitutions would be lost if the rules they established were so flexible as to bend to circumstances or be modified by public opinion." (*Post, p. 533.*)

5. SAME. *Legislative authority.*

The Constitution invests the General Assembly with legislative authority in general terms. and it is a well-settled rule of construction that a State Legislature, in its sphere of legislative action, has unlimited power, except so far as restrained by the Constitution of the State or the United States. (*Post, pp. 549, 550.*)

Case cited and approved: Henley *v.* State, 98 Tenn., 665.

6. SAME. *Constitutional provision violated by a statute must be pointed out.*

It is a familiar rule that a statute will not be annulled as in conflict with the Constitution unless its assailant can put his finger on the specific provision of the Constitution that the statute expressly, or by unavoidable implication, contravenes. (*Post, pp. 550, 551.*)

Case cited and approved: Henley *v.* State, 98 Tenn., 665.

7. SAME. *Statute not declared unconstitutional, when.*

The wisdom, policy, and desirability of statutes are matters addressed to the intelligence, patriotism, and discretion of the General Assembly. Hence a statute will not be annulled as

unconstitutional because it may be supposed to violate the best policy, or some natural equity, or to interfere with the rights of freemen, or upon the idea that it is opposed to some spirit of the Constitution not expressed in its words, or because it may be supposed to be contrary to the genius of a free people. (*Post, p. 551.*)

Case cited and approved: Henley *v.* State, 98 Tenn., 665.

McALISTER, J.    The plaintiff in error, McCully, was convicted in the Criminal Court of Henderson County of the offense of selling liquor to a minor, and from said judgment has appealed in error.

The main assignment arises upon the action of the trial Judge in overruling the defendant's plea to the jurisdiction of the Court.    The plea averred that the Hon. John M. Taylor, who was assuming to preside and hold said Court, was not Judge of the Criminal Court of the Eleventh Judicial Circuit, nor Judge of any Court in the State of Tennessee, for the reason that, on April 20, 1899, the General Assembly of the State of Tennessee adopted a resolution, two-thirds of the members of each branch concurring, which resolution was, on April 21, 1899, approved by the Governor, removing the Hon. John M. Taylor from said office, in accordance with the authority conferred by Section 6, Article VI., State Constitution.    The plea then recites the proceedings of the Legislature which resulted in the removal of Judge Taylor.

The cause for removal recited in the resolution, is that there is not sufficient business to require or justify the retention in office of said official, and

that it is necessary for the welfare of the State that the judicial circuits and chancery divisions should be redistricted, and that there should be a reduction in the number of Circuit Judges, Chancellors, and Attorneys-general, to the end that there may be a reduction in the judicial expenses of the State and for the promotion of economy in the administration of public justice. No reason personal to the Judge was assigned as cause for removal, but, on the contrary, the resolution contains a testimonial to the "eminent ability, fidelity, and purity in public and private life of said John M. Taylor."

The plea to the jurisdiction was, on motion of the Attorney-General, stricken from the files, and thereupon the defendant was placed on trial, convicted by a jury, and fined by the Court the sum of $10. The verdict of the jury is fully supported by the evidence, and the only question presented for our determination upon the record is whether the Court had jurisdiction of the case.

It should be remarked that, prior to the adoption of the removal resolution, the General Assembly had passed an Act repealing the Act creating the Criminal Court of the Eleventh Judicial Circuit and abolishing said Court, but the repealing Act was expressly limited not to take effect until the expiration of thirty days from the final adjournment.

At the time the case now under consideration was tried in the lower Court, to wit, on May 7, 1899, the abolishing and repealing Act, approved

18 P—33

April 6, 1899, had not taken effect, and hence no question is presented upon this record in respect of the right of the Legislature to abolish the Court. It is further to be observed that when the removal resolution was approved, to wit, on April 21, 1899, the abolishing and repealing Act had not taken effect. That Act, as already stated, did not take effect until thirty days after the final adjournment of the Legislature. Precisely formulated, then, the question for our determination, upon this record, is whether, upon a proper construction of Art. VI., Sec. 6, of the State Constitution, the Legislature is empowered, for economic reasons, to remove a Judge whose office is still in existence. If the Act abolishing the Court had already taken effect, and afterwards the removal resolution had been adopted, a different question would arise. In such case the whole question would turn upon the power of the Legislature to abolish the Court, for if such power existed the Judge would thereby be displaced, and a removal resolution would be useless and supererogant. It would seem a legislative solecism to remove a Judge from an office which had already been abolished and had no existence. The present case, however, must be adjudged upon the state of the law as it stood at the date of the trial below, and, as we have already seen, the Act abolishing the Court had not then taken effect, and the jurisdiction of the Judge was challenged alone upon the ground of his removal from office.

The question, then, is whether the Legislature is clothed with authority, under the Constitution, to remove a Judge from office for economic reasons purely. The authority is claimed to be derived from Art. VI., Sec. 6, Constitution of 1870, which provides, viz.: "Judges and Attorneys for the State may be removed from office by a concurrent vote of both houses of the General Assembly, each house voting separately, but two-thirds of the members to which each house may be entitled must concur in such vote. The vote shall be determined by ayes and noes, and the names of the members voting for or against the Judge or attorney for the State, together with the cause or causes of removal, shall be entered on the journal of each house, respectively. The Judge or attorney for the State, against whom the Legislature may be about to proceed, shall receive notice thereof, accompanied with copy of causes alleged for his removal, at least ten days before the day on which either house of the General Assembly shall act thereupon."

Article V., Sec. 4, provides for impeachment of Judges for crimes committed in their official capacity. In support of the action of the General Assembly, it is insisted by the Attorney-general (1) that, under this article and section of the Constitution, Judges and Attorneys-general may be summarily removed for any cause that the two houses of the General Assembly may deem sufficient; (2) that the two houses are exclusive and final Judges of the sufficiency of the

cause for removal, and the Courts cannot revise or annul their action; (3) that it is a sufficient cause for removal that an office is useless and the salary an unnecessary public burden. These propositions, thus formulated by the Attorney-general, have been reinforced with an argument evincing much ability and research. Antagonizing the views of the Attorney-general, it is insisted that the Legislature had no power, under Art. VI., Sec. 6, of the Constitution, to remove a Judge, excepting for causes personal to the Judge, or his administration of the office, and that the removal of a Judge upon economic grounds is void. It is insisted that the removal clause of the Constitution was designed to cover cases of incompetency, mental or physical disability, continued neglect of official duty, misconduct in office, or other causes which would not constitute impeachable crimes, but would, nevertheless, be proper grounds for removal. It is further insisted that if the theory of the State is sound, the constitutional tenure of office is subject to abbreviation or destruction at the will of two-thirds of the members of the Legislature, exercised for any cause they may deem sufficient for removal, whether founded on economy, politics, religion, race, policy, or expediency, thus discrowning absolutely the independence of the judiciary. On the other hand, in support of the contention that the power of removal is unlimited, it is shown from the journal of the Constitutional Convention of 1870 that three amendments, defining and limiting the

authority conferred by this section, were successively defeated.

First, Mr. Gibson proposed an amendment to define and limit the power of removal in these words —"for crime, corruption, habitual drunkenness, incompetency, or neglect of duty."

Second, Mr. Fentress offered, in lieu of Mr. Gibson's amendment, the following—"for official corruption or for continued neglect of duty or continued incapacity of any kind to perform the duties of his office."

Third, Mr. Turner proposed the following amendment—" provided the causes of removal are such as are prescribed by the general law of the land, passed by a Legislature prior to the one taking action thereon."

But the convention rejected all of these amendments, and adopted the section substantially as it stood in the Constitution of 1834. It is now asked if this Court will undertake to do what the convention so emphatically refused to do—instruct the Legislature for what causes removal can lawfully be had.

It is insisted that if the convention was willing to leave the matter to unlimited legislative discretion, this Court cannot inquire into the sufficiency of the cause of removal or the regularity of the proceedings. It is insisted the Courts can no more inquire into the existence and sufficiency of the causes or reasons that prompted the Legislature to

adopt a removal resolution than they can inquire into the reasons for the passage of statutes, or the levy of taxes or the appropriation of money. It is insisted the power of removal, as therein declared, is absolute and unconditional, and that the language indicates that the whole matter was left to legislative discretion.

We cannot concur in this construction of the removal clause of the Constitution. The fact that several amendments, specifying the particular causes for which the Legislature would be authorized to remove, were successively rejected, does not, in our judgment, demonstrate that the convention thereby intended to invest the Legislature with an unlimited power of removal. As well said by able counsel: "The authors of these amendments may have believed it best to put beyond any question that the cause of removal should be confined to the official or personal conduct of the Judge, and that this desire was met by the counter opinion that no other construction than this could be placed upon the removal section, and that, therefore, the amendments were needless and superfluous. . . . .

"Again, there is another reason showing it was judicious to reject said amendments. Causes personal to the incumbent or relating to the conduct of his office might assume many phases, and, therefore, it would be unwise to undertake to define the same. The enumeration of certain causes should have excluded any legislative power to act upon other causes

not expressly designated. An examination of the causes of removal might partially defeat the object of the removal clause. For this reason it was judicious to use general terms, so as to include the intended causes of removal in all possible phases.''

Mr. Cooley, in his works on Constitutional Limitations (2d Ed.), p. 65, says: '' When the inquiry is directed to ascertaining the mischief designed to be remedied or the purpose sought to be accomplished by a particular provision, it may be proper to examine the proceedings of the convention which framed the instrument. Where the proceedings clearly point out the purpose of the provision, the aid will be valuable and satisfactory; but where the question is one of abstract meaning, it will be difficult to derive from this source much reliable assistance in interpretation. Every member of such a convention acts upon such motives and reasons as influence him personally, and the motions and debates do not necessarily indicate the purpose of a majority of the convention in adopting a particular clause. It is quite possible for a clause to appear so clear and unambiguous to the members of the convention as to require neither discussion nor illustration, and the few remarks made concerning it in the convention might have a plain tendency to lead directly away from the meaning in the minds of the majority. It is equally possible for a part of the members to accept a clause in one sense and a part in another. And even if we were certain we had attained the

meaning of the convention, it is by no means to be allowed a controlling force, especially if that meaning appears not to be the one which the words would most naturally and obviously convey. For, as the Constitution does · not derive its force from the convention which framed, but from the people who ratified it, the intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument on the belief that that was the sense designed to be conveyed. These proceedings (the journal) are less conclusive of the proper construction of the instrument than are legislative proceedings of the proper construction of a statute, since in the latter case it is the intent of the Legislature we seek, while in the former we are endeavoring to arrive at the intent of the people through the discussions and deliberations of their representatives." We have an illustration of this in the adoption by the convention of 1870 of that clause which provides, viz., · "No corporation shall be created or its powers increased or diminished by special laws," etc. The journal of the convention shows that an amendment to limit the provisions of this section to private corporations and exclude municipal corporations was rejected. Yet this Court held that, looking to the scope and purpose of the entire section, private corporations were

alone contemplated, and the clause did not apply to municipal corporations. *State* v. *Wilson*, 12 Lea, 259.

We think any plain man looking at the force of this removal clause, and reading therein that the cause or causes of removal shall be entered on the journal of each house respectively, and that the Judge against whom the Legislature may be about to proceed shall receive notice thereof, together with a copy of the causes preferred for his removal, at least ten days before the day on which either house of the General Assembly shall act thereon, would say at once that the clause in question contemplated an investigation of some cause touching the personal or official conduct of the Judge. If the power of removal is unlimited, why provide for service upon the Judge of a copy of the causes alleged for removal at least ten days before action, unless it was to give him an opportunity to prepare for trial, and why provide for a trial of an economic question? This would present a curious anomaly in legislative proceedings—a trial of an issue to determine whether the services of the Judge are needed. In our opinion, if economic reasons had been in the minds of the framers of the Constitution, other words than a removal for "cause" and on notice would have been used. The word cause used in the removal clause means legal cause. It contemplates a charge, a trial, and a judgment of removal upon cause. *State* v. *Hewitt*, 44 Am. St. Repts., 793, 794.

In the case of the *State* v. *The City of Duluth*,

39 Am. St. Repts., 596, 598, the validity of an official removal was involved. The city ordinance provided "that any member may be removed by a vote of two-thirds of all members of the Council, for sufficient cause, on charges and notice." The Court said, viz.: "Cause or sufficient cause means legal cause, and not any cause which the Council may think sufficient. The case must be one which specially relates to and affects the administration of the office, and must be restricted to something of a substantial nature, distinctly affecting the rights and interests of the public. The cause must be one touching the qualifications of the officer or the performance of his duties, showing that he is not a fit or proper person to hold the office. An attempt to remove an officer for any cause not affecting his competency or fitness, would be an excess of power and equivalent to an arbitrary removal. In the absence of any statutory specification, the sufficiency of the cause should be determined with reference to the character of the office and qualifications necessary to fill it." *Hawkins* v. *Kercheval*, 10 Lea, 535.

Where the removal is to be made for cause on notice, and no specific cause is defined, the cause of removal is to be construed as relating to the person of the official and his administration of the office. See Throop Pub., Sec. 367; 1 Dillon (3d Ed.), Sec. 251.

"Removal for cause" is defined in Anderson's Law Dictionary as follows: "Removal for cause im-

The Judges' Cases.

ports that a reason exists, personal to the individual, which the law and sound public opinion recognize as good cause for his no longer occupying the place. Implies some dereliction or general neglect of duty, some incapacity to perform the duties of the post, or some delinquency affecting the incumbent's general character or fitness for office. The power to remove an officer 'for cause' can be executed only for just causes after he has had an opportunity to defend.'' The following authorities are cited to support definition: *People* v. *Nichols*, 19 Hun, 448 (1879); *People* v. *Fire Coms.*, 72 N. Y., 449; *Haighty* v. *Dove*, 39 N. J. L., 14; *Rex* v. *Richardson*, 1 Burr, 517.

'' Where an officer is appointed or elected for a definite term, he cannot be removed but for cause, by which is meant charges, notice, and trial.'' 57 Mo. App., 203.

'' The statute of New York confers upon commissioners of New York city the right to remove certain officers at pleasure, with this limitation—that such power of removal ''cannot be exercised in respect to any regular clerk or head of a bureau until he has been informed of the cause of the proposed removal, and has had an opportunity of making an explanation.'' It also provides that a record of the true causes of removal shall be entered of record in the department, and a statement thereof shall be filed. Under this authority, the commissioners undertook to remove a certain officer who

came within the provisions above set out, and the
Court of Appeals of New York, through Allen, J.,
said: "The party against whom the proceeding is
taken must be informed of the cause of the pro
posed removal, and be allowed an opportunity of
explanation.    This necessarily implies that the cause
must be some dereliction or general neglect of duty;
or incapacity to perform the duties, or some delin-
quency affecting his general character and his fitness
for the office.    The cause assigned should be per-
sonal to himself and implying an unfitness for the
place." *People* v. *Fire Commissioners*, 72 N. Y.,
448, 449.

Another Act of the Legislature confers the fol-
lowing power: "The heads of all departments, and
all other persons whose appointment is in this sec-
tion provided for, may be removed by the Mayor
for cause, and after opportunity to be heard, sub-
ject, however, before such removal shall take effect,
to the approval of the Governor, expressed in writ-
ing."

The Court, in reviewing a removal which had
been made under above quoted power, said:    "Be-
fore an officer can be removed thereunder, he must
have definite and specific copy of charges, reasonable
time to answer, the right to hear and examine the
evidence against him, to offer testimony himself, and
to have aid and advice of counsel during the con-
duct of the examination.    The cause must be found
in some act of commission or omission by the officer

in regard to his duty or affecting his general char-
acter, which the law and a sound public opinion
pronounce to be sufficient to justify a forfeiture
by the officer having the power of removal.
*People* v. *Nichols*, 19 Hun (N. Y.), 441 *et seq.*
This case also explicitly recognizes the power of
the judiciary to review the action of the Governor,
as well as that of the Mayor in such matters. It
also discusses at length the method of procedure
which shall be followed in removing officers where
a Constitution or act of the Legislature confers
such power without prescribing the precedure, giv-
ing to the party whose rights are to be affected
all the privileges he would have under the common
law when his rights are sought to be interfered
with.'' Other authorities on the point under discus-
sion are: *Haight* v. *Love*, 39 N. J. L., 14; 32
Mich., 255; *Edison* v. *Hayden*, 20 Wis., 932; *State*
v. *McCarry*, 21 Wis., 498; *State* v. *Waterton*, 9
Wis., 271.

In the last case above cited, the following lan-
guage is used: '' What is 'due cause' for the re-
moval of an officer is a question of law to be de-
termined by the judicial department, and in the ab-
sence of statutory provision as to what shall consti-
tute such cause, should be determined with reference
to the nature and character of the office and quali-
fications necessary to fill it.''

Removal for personal causes seems also to have
been the construction of this clause by an eminent

member of the convention, who was afterward Attorney-general of the State, and who argued the case of *Coleman, ex rel.*, v. *Campbell*, decided by this Court in 1875, reported in 3d Shannon's Tennessee Cases. In his brief, still on file in that case, he said, viz.: "Here we have the Constitution with express provisions for the independence of the judiciary. What are those provisions? (1) A fixed salary; (2) a permanent Supreme Court, not subject to interference by legislative action, independence in the highest degree in the Court of last resort; (3) exemption from removal from office for personal reasons, except by a two-thirds vote of both houses." He further says: "The Constitution itself provides for the removal of Judges on personal grounds, but it throws restrictions around these by requiring a two-thirds vote. It also, in one view, provides for the destruction of the Courts (inferior Courts), but as this involves not personal consideration merely but general matters of public policy, as it involves the interests of the people, their rights to their Courts or their support of the burden of them, it no longer throws this protection, which a man unsupported requires, but trusts him to the common cause he makes with his people."

While this section of the Constitution was not necessarily involved, and hence was not construed by the majority of the Court in *Coleman* v. *Campbell*, 3 Shannon, 355, nor in *Halsey* v. *Gaines*, 2 Lea, yet Judge Freeman, in his dissenting opinions in

those cases, expressed his views of the meaning of this section. In the former case he said, viz.: "The other mode is found in Art. VI., Sec. 6, which provides for removal by a concurrent vote of both houses, each house voting separately; two-thirds of the members to which each house may be entitled must concur in this vote. This is not based on crime in his official capacity (as provided in cases of impeachment), but the right may be exercised for other causes, but not, we take it, without causes or at arbitrary discretion of the body, for it is provided the cause or causes of removal shall be entered on the journal of each house, respectively." Again, he says: "In any case for removal the mode by which it shall be done is definitely pointed out in the Constitution, with its proper safeguards and restrictions, involving a trial or hearing, and the principle of responsibility on the Legislature for the act, as a check upon improper action." Similar views are expressed by Judge Freeman in his dissent in *Halsey* v. *Gaines*, 2 Lea.

The General Assembly, in the removal of Judge Taylor, proceeded upon the idea set forth in the report of the Redistricting Committee, that the proceeding was not, in its opinion, a proper case to be submitted on proof, and that the matter was not susceptible of proof, and was a question which addressed itself to the judgment of the Legislature, and the Judge had no constitutional right to be heard.

We entirely agree that if the Legislature had the

right to remove the Judge upon economic grounds, then an issue and trial to determine whether the State needed the services of the Judge would have been absurd. Questions of policy and economy are matters addressed exclusively to the lawmaking power, and it would seem ridiculous to argue that the Judge is guaranteed a constitutional right to be heard on such a subject. But it is very plain that this section of the Constitution does guarantee him a right to be heard on the particular cause alleged for removal, and an opportunity to defend himself against the attack, by requiring at least ten days' notice of the intended action, with a copy of the cause assigned for removal. It is very evident that economic reasons could not have been within the contemplation of the Legislature, and the cause of removal must relate to the personal conduct of the Judge or his administration of the office. Again, if the power of removal conferred by this section is arbitrary and unlimited, a Judge might be removed on account of his religion, his politics, his race, or because he had declared unconstitutional a particular enactment of the Legislature. Such a construction would be monstrous, and wholly abhorrent to fundamental ideas of justice and judicial independence. The design of the framers of the Constitution was to create three departments, executive, legislative, and judicial, which should be coordinate and wholly independent in the exercise of their appropriate functions. "The Legislature, though

possessing a larger share of power, no more represents the sovereignty of the people than either of the other departments. It derives its authority from the same high source." *Bailey* v. *Philadelphia R. Co.*, 4 Harr, 402; *Whittington* v. *Polk*, 1 H. & J., 244. Said Thomas T. Marshall, viz.: "We have incorporated certain permanent and eternal principles in written constitutions, and erected an independent judiciary as the depository and interpreter, the guardian and the priest of these . articles of freedom." It has been said that of all the contrivances of human wisdom this invention of an independent judiciary affords the surest guarantee and the amplest safeguard to personal liberty and the rights of individuals.

If the Legislature has such power as is contended for in the construction of this clause of the Constitution, the judiciary would no longer be an independent and co-ordinate branch of the government, but a mere servile dependency. But it is said, conceding the Legislature had no power to remove for the cause assigned, its action is nevertheless final and not subject to review by the judiciary. If this is so, the distribution of the powers of government and vesting their exercise in separate departments, would be an idle ceremony. It is very true that no department can control or dictate to another department when acting within its appropriate sphere. *People* v. *Bissell*, 68 Am. Dec., 591; *Wright* v. *Wright*, 56 Am. Dec., 723.

18 P—34

Each department has exclusive cognizance of the matters within its respective jurisdiction, and when acting within the authority of each, its action must be final and supreme. 6 Am. & Eng. Enc. L., 1008, note.

These principles are axiomatic, and need no citation of authority to support them, but the question remains, Who is to decide when a particular department is acting within the sphere of its authority? Mr. Webster, in his great speech on the independence of the judicary, said, viz.: "The Constitution being the supreme law, it follows, of course, that any act of the Legislature contrary to that law must be void. But who shall decide this question? Shall the Legislature itself decide it? If so, then the Constitution ceases to be a legal, and becomes only a moral, restraint upon the Legislature. If they, and they only, are to judge whether their acts be conformable to the Constitution, then the Constitution is admonitory and advisory only, and not legally binding, because, if the construction of it rests wholly with them, then discretion in particular cases may be in favor of very dangerous and erroneous constructions. Hence the Courts of Law necessarily, when the case arises, must decide on the validity of particular acts."

We are constrained, therefore, to hold that the Legislature, in removing Judge Taylor from office for the reason assigned, transcended its constitutional authority, and such action is therefore void.

Chief Justice Snodgrass, Judges Caldwell and Beard concur, Judge Wilkes dissents.

It is insisted, however, that the General Assembly, by an Act passed at the same session—to wit, April 6, 1899—abolished the Criminal Court of the Eleventh Judicial Circuit, and repealed the Act of 1895, which created the same. As already observed, this Act did not take effect until thirty days after the adjournment of the Legislature, and it had not taken effect at the date of the proceedings in this case, nor at the date of the adoption of the removal resolution herein discussed. The question, then, of the abolition of the Court does not arise on this record. But since counsel have presented the question and earnestly ask the Court's opinion touching it, thereby to avoid further litigation, we proceed to express our views. The Act creating the Criminal Court of the Eleventh Judicial Circuit was passed in 1895. That Act was repealed by an Act passed April 6, 1899, and the Criminal Court of the Eleventh Judicial Circuit was abolished. The Act provided that it should take effect thirty days from and after the final adjournment of the General Assembly. At the same session another bill was passed providing that the jurisdiction of said Criminal Circuit should be exercised by the Circuit Courts of said counties. Said Act also detached Benton County from the Eleventh Judicial Civil Circuit and attached it to the Twelfth Circuit. It was further provided that the Judge of the Eleventh

Civil Judicial Circuit should have civil jurisdiction in Madison County, and then enacted, viz.: ''And the said county of Madison is hereby attached to and also made a part of the Eighteenth Judicial Circuit of the State, and the Judge of said Circuit shall have exclusive general common law and statutory jurisdiction in all cases of a criminal character arising in said county of Madison, but shall have no civil jurisdiction whatever.'' Said bill further provided, viz.: ''That no case, proceeding or process shall abate by reason of any of the changes hereinbefore made,'' etc. This Act also provided that it should take effect thirty days after the final adjournment of the Legislature.

First, it is insisted by learned counsel representing Judge Taylor that the Act of 1899, repealing the Act of 1895, which created the Eleventh Judicial Criminal Circuit and abolished the Court, is unconstitutional and void.

We are constrained to hold, however, that this question is not *primæ impressionis* in this State, but has, on two occasions, been solemnly and deliberately determined by this Court contrariwise to the present contention. These adjudications have stood for a quarter of a century, and during that period the Legislature has repeatedly exercised the power to abolish Courts of its own creation and the power has been unchallenged. The rule of *stare decisis* is peculiarly applicable in the construction of written constitutions. Says Mr. Cooley, viz.: ''A cardinal

rule in dealing with written instruments is that they are to receive an unvarying interpretation, and that their practical construction is to be uniform. A Constitution is not to be made to mean one thing at one time and another at some subsequent time, when the circumstances may have so changed as, perhaps, to make a different rule in the case seem desirable. A principal share of the benefit expected from written constitutions would be lost if the rules they established were so flexible as to bend to circumstances or be modified by public opinion." Constitutional Limitations (2d Ed.), star page, 52.

In the case of the *State, ex rel. Coleman,* v. *Campbell,* decided by this Court at Jackson, in 1875, reported in 3d Shannon's Tennessee Cases, 355, the question presented was in respect of the constitutionality of the Act of March 15, 1875, entitled "An Act to abolish the Second Circuit Court and the Second Chancery Court of Shelby County." The Constitution of 1870, Art. VI., Sec. 1, provides, viz.: "The judicial power of this State shall be vested in one Supreme Court, and in such Circuit, Chancery, and other inferior Courts as the Legislature may from time to time ordain and establish;" provides "that Judges of the Circuit and Chancery Courts, and other inferior Courts, shall be elected by the qualified voters of the district to which they are to be assigned. . . . His term of service shall be eight years." Section 7 provides, viz.: "The Judges of the Supreme and inferior Courts shall, at

stated terms, receive a compensation for their serv-
ices, to be ascertained by law, which shall not be
increased or diminished during the time for which
they are elected.''

Construing these sections of the Constitution, this
Court held: (1) That the Legislature has the constitu-
tional power to abolish particular Circuit and Chan-
cery Courts, and to require the papers and records
therein to be transferred to other Courts, and the
pending causes to be heard and determined in the
Courts to which they are transferred. The power
to ordain and establish from time to time Circuit
and Chancery Courts includes the power to abolish
existing Courts, and to increase and diminish the
number. (2) The Judge's right to his full term and
his full salary is not dependent alone upon his good
conduct, but also upon the contingency that the
Legislature may for the public good, in ordaining
and establishing the Courts from time to time, con-
sider his office unnecessary and abolish it. The
exercise of this power by the Legislature is neither
such as interferes with the independence of the
Judge or with his tenure of office in such manner
as can be complained of. When the Court or
Courts over which a Judge presides is abolished,
the office of the Judge is extinguished and his
salary ceases. (3) It is provided there shall be but
one Supreme Court; the number of its Judges is
fixed and the places of its sessions are designated.
These provisions show that it is the direct creature

of the Constitution and subject to no invasion by the Legislature.

Judge Nicholson, among other things, said, viz.: "But it is not necessary that we should rely upon the authorities, conclusive as they are, to sustain the construction of the Constitution, so repeatedly acted upon by the Legislature, and so long acquiesced in by the people and the Courts. Upon a fair view of the subject intended to be accomplished, and the circumstances under which the language was used in the Constitution, we are of opinion it will properly bear the construction placed upon it by the Legislature. The object was to provide a system of inferior Courts, which would secure to all the people of the State the benefits of a sure and economical administration of justice through all time. The State was composed of many citizens, and its population and material interests subject to great changes. These fluctuations would necessarily require changes, from time to time, in any system of Courts that might be adopted. Hence it was not deemed proper by the Convention of 1870, to fix, permanently, by Constitutional recognition, the systems of inferior Courts then in operation, although they embrace the entire State. For the purpose of providing for future contingencies and exigencies, they were content to leave the ordaining and establishing of inferior Courts from time to time, to the discretion of the Legislature, with the single restriction as to continuance of the Circuit and Chancery Courts. It

is legitimate business of the Legislature to determine how many Courts are necessary, and how the various circuits and districts should be arranged and formed. It was proper for the representatives of the people, session after session, to have the power to provide such changes in the circuits and districts, as should be shown by experience and observation to be necessary for the public good. This was the power conceded to the Legislature by the Convention when it was provided that they should ordain and establish such Circuit, Chancery, and other inferior Courts, as they should deem necessary from time to time. The ordaining and establishing of such Courts was to be the business of the Legislature through all time. It was impossible that the object to be accomplished could be effectuated by simply adding to the number of circuits or districts. Changes would or might become necessary, which involved the necessity of abolishing existing circuits or districts in ordaining and establishing others, or in reducing the number, if experience should prove that the public good required a reduction. The power to abolish for the purpose of effecting these objects was, therefore, necessarily implied. It was not intended that the power to abolish districts should be exercised with a view of depriving any portion of the people of Courts, but as a means of so ordaining and establishing the Courts as would better promote the public good. It is proper to add that any attempt of the Legislature to exercise this

restricted power of abolishing existing Courts, for the purpose of depriving the people of the requisite number and character of Courts, would be an abuse of power which we have no right to anticipate, and which was not anticipated by the Constitution. Against such abuse of Legislative power the ballot box is the egitimate remedy."

It has no doubt been upon this view of the meaning of the power to "ordain and establish" Courts, that the various Acts of the Legislature have been passed, as well as the Act now under consideration, and we are satisfied that the construction so acted upon is correct.

We have not been able to discover in the Act in question the danger to the independence of the judicial department of the government which has been dwelt upon in argument with such earnest eloquence, nor do we see in it any evidence that the Legislature resorted to this as an indirect mode of removing obnoxious Judges. It appears to us to be the exercise of a legitimate power by the Legislature, under the conviction that two of the Courts in Memphis were unnecessary for the dispatch of the public business, and that, therefore, for the promotion of the public good they were abolished as useless, and their work assigned to two other existing Courts. We have no reason to suppose that the two Judges whose offices depended upon the continuance of the former law, were in any way obnoxious to the Legislature or the people, but were regarded as entirely

worthy of their positions. The Act cannot, therefore, be regarded as an abuse of the power of removal for reasons personal to the judges, nor do we see how the danger of such an abuse of power hereafter could be in any way guarded against or prevented by that construction of the Constitution which would render the Act of the Legislature null and void.

We have not deemed it necessary to discuss the bearing upon the case of those clauses of the Constitution which provide for the salaries and the terms of service of the Judges, for the reason that we consider it too clear for argument, that if the law abolishing the Courts is valid, the offices and their incumbents, necessarily cease, and, of course, along with them, their salaries.

In our view of the Constitution, the Judge's right to his full term and his full salary is not dependent alone upon his good conduct, but also upon the contingency that the Legislature may, for the public good, in ordaining and establishing the Courts from time to time, consider his office unnecessary and abolish it. The exercise of this power by the Legislature is neither such as interferes with the independence of the Judge or with his tenure of office, as can be properly complained of. The power may possibly be exercised without good cause, but in such case the Courts can furnish no remedy.

The opinion in the case last cited was delivered by Chief Justice Nicholson, who was a member of

the Constitutional Convention of 1870, and an active participant in its deliberations. Judge Freeman delivered an able dissenting opinion. These two opinions demonstrate that the questions now made against the validity of this legislation were presented and exhaustively considered by the Court. But this is not all. In 1879 this question was again elaborately considered by this Court in the case of *Halsey* v. *Gaines*, 2 Lea, 316, and the ruling in the Coleman case reaffirmed. Judge McFarland delivered the opinion of the Court in the Halsey case. In the latter case it appeared that Judge Halsey, whose Court had been abolished, had applied to the Comptroller for a warrant for his salary, insisting upon his right to have the same paid until the end of his term, notwithstanding his Court had been abolished. The warrant was refused, and thereupon proceedings were commenced by mandamus to enforce its payment. "Much of the argument," said Judge McFarland, "which has been pressed upon us in support of the claim, assumes that the former rulings of this Court as to the validity of the Act abolishing the Court is erroneous. . . . The Act was solemnly and in terms adjudged constitutional. It is true the relator was not a party to those proceedings, nor was he a necessary party. . . . . The adjudication is nevertheless conclusive. . . . In this view it would seem unnecessary to re-examine the grounds of our former decision, but entertaining, as we do, no doubt of its correctness, we produce

briefly the substance of the reasoning of Chief Justice Nicholson, to which we can add but little.'' Among other things Judge McFarland said, viz.: ''But it is argued that although. by the foregoing construction the Legislature may have power to abolish Courts when they become unnecessary — that the abolition of the Court can only take effect at the expiration of the Judge's term, otherwise we defeat that clause of the Constitution which says that the Judge's term shall be eight years. If the framers of the Constitution intended to leave it to the Legislature to establish and abolish Courts as the public necessities demanded, this was not qualified or limited by the clause as to the Judge's term of office. To so hold would be to allow the clause as to the length of the Judge's term to overthrow the other clause, whereas we construe the provision that the Judge's term shall be eight years to be upon the assumption that the Court continues to exist, otherwise we should have to hold that the Court must continue, although declared unnecessary and abolished by the Legislature, simply to secure to the Judge his full term and salary.''

Again, said Judge McFarland, ''It is argued that the Act abolishing the Court did not abolish the judgeship—that the relator might still be judge although his Court was abolished. Our Constitution does not recognize a judgeship except as the Judge is the incumbent of a Court or Courts which he is commissioned to hold. We have no supernumeraries,

etc.    If the law abolishing the Courts is valid, the
offices and their incumbents necessarily cease, and,
of course, along with them their salaries.    .    .    .
To dispense with an unnecessary Court is not to
change the term of judgeship, nor is it to affect the
guarantees of the Constitution as to his salary, nor
does it remove the Judge from office.    The office
no longer exists, and, of course, a removal from an
office that has no existence is not a conceivable prop-
osition."    Judge Freeman again dissented from
the views of the majority, and filed an opinion in
which his ojections to the constitutionality of the
Act are set forth with great vigor and earnestness.

It is obvious that in order to meet the exigen-
cies of the present case we will be constrained to
overrule two opinions of this Court, delivered by
two of its ablest jurists, in which the very ques-
tions now presented were solemnly and deliberately
adjudicated.

Lord Cairnes wisely said:    "I think that with
regard to statutes it is desirable not so much that
the principle of the decision should be capable at
all times of justification, as that the law should be
settled, and should, when once settled, be maintained
without any danger of vascillation or uncertainty."
*Commissioners* v. *Harrison*, L. R., 7 H. L., 9.

"Where a question has been well considered,"
says Judge Harris, "and deliberately determined,
whatever may the views of the Court before which
the question is again brought, had it been *res nova*,

it is not at liberty to disturb or unsettle such decision, unless impelled by the most cogent reasons.'' *Baker* v. *Lorillard*, 4 N. Y., 261.

If the law was manifestly misunderstood or misapplied in the case decided, its primacy as a precedent may be overthrown. Those who antagonize the construction announced in the two cases decided by this Court cannot claim more than that the constitutional provisions involved are of doubtful interpretation. That doubt has been resolved against their contention in two decisions of this Court, and upon every principle, looking to certainty and stability in the administration of the law, those rulings should now be followed. They have been cited and followed in other jurisdictions, while the Pennsylvania and Indiana cases, maintaining the adverse view, have been discarded. *Aikman* v. *Edwards*, 30 L. R. A., decided by the Kansas Supreme Court, in 1895; *Van Buren Co. Supervisors* v. *Mattox*, 30 Ark., 566; *Grazier* v. *Lyons*, 72 Iowa, 401.

In *Aikman* v. *Edwards* the Court said, viz.: '' While the independence and integrity of Courts in the exercise of all the powers confided in them by the Constitution should be firmly maintained, jealousy of encroachments on judicial power must not blind us to the just power of the Legislature in determining within constitutional limits the number of Courts required by the public exigencies, and the kind and extent of jurisdiction and functions to be discharged by each. We think,'' said that Court,

"the Legislature has the power to abolish as well as create, to diminish as well as to increase, the number of judicial districts." It should be observed that the constitutional provisions construed in that case were entirely similar to those involved herein.

The provisions of the Federal Constitution on this subject are almost identical with the Constitution of this State. The late Justice Miller, in his work on the Constitution of the United States, wrote, viz.: "The Supreme Court, once in existence, cannot be abolished, because its foundation is not in an Act of the legislative department of the government, but in the Constitution of the United States. . . . It cannot be abolished, nor its Judges legislated out of existence, although it has been forcibly urged, and probably with truth, that all the other Courts can, by legislative Act, be abolished and their powers conferred on other Courts or subdivided in different modes." This is the opinion of one of the profoundest jurists that ever sat upon the Supreme Bench of the United States. In this connection it may be remarked that, in 1802, Congress repealed an Act under which sixteen Federal Judges had been appointed and commissioned during good behavior. It is true Story and Tucker, in their commentaries, express the opinion that the repealing Act was unconstitutional, and that a majority of all the ablest lawyers of that day were of the same opinion. But the best answer to this opinion of Mr. Story is that the authority of Congress to pass

the repealing statute was not challenged in the Courts, and the Judges themselves acquiesced in their displacement. It is strange that an Act of Congress so palpably unconstitutional was not assailed if that was the opinion of the majority of all the ablest lawyers of that day.

It has been argued that the Coleman and Halsey cases were overruled by the later case of *State, ex rel.,* v. *Leonard,* 86 Tennessee. The cases were wholly dissimilar. The question in the Leonard case, as stated by the Court, was whether the Legislature has the power to terminate the office of a Judge elected under a constitutional law and for a constitutional term of eight years, within that term, leaving the Court with its jurisdiction in existence and unimpaired, by simply devolving the duties of the office upon another official, namely, the Chairman of the County Court." In *Halsey* v. *Gaines,* 2 Lea, Judge McFarland had argued this could not be done. "We concede," said he, "that legislation which indirectly aims to legislate the Judge out of office before his constitutional term expires, under the guise of changing the circuit, or otherwise, would be unconstitutional and void." Judge Snodgrass, in his opinion in the Leonard case, discusses the Coleman and Halsey cases, and says "it is sufficient to say that the case here presents no such question as that determined there" (in those cases).

The cases of *Keys* v. *Mason,* 2 Sneed, 6; *Cross* v.

*Mercer*, 16 Lea, 489, relating to the constitutional tenure of Justices of the Peace; *Powers* v. *Hurst*, 2 Hum., 24, relating to the constitutional office of Register; *Pope* v. *Phifer*, 3 Heis., holding the quarterly County Court a constitutional Court, do not, in our judgment, bear the remotest kindred, either by affinity or consanguinity, to the cases now under consideration. They are not even. mentioned in the majority or minority opinion in the Coleman-Halsey cases, nor in the Leonard case. The cause of *State* v. *Cummings*, 14 Pickle, in which we held the constitutional office of Sheriff inviolable, is not at all analogous to this case. Art. VII., Sec. 1, Constitution of 1870, provides: "There shall be elected in each county one Sheriff, one Trustee, one Register," etc. This provision is similar to the other clause providing for one Supreme Court. How different the other clause, empowering the Legislature from time to time to ordain and establish Circuit, Chancery, and other inferior Courts! One is established by the Constitution and the others are established by the Legislature.

Another objection to the constitutionality of this Act remains to be noticed. It is based upon Art. VI., Sec. 4 of the Constitution, which provides that "the Judges shall be elected by the qualified voters of the district or circuit to which they are to be assigned." As already seen, the Legislature, in this instance of the abolishing of the Eleventh Criminal Circuit, directed that the Circuit Judge of the respective

18 P—35

counties formerly constituting the Eleventh Criminal Circuit should have and exercise criminal jurisdiction in said counties, except that Benton County should be detached from the Eleventh. Civil Circuit and attached to the Twelfth Civil Circuit, and that Madison County, which was embraced in the Eleventh Civil and Criminal Circuits, should be attached to the Eighteenth Judicial Circuit, so far as jurisdiction in respect of criminal cases arising in said county was concerned, but excluding from the jurisdiction of said Court all civil causes arising in said county. The objection to the Act is that the Criminal Court of Madison County and the Circuit Court of Benton County are to be held by Judges who were not elected by the qualified voters of said counties.

The question now sought to be made arises upon the Act which attaches Benton and Madison Counties to circuits whose Judges the qualified voters of said counties had no voice in electing. If this question is fairly before us, the two Acts, being component parts of one plan to be considered and construed together, we should say, first, that the constitutional provision in question was designed to determine who should be electors of Judges—"They are to be elected by the qualified voters of the district or circuit to which they may be assigned."

It does not mean that a Judge may not exercise civil or criminal jurisdiction in a county unless he has been elected by the qualified voters of that

county, for that would prevent the interchange of Judges and Chancellors. Morover, the Act of the Legislature authorizing the Governor to make *pro tempore* appointments of Judges to fill vacancies until the next biennial election would also contravene this provision of the Constitution.

In *State, ex rel.*, v. *Glenn*, 7 Heis., 472, it was remarked that this clause of the Constitution, providing for election of Juges by the qualified voters of the district or circuit, has not been supposed to take away the power of the Governor conferred by the Legislature to fill a temporary vacancy. The Constitution, Art. VI., Sec. 17, provides, viz.: "No county office created by the Legislature shall be filled otherwise than by the people." It was held this provision relates only to the mode of filling a temporary vacancy. *State* v. *Glenn*, 7 Heis., 472. So we think the present arrangement is in the nature of filling a temporary vacancy in the Circuit Courts of said counties. Judicial Circuit Judges were elected by the qualified voters of their respective circuits. The fact that Benton and Madison Counties have been attached to these circuits since the Judges were elected cannot affect their election or show they were not elected by the qualified voters of the circuit. It is true they were not elected by the qualified voters of Benton or Madison Counties, but they were themselves elected by the qualified voters of their respective circuits. There has been no election for

Judges since the new counties were attached, but when there is an election the qualified voters of said new counties will of course participate.

The Constitution, moreover, does not provide that the election shall be by the qualified voters of the respective counties, but by the qualified voters of the district or circuit. By § 5708 Shannon's Code, "the Judges and Chancellors are Judges and Chancellors for the State at large," etc. The construction now sought to be placed upon this section of the Constitution would revolutionize and destroy our whole system. The Legislature has, from time to time, changed judicial circuits by adding and detaching counties, and its power to do so has never been challenged. *State* v. *McConnell*, 3 Lea, 332; *State* v. *Algood*, 87 Tenn., 163. If the Legislature has the power to abolish circuits, which we think is no longer open to question in this State, it must follow that it can reassign its parts. Construing a similar provision of its Constitution, the Supreme Court of Kansas, in *Aikman* v. *Edwards*, 30 L. R. A., 153, said, viz.: "The most substantial objection that can be urged against such a transfer as is made by this Act is that the people are placed in a district under a Judge in whose selection they have had no voice, and who might not have been chosen if all the people in the enlarged district had been permitted to vote at the time of his election. The reasons apply against the transfer of one county with just the same force as against the transfer of

all the counties included within a district. Acts of the Legislature transferring a county from one district to another have very frequently been passed during the history of the State, and their validity has never been questioned. It has never been contended, so far as we are aware, that the Legislature is without power to change the boundaries of judicial districts by deducting counties from one and adding them to another, nor has it been doubted that the Legislature might do this during the continuance in office of any Judge.''

In our opinion the power to detach counties from one circuit and add them to another is clearly within the constitutional grant of authority conferred upon the Legislature to ordain and establish from time to time Circuit, Chancery, and other inferior Courts, and it is not a valid objection to the exercise of the power that it may result in placing the people of the county so transferred temporarily under the jurisdiction of a Judge in whose election they have had no voice.

Affirmed.

Judges Caldwell and Wilkes concur. Chief Justice Snodgrass and Beard dissent.

--------

### JUDGE WILKES' OPINION.

WILKES, J. The questions involved in these cases having been fully stated, I proceed at once to their consideration and decision.

The question underlying both is the extent and authority of the power of the Legislature, in view of the provisions of our Constitution. That instrument, Section 3, Article XI., declares, "The legislative authority of this State shall be vested in a General Assembly." It nowhere attempts, in general terms, to limit this power and authority, and it is a well-settled rule of construction that a Legislature, in its sphere of legislative action, has unlimited power, except so far as restrained by the Constitution of the State or the United States. It does not derive its power from the Constitution, but has all power not expressly withheld from it by the Constitution so far as the legitimate sphere of its action extends. While, under our form of government, Congress has only such power as is conferred upon it by the Constitution of the United States, a State Legislature has all and every power not expressly withheld from it by the organic law of the State or Union that properly pertains to a legislative body. *Henley* v. *State*, 98 Tenn., 665 and cases cited; 6 Am. & Eng. Enc. L. (2d Ed.), 933.

The ordaining and creating of Courts and their abolition, and the removal of Judges from their offices, can neither be said to be strictly a legislative function, and hence we may upon these matters look to the constitutional provisions, and they must, so far as they extend, form a guide for legislative action and a check upon legislative power.

It is another familiar rule that no Act of the

General Assembly can be annulled and set aside by the Courts, unless it contravenes and conflicts with some provision of the Constitution, and whenever the validity of any Act is assailed, the specific provision of the Constitution which it expressly, or by unavoidable implication, violates, must be pointed out. *Henley* v. *State*, 98 Tenn., 665.

An Act cannot be annulled because, in the opinion of the Court, it violates the best public policy, or does violence to some natural equity, or interferes with the inherent rights of freemen, nor upon the idea that it is opposed to some spirit of the Constitution not expressed in its words, nor because it is contrary to the genius of a free people, and hence the wisdom, policy, and desirability of such Acts are matters addressed to the General Assembly, and must rest upon the intelligence, patriotism, and wisdom of that body and not upon the judgment of this Court. The only question for this Court is, Does the Act or resolution violate any provision of the Constitution, expressly or by necessary implication? *Henley* v. *State*, 98 Tenn., 665; 6 Am. & Eng. Enc. L. (2d Ed.), 923.

The provisions of the Constitution which relate to the judicial department are as follows: "The judicial power of this State shall be vested in one Supreme Court, and in such Circuit, Chancery, and other inferior Courts as the Legislature shall, from time to time, ordain and establish, in the Judges thereof and in the Justices of the Peace." Consti-

tution, Art. VI., Sec. 1. It is further provided in Sections 4 and 7, in substance, that the Judges of the inferior Courts shall be elected by the qualified voters of the district or circuit to which they are to be assigned; that their term of office shall be eight years; that to be eligible they must have been residents of the State for five years and of the circuit or district one year; that they shall at stated times receive a fixed compensation for their services, to be ascertained by law, and which shall not be increased or diminished during the time for which they are elected.

It is urged with much force that the proper construction and unavoidable implication arising out of these provisions, when considered together, as they must be, is, that the people of any particular county, circuit, or district are entitled to have over them Judges of their own selection, and not others in whose election they have had no voice; that these Judges must be residents, when elected, of the particular circuits and districts over which they preside; that such Judges shall have a tenure of office of eight years and a fixed compensation during that time, to be paid at stated intervals, and which shall not be lessened or increased during the term. It is insisted this latter feature is essential to the independence and integrity of the judicial department, and hence any law abolishing a Court, thereby bringing the people who had been subject to its jurisdiction under a different Court and Judge, or any

act or resolution which removes a Judge from office, and thus deprives him of his compensation for the term for which he was elected, and deprives the people who had elected him of his services, is contrary to these provisions by necessary and unavoidable implication.

All of these questions do not arise in the case of the defendant, Lee Thornton, since he was, when he was removed and his Court abolished, holding under an executive appointment, and not under an election, and the business of his Court was simply transferred to another Chancellor, elected by the same people and having a local jurisdiction the same in extent and otherwise, but it is not insisted that there is any difference between an appointed Judge and one elected, and the whole question of the abolition of Courts and removal of Judges, under various acts passed at the last session of the General Assembly, has been argued before us and treated as involved.

It is evident that, under our judicial system, Judges and Chancellors, no matter where elected, nor by whom, are officers for the State at large, and not merely for their own circuits or divisions. The statute (Shannon, § 5707) says: "Each Judge or Chancellor is required to reside in the judicial district or division for which he is elected, and a removal therefrom shall create a vacancy in the office."

By § 5708 it is provided: "The Judges and Chancellors are, however, Judges and Chancellors for the State at large, and, as such, may, upon inter-

change and upon other lawful grounds, exercise the duties of office in any other judicial circuit or division of the State.''

Accordingly, under both the Constitution of 1837 and that of 1870, the Legislature has, from time to time, repeatedly transferred counties from one circuit or division to another having a different Judge not elected by the people of the county transferred. It has also consolidated Courts, and abolished them, and transferred causes to other Courts, as it deemed for the public interest. A few instances, by way of illustration, will suffice to show the extent of the power claimed and exercised by the Legislature.

In 1865 the counties of the Fourteenth Judicial Circuit were distributed to the Eleventh, Twelfth, and Fifteenth, and the Fourteenth Judicial Circuit was abolished.

In 1867 (Ch. 25, Sec. 4) the Circuit and Chancery Courts of Overton were consolidated, and the process of the Chancery Court was made returnable on the Circuit Court days.

The Common Law and Chancery Courts of Memphis was separated by the Act of 1866 (Ch. 32) into two Courts, and a new Judge made.

On December 4, 1869, by Ch. 28, Sec. 2, ''the present Circuit Court of Shelby County, the Law Court of Memphis, the Municipal Court of Memphis, the Chancery Court of Memphis, and the Criminal Court of Memphis were abolished,'' and by Section 3 six new Courts were established. This

was just before the Convention of 1870, which met on January 10, 1870.

December 3, 1869, the Seventeenth Circuit was abolished (Ch. 25, Sec. 1).

County Judge's office was abolished in Sumner Shelby, Giles, Lincoln, Smith, Weakley, Wilson, and Van Buren Counties, in October and November, 1869; in Anderson, November 1; in Cheatham, November 27.

Session of 1870, office of County Judge of Knox County was abolished. Removal of county seat of Hamilton and merger of Courts provided June, 1870. Office of County Judge of Lauderdale abolished.

On June 24 and June 28, 1870, the circuit and chancery districts were organized by the Legislature, and fifteen circuits were made, where before there were seventeen and twelve chancery districts.

Chancery Court of Madisonville abolished January 26, 1871.

Quorum Court of Carroll and DeKalb abolished.

These citations are taken from a brief upon the subject, prepared by Hon. J. B. Heiskell, formerly Attorney-general of the State, a member of the Constitutional Convention of 1870, and Chairman of its Judiciary Committee. We have not been accessible to the Acts to verify the citations. Cases in which this power of adding counties to, or detaching them from, existing circuits or divisions was involved, have passed in review before this Court, and the

validity of the Acts involved questioned on other grounds, but this power appears to have been concede *State* v. *McConnell*, 3 Lea, 332; *State* v. *Algood*, 3 Pickle, 163.

In the great majority of cases of this character no question of the power of the Legislature has ever been made. However, in the case of *State* v. *Campbell*, decided at Jackson in 1875, the constitutionality of the Act of March 15, 1875, was drawn into question, and was ably and clearly contested. The object of that Act was to abolish the Second Circuit Court and the Second Chancery Court of Shelby County. It required the records and papers of the two Courts to be transferred to the First Circuit and First Chancery Courts of Shelby County, respectively, and provided for the hearing in these Courts of causes pending in the abolished Courts, and repealed the Act of December 4, 1869, under which the Courts of Shelby County were organized and the Second Circuit and Second Chancery Courts established. The suit was an action by the clerk of the surviving Court to compel the clerk of the abolished Court to deliver to him the records and papers of the abolished Court. The opinion was delivered by Chief Justice Nicholson, who had been one of the most prominent members of the Constitutional Convention of 1870, and within five years after the framing of that instrument, which is still the organic law, and when the proceedings and deliberations of that body were fresh in his mind.

He stated the questions involved in the case in this language: ''The question is whether the Legislature has the power, under the Constitution, to abolish these two Courts and to transfer the causes therein pending to be heard and determined in the other two Courts of Shelby County to which they were transferred. If the Legislature had the power to enact the law, it must be either because the ordaining and establishing of Courts is a legitimate legislative power, necessarily involving the power to abolish, as well as to ordain and establish, and that the Constitution has placed no restriction upon the exercise of this power inconsistent with the action of the Legislature in the present case, or because the Constitution, either expressly or by necessary implication, has vested in the Legislature the power to ordain and establish Courts, and that this power carries with it the power of abolishing existing Courts. It is maintained by the Attorney-general and counsel for the State that the Act in question is constitutional and valid on both of these grounds, while the counsel for the relators insist that the two Courts abolished by the Act were so guarded and protected by the Constitution that, in the exercise of its power to ordain and establish Courts, these two Courts could not be abolished.

The Court proceeds to discuss the questions involved in a manner at once exhaustive and able, and arrives at a conclusion that the Acts were valid and constitutional. We cannot hope to add anything

to the force and reasoning of the opinion in this
case. With one immaterial difference, the case pre-
sents every question that could arise in the consid-
eration of the present Acts, which attempt to abolish
Circuit, Chancery, and special Courts, and it is well
worthy the perusal of every lawyer and other per-
son interested in the important question involved.
The case is now for the first time reported in 3d
Tennessee Cases, pages 355 to 368, and we will not
mar its force and symmetry of reasoning by attempt-
ing to make extracts from it, and it is too lengthy
to be copied in full. We can add nothing to it,
and we do not feel disposed, for reasons hereafter
stated, to take anything from it. An able dissent-
ing opinion was filed by Mr. Justice Freeman,
which is also worthy of perusal and closest atten-
tion.

In the case of *Halsey* v. *Gaines*, 2 Lea, 316,
the question came up the second time before this
Court. In that case the Judge of the abolished,
Court sought to compel the State Comptroller to
issue warrants for his salary after his Court was
abolished, and again the sole question considered
was the constitutionality and effect of the abolishing
Act. The Court was divided as in the Campbell
case, Justice McFarland delivering the opinion of the
majority, and after a very painstaking and careful
consideration of the whole question, again sus-
tained the constitutionality and validity of the Acts.
There was also an exhaustive dissent by the same

Judge (Freeman) who dissented in the Campbell case. These judicial interpretations, in addition to the fact that they are able and learned and by Judges who are equal to any who have ever adorned the bench of Tennessee, have the added force of holdings almost contemporaneous with the promulgation of the Constitution itself, and by men some of whom were members of the Convention. Such contemporaneous construction, judicial and legislative, is entitled to great weight. 6 Am. & Eng. Enc. L. (2d Ed.), 931, 932.

It is said the case of *The State, ex rel.,* v. *Leonard,* 86 Tenn., is not in accord with these rulings. The opinion in that case cites the former opinions, and states that it differs with their reasoning in some respects, but also disclaims any intention to overrule them. The question involved in that case was not identical with that involved in the former cases nor in this case. The Act of March 14, 1887, then brought into question, undertook to abolish the office of County Judge of Marshall County, and to transfer his powers, duties, and jurisdiction, without diminution or change, to the Chairman of the County Court to be elected by that body, and the Act was held to be invalid and unconstitutional. It was also held in that case that a County Judge elected under a valid law was entitled to hold his office for the constitutional term of eight years, although the statute creating the office may have prescribed a shorter term of four years. The

case was differentiated from the former cases in the able opinion of the present Chief Justice, Snodgrass, in the following language:

"It is sufficient to say that the case here presents no such question as that determined there. The Act of 1875 construed [in the Halsey case] had abolished the [Memphis] Court. It did not leave the Court with all its powers, jurisdiction, rights, and privileges intact, and devolve them upon another, as in this case.

"Here the Court was left as it existed, except the change made in its official head. He was simply removed by operation of the Act, if it could take effect according to its terms, and another put in his place."

The Leonard case appplies only to a County Judge, where only one can exist in a county, and where his functions and duties cannot be devolved upon another, and is different from cases involving Circuit, Chancery or other judicial officers who preside over a system of courts common to the whole State. In the former class of cases the jurisdiction and business of the abolished court must necessarily go to a Judge created especially by the Legislature to receive them. In the latter class Judges are Judges for the State at large, and the transfer is not of jurisdiction but of business; not to a Judge specially created, but to a Judge already elected by the people and clothed with authority and jurisdiction to act.

These cases we consider to be conclusive upon the right of the Legislature to abolish or change judicial circuits or districts, or special courts, and so far as this feature of the controversy is concerned, the case might be left to rest upon their authority. It was in view and consequence of this holding of the Court that the General Assembly framed its legislation when in its wisdom it saw proper to reorganize the judiciary and dispense with what it deemed unnecessary offices and officers. These holdings and constructions given by the Court to constitutional provisions, which have been made the basis and foundation for legislative action, should not be departed from, even though, if the matter were *res integra*, this Court or members of it should be disposed to entertain contrary or modified views of the subject. We know, as a part of our history, that this action by the Legislature was not only based upon this holding by the Courts, but was in obedience to a public demand which had been impressed upon the members when elected. But examining the question without regard to these adjudications, we find, as we think, a safe guide to the interpretation of these constitutional provisions, arising out of the proceedings of the Convention which framed the Constitution. It is evident from the provisions of the Constitution that but few limitations were intended to be placed upon the power of the Legislature to create, establish, and change inferior Courts. Limiting safeguards were placed

18 P—36

around the Supreme Court, to protect it both from legislative and executive control, which were not placed around the inferior Courts. It was provided there should be but one Supreme Court, so that its powers and prerogatives could not be lessened by being divided; the number of Judges was fixed, so that it could neither be increased nor diminished; the places of holding its Courts were fixed, so that they could not be changed. None of these limitations were thrown around the inferior Courts. The number of Courts, the number of Judges, and the places of holding these Courts was left to be determined by the Legislature. Why this distinction between the supreme and inferior Courts was made we need not now stop to consider. It was not ·done, as we know, without an effort to place restrictions also upon the Supreme Court, and to put ·it likewise within the control of the Legislature. It appears that a resolution was submitted by Hon. John M. Taylor, a delegate to the Convention of 1870, and one of the officials now concerned in these proceedings, providing that the Supreme Court should consist of a Chief Justice and four associate justices, and that the number of associate justices might be increased or decreased by law, but should never be less than two. Journal of the Convention, page 59. This resolution was referred to the Judiciary Committee, but never became a part of the Constitution, and the Convention refused to

put the Supreme Court to this extent under the control of the Legislature.

The Convention did see proper to restrict the Legislature in the enactment of certain other statutes, such as retrospective laws, laws impairing the obligation of contracts, laws increasing or diminishing certain official salaries, but it did not place any restriction upon the enactment of statutes similar to those under consideration so far as they relate to inferior Courts and Judges. An effort, however, was made to do this. Hon. Henry R. Gibson, a member of the Convention, offered the following as an independent section: "The Legislature shall, from time to time, by a general law, divide the State into judicial circuits and chancery districts or divisions, so that the number of circuits shall not exceed one for every sixty thousand inhabitants, and the number of chancery districts or divisions shall not exceed one for every seventy-five thousand inhabitants; *Provided*, That territory and population shall be so equalized as to equalize the labors of the several Judges and the several Chancellors as nearly as possible. And no circuit, district or division shall be created otherwise than by a general law recircuiting or redistricting the entire State." Journal, 237. This was defeated, and the Convention refused to make it a part of the Constitution. While thus refusing to relax any of the restrictions upon legislative power over the Supreme Court imposed by the Constitution of 1834, as evidenced by

the rejection of the Taylor resolution, the Convention refused to impose any restrictions upon legislative power over the inferior Courts, except simply to preserve a system of Circuit and Chancery Courts, as evidenced by the rejection of the Gibson resolution.

It is insisted there is a difference between the abolition of a Circuit Court and the removal of the Circuit Judge, as in the case of Judge Taylor, and the abolition of one of two Courts in the same territory and the removal of one of the Judges, leaving another with the same local jurisdiction, as in the case of Judge Thornton; and the Campbell case and the Halsey case are referred to as belonging to the latter class and standing upon the same footing as the Thornton case. This argument proceeds upon the idea that in the abolition of a Circuit Court and removal of a Circuit Judge the people within that local jurisdiction are necessarily compelled to pass under a Judge in whose election they never had a voice, while in the cases such as Campbell's, Halsey's, and Thornton's there remains a Judge elected by the people and a Court with the same power and jurisdiction, local and otherwise, which pertains to the one abolished, and so the people are not required to pass under a Judge whom they did not aid in electing, but still have a Judge selected by themselves. We think this argument specious, for several reasons. In the first place, if the people of any particular locality have

elected two Judges to preside over them, upon the reasoning assumed they are entitled to both, and, in having their controversies determined, to a choice between the two, and neither can be abolished or removed. In the next place all Judges and Chancellors have jurisdiction co-extensive with the limits of the State, and, while they are expected to preside where they were elected, they can preside elsewhere. Again, whenever a new circuit or Court is established, the office is filled by appointment of the Governor until the next election, and not by a vote of the people until that time, and, while this may be in consequence of a special constitutional provision, it is in accord with the whole theory and system of our judicial department. We may grant that, as a general provision, it is intended the people shall elect their own Judges; still in exigencies, when it becomes necessary, Judges may be appointed until an election can be had, and this is virtually what is done in cases when a Circuit Court is abolished and a Circuit Judge removed, and the citizens of that locality transferred temporarily to other Courts and Judges.

The decisions of other States are conflicting upon the questions here involved. Perhaps a few of the State Constitutions do not contain the removal clause. It is not to be found in the Federal Constitution. There are leading and important cases reported in Pennsylvania, Indiana, Illinois, and Wisconsin that

support the contention of the Judges. There are others in Kansas, Iowa, and Arkansas that sustain the views herein expressed.

The case of *Aikman* v. *Edwards*, decided in 1895 by the Supreme Court of Kansas, considers the question more elaborately than any other, and may be found in 30 L. R. A., pages 149 to 155. By an examination of the opinion of the Court and the briefs of counsel, it will be seen that all the questions raised in this case were then forcibly presented, elaborately argued and maturely considered in the light of constitutional provisions very similar to our own. It was there urged that Judges were constitutional officers, and had a vested right in their offices; that their terms were fixed by the Constitution, and could not be abridged or destroyed; that it was the intention of the Constitution that they should not be disturbed in their offices for any cause except malfeasance in office; that taking away the territory of the officer in effect took away the office, and that the exercise of power of removal would destroy the independence of the judiciary. On the other hand, it was insisted for the State that the Constitution did not, directly or indirectly, prohibit such action by the Legislature as the abolition of Courts, and, such being the case, that body had the power to do so, and the passage of the Act was conclusive upon the Courts of the wisdom and necessity of the Act, and the fact that thereby the terms of judicial office were lessened would not

render the Act unconstitutional. A large number of authorities from different States were cited and relied on, and considered and commented on by the Court. The provisions of the Constitution of Kansas are set out, and upon the features of abolishing Courts and removing Judges are very similar to those in the Constitution of Tennessee. The opinion is too long and elaborate to be copied, but it is worthy of perusal. It antagonizes the cases of *Com.* v. *Gamble*, 62 Pa., 343 (1 Am. Repts., 422); *State* v. *Friedly*, 135 Ind., 119 (21 L. R. A., 634); *People* v. *Dubois*, 23 Ill., 547, and *State* v. *Messman*, 14 Wis., 177. The condition of affairs which caused the abolition of the Courts in Kansas was quite similar to that existing in Tennessee. By previous legislation judicial districts had been created which were found to be unnecessary and the salaries necessary to support them burdensome, and the people demanded the abolition of useless offices, and the Acts were passed abolishing the Courts in recognition of this public demand. It will be noted, however, that the matter was in that case placed before the Court under somewhat different circumstances from those presented in this case, and it is not directly in point. The case did not involve the removal of an officer from office by the abolition of his office, but presented the question of the right of the relator to become a candidate to fill the office which the Legislature had abolished. The Act itself provided that it should not be construed as to de-

prive any Judge of his salary.   The contention, as
broadly made, was that the Legislature could not
abolish the circuit which it had established, and,
this being so, the office of Judge still existed, and
the relator had a right to become a candidate for
it, and the Court very properly said that the re-
lator did not claim any vested right in the office,
and that the question of the right of the Legisla-
ture to deprive a district Judge of the compensa-
tion allowed by law was not involved; and the
Court declined to discuss the question whether there
could be a Judge without a district or Court over
which to preside, and the question was not involved.

   The leading and strongest case holding a view
contrary to this is that of the *State of Indiana* v.
*Friedly*, which may be found in 21 L. R. A., 634,
in which the question was fully presented, elabo-
rately argued, and maturely considered and decided
by the Supreme Court of Indiana in view of the
provisions of the Constitution of that State.   The
real points decided in that case were that a Judge
whose term of office is fixed by the Constitution
cannot be deprived of his office or of the exercise
of its duties before the expiration of his term, by a
statute attempting to abolish the judicial district
to which he was elected.   The removal of a
Judge under a constitutional provision was not in-
volved.   This case is also well worthy of pe-
rusal, and presents the question of the abolition
of Courts, and offices in consequence, strongly

in favor of defendant's contention. There are numerous other authorities cited in these cases and elsewhere, but we need not quote them here. 19 Am. & Eng. Enc. L., 562; 6 Am. & Eng. Enc. L., 2d Ed., 1047.

We are cited by defendant's counsel to a number of cases in our own reports in support of their contention, and to them we make a brief reference, with the general statement that none of them are applicable to the present case. With three exceptions they were cases decided prior to the cases of Campbell, Halsey and Leonard, and yet were not cited by the Court in those cases, nor, so far as we can learn, relied on by counsel. We cannot presume they were overlooked.

The first case is that of *Norment* v. *Smith*, 5 Yer., 270, in which it was held that the Act of 1827, Ch. 37, authorizing the Governor to appoint a special Judge in case of sickness or bodily infirmity of a Circuit Judge, was unconstitutional and void under the Constitution of 1796. This was remedied by the Constitutions of 1834 and 1870 by express provisions, and the case itself has been seriously questioned, if not overruled, by the case of *Venable* v. *Curd*, 2 Head, 586, and was only a majority opinion in the first instance. So far as this case touches the real question at issue in the present one, it is antagonistic to the views of the defendant, as it illustrates the greater power vested in the Legislature over the judiciary by the Constitutions of 1834

and 1870, when compared with that of 1796, and it serves also to show that the disastrous results foreshadowed in the views of Chief Justice Catron as liable to happen, if the power of appointing a special Judge was conceded, have proved to be entirely baseless by our subsequent judicial history.

The case of *Brewer* v. *Davis*, 9 Hum., 208, is one affecting the tenure of office of the Clerks of inferior Courts, who under the Constitution are given a term of four years. It was held *arguendo*, but no doubt correctly, that the term could not be changed by the Legislature so as to eject one incumbent and install another during that time. This is in accord with all the cases, but is not applicable to the case at bar.

. The case of *Keys* v. *Mason*, 3 Sneed, 7, is a case under the Constitution of 1834, which fixed the term of office of Justices of the Peace at six years, and it was held that a Justice elected to fill a vacancy was entitled to hold the full term of six years, not merely for the unexpired term of his predecessor. This provision in regard to filling vacancies was changed by the Constitution of 1870, and furnishes another illustration of the trend of constitutional and legislative action to provide for a shorter term of office under certain conditions, though the term, in the absence of such conditions, remained as before. It is well to note in this connection that neither of our Constitutions made Justices of the Peace impeachable or liable to removal by reso-

lution of the Legislature, as was provided in case of
Judges.

*Pope* v. *Phifer*, 3 Heis., 682, simply holds that
the County Court is one of the judicial institutions
of the State recognized by the Constitution, and
that its functions cannot be taken away from it and
devolved upon another body.

The case of *State* v. *McKee*, 8 Lea, 24, is to the
effect that while a Judge of the County Court is a
constitutional officer so far as pertains to his judi-
cial functions, he is also general agent and account-
ing officer of the county, and may receive extra com-
pensation for services in that capacity.

The case of *Cross & Mercer ex parte*, 16 Lea, 486,
holds that the Legislature has no power to abridge the
term of office of a Justice of the Peace to a period
less than that fixed by the Constitution of six years.
The case is distinguished from the Campbell and
Halsey cases by the same Judge (Freeman), who
dissented in those cases, and shown to be not a
parallel case, and this is so obviously apparent
that we will not discuss it.

The case of *State* v. *Cummings*, 15 Lea, 667,
holds that the Legislature cannot deprive the
Sheriff, who is a constitutional officer, of a sub-
stantial part of his powers and functions. The
office of sheriff is one *sui generis*. It is provided
for by the Constitution, but the duties of the
office are not defined. There can be only one
in any county, and no other officer in the county

has the same functions and powers. The same is true of the County Judge as in the Leonard case, and the County Register, as in the case of *Powers* v. *Hurst*, 2 Hum., 24. They are all officers recognized by the Constitution, and there is no other officer upon whom the same functions and powers are devolved, and the Legislature can create no other. There is no provision for ordaining and establishing a number of these offices. In many respects they stand upon a footing similar to that of Supreme Judges. There can be but one Supreme Court for the State, one County Judge, one Sheriff, and one Trustee and Register for a county, and the Legislature has no power to create more, nor can their powers, duties, and functions be taken from them and devolved upon others. Upon this proposition alone the Leonard case is abundantly supported.

There are cases cited from other States, notably *Com.* v. *Gamble* (Pa.), 1 Am. Rep., 422; *Fant* v. *Gibbs*, 54 Miss., 396; *Hoke* v. *Henderson*, 25 Am. Dec., 675 *et seq.*, but this Court, in the Halsey case, refused to follow them.

It is said upon the one hand that the power to create and establish Courts and Judges carries with it the power to abolish and regulate, and, on the other hand, it is said the Constitution does not give the power of removal. If the latter contention be correct, it follows that once a Court always a Court, once a judgeship always a judgeship, and the logi-

cal result would be that when a Court or judicial circuit is once established it could never be changed or abolished. No one takes this extreme view, but it is conceded that the Legislature has the power to change and abolish, provided the tenure of the Judge is not interfered with, and the people are not transferred to a district or circuit presided over by a Judge whom they have had no voice in electing.

It cannot be insisted that there is any express prohibition against abolishing a Court, except at such time as the term of office of its Judge expires, but the strength of defendant's contention is based upon that provision of the Constitution which gives to Judges a term of office of eight years and a stated salary. And it is argued that this term cannot be abridged, nor the officer removed, nor the Court abolished, so as to affect the right of the Judge to discharge its duties and receive compensation for the constitutional term. The eight-year term of office is thus made the constitutional limitation upon the power to abolish the Courts. It must be evident that the provision that the term of service shall be eight years is not unconditional and absolute. On the contrary, it is subject to many contingencies and conditions. For instance, the term is not eight years if the incumbent dies or is impeached, or becomes incompetent by removal from the district or State, or if he shall be convicted and sentenced for felony, or shall be removed by the adoption of a new Constitution. If the term of office can be

abridged by these means, why may it not be by the abolition of the office or by removal of the incumbent by the General Assembly? The implication is as strong against any abridgment of the term in the one case as in the other. It has never been held in this State that an official holds his office by virtue of any contract which is protected by constitutional provision. Even in jurisdictions where this doctrine most strongly prevails, it is said that offices are only subjects of property so far as they can be so treated in safety to the general interests involved in the discharge of their duties. And as is the creation, so is the continuance of the office a question of sound discretion in the Legislature, of which the Court cannot question the exercise. When the office ceases to be required for the benefit of the people, it may be abolished. There is no obligation on the Legislature or the people to keep up a useless office or pay an officer who is not needed. He takes the office with the tacit understanding that the existence of the office depends on the public necessity for it, and that the Legislature is to judge of that. *Hoke* v. *Henderson*, 25 Am. Dec., 677, a North Carolina decision by Ruffin, Chief Justice.

The doctrine, tersely stated, is, that the rights of the individual must give way to the rights of the public, and the tenure of office is controlled by the general welfare and the interests of the public, and they must control the term of office instead of being controlled by it, and this is the holding of our cases.

Much that has been said in regard to the abolition of Courts is directly applicable also to the resolutions of removal. The "causes" of removal, as set out in the resolutions and other proceedings relating thereto—and they are all substantially the same—are that the public business will not justify the retention in office of the Judges involved; that the public welfare requires a redistricting of judicial circuits and chancery divisions; that a reduction in the number of inferior Judges and compensation to be paid them is demanded in the interest of public economy, and that the Courts over which they have presided have been abolished as unnecessary. It will be noted that there is no charge of incompetency or dereliction of duty or want of fidelity in the discharge of his duties ascribed to any Judge or attorney who is removed; but, on the contrary, the resolutions testify to and emphasize the eminent ability, fidelity, purity, and faithfulness of the officials in private and official life.

The constitutional provision under which this removal is effected was in this language, to wit: "Judges and attorneys for the State may be removed from office by a concurrent vote of both houses of the General Assembly, each house voting separately; but two-thirds of the members to which each house may be entitled must coincide in such vote.

"The vote shall be determined by ayes and noes, and the names of the members voting for or

against the Judge or attorney for the State, together with the cause or causes of removal, shall be entered on the Journal of each house, respectively.

"The Judge or attorney for the State against whom the Legislature may be about to proceed, shall receive notice thereof, accompanied with a copy of the causes alleged for his removal, at least ten days before the day on which either house of the General Assembly shall act thereon." Const., Art. VI., Sec. 6.

It is conceded that the Legislature has the power to remove Judges and attorneys for the State under this provision, but it is insisted that the true interpretation of the word "causes" is that such removal can be had only for reasons personal to the official, and does not embrace reasons and grounds of public economy and public policy. I insist that no such narrow or limited construction can be given to the term "causes" as used. A provision similar to this one contained in our Constitution is found in that of a majority of the States of the Union. It exists in Alabama, Arkansas, Colorado, Connecticut, Delaware, Georgia, Florida, Illinois, Kansas, Kentucky, Louisiana, Michigan, Maryland, Mississippi, Minnesota, Missouri, New York, New Hampshire, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Vermont, Virginia, West Virginia, and Wisconsin.

In different States the power of removal is vested in different tribunals and to be pursued in different

modes—sometimes by the Governor, sometimes by the General Assembly, and in other States by the Supreme Court. The modes prescribed are substantially the same. Some of the State Constitutions specify, either in general or special terms, the grounds upon which removals may be made. In Delaware, Kentucky, Nevada, and Louisiana removal may be for any reasonable cause; in Alabama, South Carolina, Michigan, Mississippi, Pennsylvania, and Texas it may be for any willful neglect of duty or any other reasonable cause which shall not be sufficient ground for impeachment; in Georgia and Rhode Island by impeachment or upon conviction of any crime; in Indiana for corruption or for any high crime; in Oregon for malfeasance, misfeasance, or willful neglect of duty; in West Virginia upon conviction of willful neglect of duty or misbehavior in office, or any other crime; in Maryland on impeachment; in Ohio upon complaint; in Illinois, Missouri, New York, Tennessee, Virginia, and Wisconsin for "cause," without any limitation or definition of that term. The language of our Constitution enumerates no causes of removal, not even by general classification. It gives no hint of the nature of the causes for which removal may be had. The power of removal, as therein declared, is broad, general, and unrestricted. The tribunal to which the power belongs, inherently and by declaration, is one of general powers, unlimited except by Constitution.

The term "cause or causes" signifies nothing as
18 P—37

regards the nature of the grounds for removal. The language indicates that the whole matter was left to legislative discretion, and that any cause dictated by the public interests is sufficient. The history of this clause, and its predecessors, is instructive and conclusive of this view.

In England the proceeding was known as removal by address, and consisted of an address of both houses of Parliament to the sovereign for removal of a Judge. When it was sought to provide for removal by address in framing the Constitution of the United States, the proposition was bitterly antagonized, and received in the Convention the vote of only one State, to wit: New Jersey. 3 Story on Const., 484.

No removal clause is found in our Constitution of 1796, probably by reason of antagonisms excited by the then recent debates in the convention that framed the Federal Constitution. The clause is found in the Constitutions of 1834 and 1870 in practically the same language. The first time was but a short while after the fearful struggle in Kentucky over a similar provision. It was antagonized in both conventions, and has passed twice through the fire of discussion. The proceedings of these conventions, in relation to this clause, as preserved in the journals, leave no doubt that it was intended the Legislature might. remove for any cause whatever that might be deemed for the public good.

In the Convention of 1834 the following occurred:

Mr. Huntsman offered to amend the clause by adding: "And the Judge shall be served with a copy of charges to be exhibited against them at least twenty days before the General Assembly shall act upon his removal."

In lieu of which Mr. Humphreys offered the following: "Judges for any reasonable cause, which may not be sufficient for an impeachment, may be removed from office," etc.

Mr. Huntsman accepted this amendment, which was rejected by a vote of 33 to 23.

The proposition confining the clause to "infamous and corrupt conduct," and requiring a trial, was rejected.

These proceedings are significant.

The Convention of 1870 witnessed another and more doubtful struggle over this clause. It was reported, without material change, from the corresponding clause in the Constitution of 1834. When it came up for adoption, Mr. Gibson offered the following amendment, seeking to define and limit the legislative power of removal to the causes named therein: "Insert between the words 'office' and 'by,' in the first line, the words 'for crime, corruption, habitual drunkenness, incompetency, or neglect of duty.'"

Mr. Fentress offered in lieu the following: "Insert after the word 'State,' first line, the words 'for official corruption, or for continued neglect of

duty, or continued incapacity of any kind to per-
form the duties of his office.'"

A motion to lay both amendments on the table
failed.

Mr. Turner offered the following amendment:
"*Provided*, The causes of removal are such as are
prescribed by a general law of the land, passed by
a Legislature prior to the one taking action there-
on." Journal, 225.

Mr. Cobb then offered, in lieu of the entire
clause as adopted, the following: "If any cause of
removal assigned amounts to a charge of infamous
or corrupt conduct, then a Judge shall be tried by
impeachment, or the Attorney-general by impeach-
ment or indictment; or if guilt has been ascertained
by previous indictment for a crime not committed
in office, then they may be removed, as aforesaid,
without further trial, and, in either case, the Judge
or Attorney-general shall be suspended from office
from the time of impeachment or indictment filed
until the end of the trial." This was likewise re-
jected. Journal, 229. The clause resisted a mo-
tion to strike out by a vote of 42 to 14.

These proceedings show a determined purpose to
limit, and an equally determined purpose not to re-
strict, the legislative discretion as to causes of
removal. The proposition naming the grounds for
removal as "charges to be exhibited," was too
strong. The weaker term, "causes," was adopted.
The proposition naming the grounds, as "for any

reasonable cause which may not be sufficient for impeachment," was too restrictive, and was rejected.

Some confusion appears in the journal as to the voting upon the several amendments, but the final result was the rejection of all amendments and the adoption of the clause as reported by the committee, without change. Journal, 227–230.

It is significant that the Convention, after a struggle between forces nearly equally divided, refused in any way to define the causes for removal. Three propositions for this purpose were submitted and rejected. The first two covered a very broad field, and yet did not meet the views of the majority. The third was a proposition that the Legislature should, by law, define the causes. But the majority would not submit to even this limitation of the clause. The minority wanted the legislative power defined and limited, but failed. The majority wanted it left without limitation, and succeeded.

Art. V. of the Constitution deals with impeachment. Art. VI., in which is found the clause under consideration, deals with the judicial department. Both articles were reported in the Convention of 1870 by the same committee, to wit: the Committee on the Judicial Department, and at the same time. Among the distinguished lawyers on the committee were A. O. P. Nicholson, John Baxter, W. B. Staley, and J. B. Heiskell, the latter its chairman. Journal, 42.

In Art. V. it was provided that all Judges and

Attorneys for the State should be "liable to impeachment whenever they may, in the opinion of the House of Representatives, commit any crime in their official capacity which may require disqualification." Art. V., Sec. 4. A trial and mode of procedure are provided for in this article. The House prefers the articles of impeachment and prosecutes them by its members. The Senate, presided over by the Chief Justice, is the tribunal for trial. The trial is had after the adjournment of the Legislature *sine die.* Concurrence of two-thirds of the Senators, sworn to try the officer impeached, was required for conviction. The judgment, upon conviction, was removal from office and disqualification thereafter to hold office. In view of these proceedings and the provisions of the Constitution relating to impeachments, what scope and operation did the Convention intend the removal clause to have? It is conceded that it was intended to apply when the cause of removal was personal to the Judge, and it is insisted that it goes no further. In other words, a Judge who has become physically or mentally unable to discharge the duties of his office may be removed, but one who is able to work cannot be, even though there is nothing for him to do. I cannot consent to such construction, and, I ask, what warrant is there in the language of the Constitution for such construction as leads to the result that a Judge who, by misfortune or overwork, has become unable to serve can be removed for these reasons,

and one who has become useless for want of work to do cannot be? The rejection of the amendments offered by Mr. Gibson and Mr. Fentress expressly negative the idea that the causes of removal should be limited to grounds personal to the official. These debates and proceedings in the Convention to which we may look (2d Ed., Am. & Eng. Enc. L., Vol. 6, 930), discloses the fact that, while a persistent effort was made to define and limit the causes of removal, the Convention steadfastly refused to do so, but left it to the discretion, wisdom, and patriotism of each General Assembly, not allowing it to prescribe in advance what should constitute cause. But the official to be removed was hedged around by extraordinary safeguards and protection. It requires more unanimity on the part of the Legislature to remove than it does to impeach. Both houses in removal cases must vote and vote separately. In impeachment cases the Senate alone votes. In removal cases two-thirds of all the members to which each house is entitled must vote for the removal. In impeachment it requires only two-thirds of the Senators sworn to sit on the trial. In removal proceedings the individual responsibility of each member is fixed and perpetuated by entering the ayes and noes on the journal. It would thus appear that no greater safeguard could be thrown around the officer concerned. It is said, with much more force and vigor than logic, that the exercise of the power of removal is violative of the Con-

stitution, subversive of the fundamental principles of our government, and destructive of the independence of the judiciary, and an earnest protest, much in this language, was presented to the General Assembly and spread upon its minutes when the proceedings were pending. But it is plain that if the removal resolutions are authorized by the letter of the Constitution, they cannot violate that instrument. The question as to whether they are subversive of the fundamental principles of our government, and destructive of the independence of the judiciary, are questions proper to be addressed to the Convention that framed the Constitution and to the Legislature that passed the resolution, but they are not questions for this Court when the provision is plain and unambiguous. Arguments which might have been weighty and conclusive before those bodies are out of place in this Court. The question for this Court is, Is there such a provision, and what does it mean? When that is answered it must control this Court, no matter what views it may entertain of the consequences. If the power of removal exists, this Court cannot ignore it, nor refuse to recognize it, even if it be deemed hurtful or dangerous. It is difficult, in debating this question, to keep out of view considerations of public policy and welfare, and confine ourselves strictly to the point proper for us to consider, and that is the existence and scope of the power, without regard to the results of its exercise. As individuals the members of this Court

may entertain their own convictions of the wisdom of such power, but as a Court we must lay aside such convictions and simply inquire, Does the power exist and what is its scope?

I am not able to see that the Legislature intended to limit the removal resolutions to causes personal to the official. To so hold one must read into the Constitution a provision that not only does not appear in it, but one that, after the most persistent and determined struggle, the Convention refused to incorporate in it.

In the case of *The State* v. *Campbell*, which we have already commented upon, the learned Judge who dissented in that as well as the Halsey case, expressed the opinion that, under the clause of the Constitution we are now considering, the Legislature might remove any judicial officer for any cause or upon any ground which in its wisdom was sufficient and proper, and the power and discretion was unlimited. He stated that it was without question the object of the Legislature in that case to rid the State of a useless officer in the interest of economy; that there were no reasons personal to the Judge for his removal, and hence the Legislature should have proceeded under this removal clause of the Constitution, instead of by the circuitous way of having the Court abolished, and said: "Upon this aspect of the case, the Constitution has left nothing to inference or deduction. The language of the clause includes all possible causes of removal known

to the Constitution, and all conceivable causes for which a Judge or Chancellor may be removed from his office. It appears to me an anomaly to hold that the Legislature, for economic reasons, may remove a Judge by abolishing his Court, but cannot, upon the same grounds, remove him by resolution."

It is said in argument that since the clause in the Constitution provides notice to the officer, and that he be informed of the grounds of removal, that such removal can be had only for reasons personal to the Judge, after a formal trial and an opportunity to be heard, and an actual hearing by the official to be affected, and it is said that the Constitution did not contemplate such a farce as notice to an officer of proceedings, without giving him the fullest opportunity to defend against it on every available ground. Upon this feature of the case, it will be noted that the resolutions of removal recite that they were passed after hearing and due consideration. The Constitution does not prescribe in what manner such hearing may be had, or how formal the trial shall be. It will also be noted that the resolutions recite that the office of the official has become useless and been abolished. This is an official declaration by the Legislature of the existence of such cause, and must be conclusive. If we look to the journals of the General Assembly, we find that an opportunity was given to each official to be heard before the removal body upon the resolutions, both

by himself and his counsel; that they appeared in person, or by attorney, and defended; that no further time was asked. It is said, however, that the officials were not given the privilege of examining witnesses to show that the causes of removal did not exist. It appears, however, that the facts which caused the removal were not of such nature as required examination of witnesses or production of records. The causes of removal were of a character known to all as matters of public concern, and were peculiarly within the knowledge of the legislators themselves, and all information they did not have they have obtained by means of a committee of investigation. It is admitted by the majority that if the removal could be had for economical reasons, then no evidence of trial was necessary. We may concede, therefore, that, as against many causes of removal personal to the officer, the official might defend by showing facts, but they are cases where the facts are in the keeping of the official and not of the Legislature. As, for example, if physical infirmity or mental weakness or absence from his district, or other cause of this character were the ground or cause of removal, being a matter personal to the Judge, the official may furnish evidence not accessible to legislators generally, and no doubt such evidence would be allowed to be produced; but when the facts are matters of public knowledge, about which the members could find no witnesses better qualified than they are themselves to speak, and

which are not personal to the officer, it would be
folly to take a mass of evidence that could at least
be of no avail.    But, so far as this case goes, the
fullest and fairest investigation was had, and an op-
portunity was afforded the official to be heard, and in
such case as this, the action of the Legislature must
be accepted as conclusive, and cannot be inquired
into.    It is said that there is a discrepancy between
the causes stated in the notices and in the resolu-
tions removing the judges.    This we consider a
matter of no importance.    We may concede that
the Judge can only be removed for the reasons
stated in the notice, and still the ojection is not
well founded, and the discrepancy is immaterial. .
The substance of the reasons stated in the notice,
and the reasons stated in the removal resolution, are
the same, to wit, that there is not sufficient businesss
to require the retention in office of the official,
and that it is necessary for the welfare of the State
to abolish the office and remove the officer in the
interest of public economy.    The resolutions of re-
moval set out reasons as grounds for removal, which
was in effect a legislative adjudication that such facts
existed and adds that the Court has been abolished,
a fact which had not transpired when the notice was
given, and which was merely supplemental action by
the Legislature in pursuance of the previous adjudi-
cation.    The fact that the office had, since the no-
tice, been abolished may be treated as immaterial
surplusage, the important fact being that there was

no longer any necessity for either office or officer. It is said this is a dangerous power to lodge in the discretion of the General Assembly. Grant it. Still, the framers of our Constitution, with the light of experience and the lessons of history in their minds, so lodged it. Shall we question their wisdom? So long as the people are to be trusted and they do their duty in selecting representatives, where could it be more safely lodged? It has been a part of our organic law for sixty-five years, and we have been cited to no case of its abuse. The purpose of the removal resolutions now under consideration, is the public good and the economical administration of justice. No charge is made of any sinister purpose on the part of the Legislature towards individuals or the public. It is said it is a power that may be used to crush the judiciary, to break down its independence, and to stop the business of the judicial department. But the same object may be accomplished by other modes by the Legislature, if it shall decide to adopt revolutionary methods. It may unjustly impeach, and thus remove; it may refuse to pay salaries and expenses, and thus stop the Courts; it may refuse to provide for elections; it may, in other words, overthrow the government, because it handles both the sword and the purse. But unless such power can be lodged in the direct and immediate representatives of the people, it ought not to be lodged anywhere, and ought not to be incorporated into our organic law.

So that, after all, these questions are not for this Court, but for the people, and in placing this control of the judiciary in the hands of the Legislature the people have drawn it as near to themselves as it is possible to draw it under our system of government.

Much has been said, and properly said, as to the necessity for an independent judiciary. There is no feature of our governmental system more vital and important, but the idea must not be pushed too far, and we must remember that, with the exception of the Supreme Court, all Courts exist as a consequence of legislative action. The number, powers, and jurisdiction, local and general, of the inferior Courts are all dependent upon the legislative provisions. The salaries of all Judges, the expenses of all Courts, are paid only in pursuance of legislative action, and, in addition, the General Assembly is given the power to impeach and the power to remove. The true theory of the government is that each department is independent in its sphere. The Legislature can enact laws without dictation from the judiciary. The latter can pass upon their validity and meaning without legislative interference. We cannot assume that either will arbitrarily disregard the rights of the other, or trench upon its province, and any argument based upon such premises is unsound and unwarranted. The departments of the government should work in harmony, as component parts of one homogeneous whole, and if each

will ' accord to the other purity of motive and an earnest desire to enhance and conserve the public welfare, there will be that co-operation and single-ness of purpose which will redound to the highest good of the people. The Courts have the Constitution and the statutes as charts to mark the extent of their authority. The Legislature has the same Constitution as its chart, but in respect to the Legislature the function of the Constitution is not to confer power and jurisdiction, but to limit it.

The argument that the power to abolish judicial office cannot exist, because it can be abused to the extent of destroying the entire judicial system, can have no force in the construction of the Constitution, and the possibility of abuse of power is never a valid argument against its existence. It has been properly said: "This is an argument often resorted to, and no argument is more fallacious. It assumes that if the power be one that the Legislature might abuse, and in its abuse subvert the other departments of the government, therefore the power does not exist; whereas, it is certainly true that the Legislature may, in many modes, in the exercise of unquestioned power, utterly ruin and destroy the government. The remedy, when the Leislature attempts to exercise power which it does not possess, is in the Courts, but where it simply abuses power that it does possess, the remedy is with the people."' McFarland, J., in *Halsey* v. *Gaines*, 2 Lea, 322, 323.

The causes assigned in these resolutions for the removal of the Judge and attorneys are entitled to the highest consideration, and, if any causes not personal to the officer involved can be sufficient, these reasons of public policy and public economy must be so regarded. It is not necessary in this case, therefore, to consider the question whether the Legislature may arbitrarily remove such an officer, whether for political or personal reasons or because a particular Judge may have ruled contrary to its ideas of law and right. No such case is presented in this record. It is intimated in the Campbell and Halsey cases that a removal, with a sinister design upon the part of the Legislature, would not be allowed. It is not necessary to consider this proposition, as it does not arise in this case. Whether the Court can revise the action of the Legislature in any case of removal, and question its authority to act upon the cause made the basis of such removal, is a grave question of much difficulty and delicacy. The Legislature could act arbitrarily quite as readily for personal as for causes of a public nature, and would more likely do so for personal causes than for those of a public or general nature. The danger of arbitrary and unwarranted action is not avoided by confining the causes of removal to personal causes. Perhaps the true rule may be stated thus: In all impeachment and removal proceedings before the General Assembly, if the causes for which removal or impeachment

are had are such as are authorized by the Constitution, and the methods pursued in the proceedings are not contrary to those prescribed by the Constitution, the action of the Legislature is final, and cannot be questioned by this Court. If, however, the Legislature should attempt to impeach or remove for a cause not warranted by the Constitution, or should pursue methods contrary to those prescribed by the Constitution, this Court would have the power to declare such proceedings void for want of power and authority in the Legislature. If, for instance, the Legislature should attempt to impeach or remove an officer for political reasons, so specified and expressed, this Court could declare such action unconstitutional and void. I do not contend that the power of removal is unlimited, and cannot be, in any event, revised or questioned by this Court.

It is urged that this power of removal is not contained in the Constitution of the United States, nor in the Federal system, nor in the English system of Courts. This is true. The Federal system, as well as the English system, provides for a tenure during good behavior. The history of judicial tenures is not without its lesson. In England, prior to the reign of James II., Judges held their offices at the pleasure of the Crown. This power lodged in the Crown was abused to such an extent that Judge after Judge was removed, until the bench became a mere tool of the Crown. Its abuse was one of the causes of the English revolution, and in

18 P—38

the bill of rights following it the permanency of
judicial tenure was first secured, and it was con-
firmed by the statute of 13 William III., providing
for a judicial tenure during good behavior, and pro-
hibiting removals except upon the address of both
houses of Parliament.    Afterwards, by statute, in
the reign of George III., this tenure was made to
extend beyond the demise of the King, and full
salaries were provided for Judges during their con-
tinuance in office.    The power of arbitrary removal
of Judges by the Crown was also one of the
reasons embodied in our Declaration of Independence
for throwing off the English yoke.    In the light
of these historical events, the Federal Constitution of
1787 was framed, and judges, both Supreme and in-
ferior, were given life tenures of office, with fixed
compensation, not to be diminished during their con-
tinuance in office.    This system of Federal judgeships
and tenure is still in force, and whatever may be
said by bench and bar in its praise, the people, it
may be safely asserted, are not enamored of the
system, and would gladly change it.    It was
strongly commended by the statesmen of the revo-
lutionary period, and by the law writers, such as
Story, Kent, and Marshall of a little later date.
It was followed by each and every one of the
thirteen original States, and by others that came into
the union· soon after its formation.    It was adopted
in Tennessee, and under our first Constitution of
1796, judges held for life with fixed salaries.    But the

pendulum has swung back in the opposite direction, and it is a significant fact that there are only three State Constitutions in existence to-day that provide for a life tenure of Judges. It was upon this feature of a life tenure for Judges that Story and Marshall and Tucker and others wrote so eloquently, and not upon any power of removal; but their views have not prevailed, for in the great majority of the States the term is fixed at six years.

We speak of these historical facts as tending simply to show the trend of public opinion upon the subject of judicial tenures. The history of judicial tenure in Tennessee is even more suggestive. By the Constitution of 1796 Judges were appointed and held for life, with fixed salary and without power of removal. By the Constitution of 1834 they were still appointed, but for only a term of eight years, and subject to removal. By the amendment of 1853 they were made elective by the people, but the tenure of office remained the same, and the power of removal was continued, but slightly modified. It has thus been clearly manifested that the people intended to draw the Judges close to themselves, and through their representatives, as well as directly by election every eight years, exercise some control over tham. This is the system now in force under the Constitution of 1870.

For the reasons herein stated I am constrained to believe that the Acts and resolutions are all valid and constitutional.

DISSENTING OPINION.

SNODGRASS, Ch. J. This case was instituted in the Circuit Court of Shelby County, under the statutes authorizing such proceeding (Shannon's Code, §§ 5165, 5187) to restrain defendant from exercising the functions of the office of Chancellor of Part II. of the Chancery Court of said county. By bill and amended bill two questions were made: (1) That the Court had been abolished by an Act of the Legislature passed February 25, 1899, approved February 27, and defendant's term of service as Judge thereby ended, and (2) that defendant had been removed from office by a joint resolution of the House of Representatives and the Senate, adopted April 20, 1899, and approved on the twenty-first. Answer was filed denying the constitutional validity of both Act and resolution. The Circuit Judge, L. H. Estes, heard the case on the issue thus presented, and decided against defendant, enjoining him from exercising the functions and powers of Chancellor, and defendant appealed and assigned errors.

It is obvious that the judgment is incorrect if both propositions of defendant are successfully maintained, and correct if he fails in either; for if the Court is legally abolished, he could not continue to hold it, whether he did or did not cease to be a Judge, and if he has been under the resolution legally removed from office, he could not hold the Court, though it did not cease to be a Court by virtue of the abolishing Act.

It is necessary, therefore, to consider and determine both questions.  Before doing so, however, it is proper to determine one or two questions, and suggest certain consequences necessarily deducible; and, first, whether the officer can exist when the office is legally destroyed.  We think that this question is not susceptible of debate.  It would be an unintelligible jargon to employ words to express how an official existence was continued, when the office, the thing which was constituted only as a place and reason for such existence, was extinct. From this a consequence is deducible that, in . one aspect, might make the consideration of the legislative resolution unimportant or irrelevant.  If the Act in controversy was constitutionally passed when approved on February 27, defendant, Thornton, was no longer Judge, and the Legislature had no authority whatever to proceed against him for removal in any way, whether that taken was correct in form or substance, being wholly immaterial, for it will be remembered that the resolution was adopted on April 20, after the Act abolishing the Court had taken effect, which, by its express terms (not heretofore stated), was "from and after the first Monday in April, 1899." Another obvious conclusion is that if the power to remove a Judge when the office had not been legally abolished is exercised, the effect of it would only be to get rid of the particular incumbent, for, the office remaining, the

Governor would have to fill the vacancy, and no purpose even of economy could be subserved.

In order, therefore, that the resolution could have any force or effect, it is essential. to establish the invalidity of the Act; and the legislative resolution first adopted, and which was to be, and was in fact, served as notice upon the defendant, did assume (not merely, as it would be held by implication to do, when · it proposed a removal from office, that the office existed) in express words that the office was then existing. This resolution was adopted on April 7, four days after the Act, if it took effect at all, had taken effect.

The resolution, which was the first in the series leading to final removal, is as follows:

"*House Joint Resolution No.* 105.—WHEREAS, The public welfare requiring the removal from office of the following named official, to wit: Lee Thornton, Chancellor of Part II. of the Chancery Court of Shelby County, Tennessee; and,

"WHEREAS, Such necessity for the removal from office of the aforesaid official arises from the reasons and causes that there is not sufficient business to require or justify the retention in office of said official; and,

"WHEREAS, It is necessary for the welfare of the State that the judicial circuits and chancery divisions of the State should be redistricted, and the aforenamed official removed from office, to the end

that the said circuits and divisions may be properly redistricted and the public welfare subserved; and,

"WHEREAS, There no longer exists in the State any reason or necessity for the services of said official, or the continuance in office of said official, or the further continuance in existence of his said office as now existing, and the public welfare requires a reduction in the number of Circuit Judges and Chancellors and Attorneys-general in the State, to the end that a reduction may be had in the judicial expenses of the State, and for the promotion of economy in the administration of public justice; and testifying to and emphasizing the eminent abilities, fidelity, purity, and faithfulness of the above-named official in private and public life; therefore, be it

"*Resolved, by the House of Representatives of the State af Tennessee, the Senate concurring*, (1) That the Clerk of the House and Senate, each, at once make, issue and deliver to the Sergeants-at-Arms of the respective houses correct copies hereof for service upon the aforesaid official, duly certified by such Clerk.

"(2) That the said Sergeants-at-Arms are hereby authorized and directed to proceed at once to deliver to said official one of said copies, and, to carry into effect and execute this resolution, each of such Sergeants-at-Arms is authorized to appoint a sufficient number of deputies speedily to execute this order. Such Sergeant-at-Arms or his deputy will

make return of the time at which he delivers such copy to the said official.

"(3) That in pursuance of, and in accordance with, the provisions of Sec. 6, Art. VI., of the Constitution of the State of Tennessee, the House of Representatives and Senate proceed, as therein authorized, on the eleventh day after the service of copy of this resolution upon such official, to remove said official from the office held by him as Judge of said Court, for the State of Tennessee, to this end and for this purpose that the proceedings be had and continued from day to day until finally and fully acted upon, and disposed of in accordance with the aforesaid provisions of the Constitution.

"(4) That the service of a copy of this resolution on such official shall be service of notice as required in the aforesaid section, and that the removal from office shall be for the causes stated herein.

"Adopted April 7, 1899.

"JOSEPH W. BYRNES,

"Speaker of the House of Representatives.

"SEID WADDELL,

"Speaker of the Senate.

"Approved April 7, 1899.

"BENTON McMILLIN, Governor."

It has already been observed, and as is therein recited, that this was to serve as notice of the "causes of removal" contemplated by the Constitu-

tion, and it will have been seen that it not only does not recite, or give notice of such "cause" (that is, that his office had been abolished), but it, among other things, recites that it "is necessary that the judicial circuits and chancery divisions of the State should be redistricted," etc., and that there no longer exists "any reason or necessity for the services of said official, or the continuance in office of said official, or the continuance in existence of his said office as now existing," and that on the eleventh day after the service of a copy of this resolution upon such official, the two houses will proceed "to remove said official from the office held by him as Judge of said Court." This resolution also provided that the removal shall be "for the causes stated herein." It was followed by another giving brief time for all Judges and all Attorneys-general proceeded against to be heard, but this it is not necessary to copy.

When the final resolution of removal came to be adopted, it was inserted, among other "causes of removal," that the Court had been theretofore abolished. That resolution is as follows:

"*No.* 56.—WHEREAS, The public welfare requires the removal from office of the following named official, to wit: Lee Thornton, Chancellor of Part II. of the Chancery Court of Shelby County, Tennessee; and,

"WHEREAS, Such necessity for removal from office of the aforesaid official arises from the

reasons and causes that there is not sufficient business to require or justify the retention in office of said official; and,

"WHEREAS, It is necessary for the welfare of the State that the judicial circuits and chancery divisions of the State should be redistricted, and the afore-named official removed from office, to the end that the said circuits and divisions may be properly rearranged and redistricted and the public welfare subserved; and,

"WHEREAS, There no longer exists in the States any reason or necessity for the service of the said official, or the continuance in office of said official, or the further continuance in existence of said office as now existing, and the public welfare requiring a reduction in the number of Circuit Judges, Chancellors, and Attorneys-general in this State, to the end that a reduction may be had in the judicial expense of the State, for the promotion of economy in the administration of public justice, and to this end the present General Assembly, by appropriate legislation, has abolished the Court of which the aforenamed official was the Chancellor, thus making it unnecessary that he should longer remain on the pay-roll of the State, and testifying to and emphasizing the eminent ability, fidelity, purity, and faithfulness of the above-named official in private and public life, and it appearing that notice has been given to the aforesaid Lee Thornton, Chancellor of Part II. of the Chancery Court of Shelby County, accompanied with

a statement of the causes for his removal from office, as provided and contemplated in Sec. 6, Art. VI., of the Constitution of the State of Tennessee, after hearing and due consideration hereof; therefore, be it

"*Resolved by the Senate of the State of Tennessee, the House of Representatives concurring*, That aforesaid Lee Thornton be, and is hereby, removed from the office of Chancellor of Part II. of the Chancery Court of Shelby County as aforesaid, for the causes mentioned and set forth hereinbefore.

"Adopted April 20, 1899.

" SEID WADDELL,

" *Speaker of the Senate.*

" JOSEPH W. BYRNES,

" *Speaker of the House of Representatives.*

"Approved, April 21, 1899.

" BENTON McMILLIN, *Governor.*"

It is clear, therefore, that while the Legislature could only remove if in office, and that it so recognized the scope of its power and did assume in the notice given that the office yet existed notwithstanding the Act, and that in the final resolution it inserted this cause of removal (that is, the former abolition of the office as a cause which was not specified in the notice given), and left it open to the objection that defendant was or may have been removed for a cause of which he was not notified nor had a hearing, yet this is only noticed by way

of enforcing and illustrating other observations yet
to be made upon the resolution itself, because in the
view we take of it, the whole matter is immaterial;
for, treating the office as not abolished, we are of
opinion that the attempted removal is utterly void,
for the clearest constitutional reasons embodied in the
plain terms and necessary implications of the consti-
tutional clauses bearing on that subject.

Waiving the question of the form of these pro-
ceedings—a joint resolution notifying defendant that
he was to be removed as an already determined
fact, and reciting in the resolution, fixing a time for
his appearing, that they would then "proceed to re-
move him," and of a final removal by joint resolu-
tion of the ordinary character (but of requisite ma-
jority), adopted by the two houses and approved by
the Governor, when the Constitution makes no men-
tion of a resolution for such purpose, or any action
at all by the Governor, but contemplates some sort
of an accusation by or before the Legislature, and a
proceeding by it; of a trial, and a recorded vote of
necessary majority of the members of each House,
for and against the Judge, and for the purposes of
the argument, treating this as a method by which
the result contemplated by the Constitution could be
reached—we proceed to inquire if in its substance
it is a constitutional result.

The constitutional provisions bearing on the ques-
tion are as follows: After making provision for the
impeachment of Judges for the "commission of crime

in their official capacities'' (Art. V., Sec. 4) it then proceeds to provide for another form of removal from office. It declares that ''Judges and Attorneys for the State may be removed from office by a concurrent vote of both houses of the General Assembly, each house voting separately; but two-thirds of the members to which each house may be entitled must concur in such vote. The vote shall be determined by ayes and noes, and the names of the members voting for or against the Judge or Attorney for the State, together with the cause or causes of removal, shall be entered on the journals of each house respectively. The Judge or Attorney for the State against whom the Legislature may be about to proceed, shall receive notice thereof, accompanied with a copy of the causes alleged for . his removal, at least ten days before the day on which either house of the Generel Assembly shall act thereupon.'' Art. VI., Sec. 6.

It would. seem clear, from the express terms of this section, that no general power was vested in the Legislature to remove these officials whenever it appeared desirable to them or for whatever reason they assumed proper, for in that event the requirement that '' cause '' or '' causes '' of removal should be entered on the journals of each house, and an official proceeded against should have at least ten days' notice of the proceedings, and of the causes of removal alleged, before either house could act thereon, would be nugatory. If it was intended to

vest in the General Assembly the power to remove
"for the general welfare," or "to subserve the
public good," or "to promote economy in the ad-
ministration of justice," or "to exercise the power
of redistricting the State," surely it would not have
been accompanied with requirement that any such
official included in the provision should have notice
of such "reasons" for removal, or that such
notice should, by at least ten days, precede the
authority of the Legislature to act in the prem-
ises.   These are matters of general public concern,
with which the officer has no more to do than any
other citizen.   They are addressed alone to legisla-
tive consideration and discretion.   What answer could
any official make to such an assumption of the Legis-
lature, not to a charge against him, but the recital
of a public necessity or desirability for the vacation
of his place?   Why give him notice, and timely no-
tice, of a proceeding against him, for reply, when
in the very nature of things there can be no reply.
He cannot say, "I deny your right to determine what
the public welfare requires;" he cannot say, "You
cannot judge what is promotive of the public good
and economy in the public service or whether the State
needs redistricting."   These are all suggestions made
to him, and made not only with the knowledge that
they are not issues tendered which he can accept,
and on which he can make a contest, but they are
the recital of assumed conditions not susceptible of
outside contest, because addressed alone to the wis-

dom and discretion of the Legislature. And the Legislature did not do its intelligence the injustice to pretend to think differently on this subject, for it did not invite the official to contest them. It assumed and assured him in the notice that they were settled and that he was merely notified that he, because of their existence, would be removed. He was not invited to a trial, or to take issue on a "cause" of removal averred against him in a proceeding instituted for cause, and which he might show did not exist. He was merely notified that certain "reasons" for his removal existed in the judgment of the Legislature, which alone could determine, not on evidence necessarily, but as the legal representatives of the people vested with power to entertain and determine them as matters of pure discretion. So that it comes to this, either the two houses of the General Assembly have, upon the requisite two-thirds vote, the power of removal without cause, and at their unlimited discretion, or they have no such power, however they attempt to exercise it, and their action is open to objection whenever and wherever the right of the official is taken away without cause personal to himself. But here it is urged that, granting there must be cause personal to the official, such as unfitness, incapacity, neglect of duty, or want of moral character, or immoral conduct, or other causes justifying removal, and which can be charged against him, and on which charge he can take issue and offer evidence, still the Legislature is

the final judge of what the cause or causes are, and that they have settled it in this case. This being so, it is argued, even though they were wrong, there is no remedy. This specious and plausible argument is wholly unsound. If a "cause of removal," like a cause of impeachment, had been presented and tried and determined by the Legislature, though erroneously, its action would have been final. But before it can become so there must be a proceeding such as is contemplated in the Constitution. There must be an issuable averment of a *bona fide* cause of removal which may be traversed, and, before the just legislative judges, may be successfully met or established; until this is done there has been no legitimate action by the Legislature, and this, like all other acts, is subject, on this ground, to the reviewing control of this Court.

We come, then, to the merit of the argument that "cause of removal" means anything the Legislature may assume to be such, which is pressed with great urgency upon us. We are told that the Legislature might remove because a Judge, acting in good faith and with most loyal convictions of duty, had decided, or was about to decide, a case a particular way, and the argument is enforced by the illustration that if the Legislature of 1881, existing when this Court passed adversely on that Act, had concluded that the noted statute (called the 100 and 3 Act) was about to be declared unconstitutional, it might have resoluted the prospectively offending Judges

of this Court, singly or as a body, out of office, under this provision of the Constitution, or that it might have done so afterward if it had been so disposed, and thus have wreaked its vengeance on the Court or any of its members for doing its constitutional duty, but adversely to the legislative will. The argument is not strained. If it be a sound precedent position that the Legislature has unlimited power of removal for any "reason" it treats as a "cause" of removal, it was in its power to have removed that Court before that decision and had it reconstituted by an executive favorable to the measure, and it was in its power to have removed its members after the decision for no other cause or reason than that they did their duty as they saw it in the fear of God, and, as it happened, in the favor of the public. The State is much pressed for reasons when it must rely, to sustain the legislative action and uncontrolled legislative authority over the judicial department, upon argument which leads to such monstrous conclusions as this. Instead of having a sensible Constitution, sustaining in all its parts, by plain words and necessary implications, three distinct, independent departments, we would have one which made the judicial so dependent and so humiliatingly subservient that its personal representation would be in the unrestrained hands of the legislative department— its overawed ally or its cringing dependent in every contest on great questions of public interest, or in the wild outbreaks of public passion. The Judges of

18 P—39

the several Courts, too, would be under a far more despicable subserviency. From term to term of the Legislature, recurring every two years, they would be fighting for existence against the strife of politics, the demands, real and fictitious, of economy, and the claim of each agitator of retrenchment in the name of reform. They would be forced to defend against the antagonisms of · local enemies, disappointed suitors, and desperate victims of their administration of law. Lives would be made intolerable in anxieties and apprehensions to the good and the well-meaning men of the inferior Courts, while they would be made existencies of crawling shame to the weak or willing tools who yielded to such domination. This is the consequence if the "cause of removal" in the Constitution means anything assumed to be "reason" for removal by the Legislature, or if its assumption of "reason of removal" as "cause" is not disputable in the Courts.

To give the Constitution its plain meaning, no such condition can. result. No honest Judge can fear or need fear legislative deprivation of office "for cause." He will give no just cause, and he can trust any body of legislative Judges to shield him, from the shame to itself of robbing him of his rights, in a trial where an issue must be made as to his conduct or character, and where in open day the · public must see him condemned and hear his sentence. But if the Constitution be so construed as to mean that it is all a matter of legislative discre-

tion, and how long he shall exist, and for what reasons he shall go, are questions for the Legislature as his superior to determine, then the Constitution is no protection to him, and a legislative Act is not objectionable, though it remove and destroy him, if it may be done under the properly construed provisions of the Constitution. The record itself could always be made to wear the appearance of sanctity; the proceeding could take on the robe of economy or the garb of piety, and the work be done "properly," being done under the Constitution. Nevertheless the Judge would be, instead of a distinct, independent servant of the people by whom he was elected (and by all of whom he was elected, as the individual members of the other departments were not), an easily destroyed victim of legislative disfavor, without independence in his place or his conduct, and without protection under the Constitution and law he was created to construe and sworn to enforce.

It is said, however, that the constitutional provision for removal is not to be for "specific" cause, and it is, therefore, assumed to be for "any" cause which the Legislature may elect to so treat, and going a step farther, that any "reason" the Legislature gives must be treated as "cause," if they so treated it, because the Constitutional Convention of 1870 rejected certain amendments which were offered, attempting to specify particular "causes" of removal in the constitutional provision, or to re-

quire their specification by law; and on this point the journal of the Constitutional Convention is quoted, and likewise the argument (made in this case in the Court below) of a member of the Constitutional Convention, and later Attorney-general of this State, referring to the journal of the Convention, and also to his scrap-book of the daily papers, showing more to the same effect. In that argument it seems, by reproduction here, that several eminent men yet living, who were also members, had views antagonistic to his of. what took place in the Convention on that subject, and of the intent and purpose of the Convention, as indicated by expression of sentiment. All this disagreement of recollection and controversy as to views are reproduced here in argument, and much of it printed in the briefs. It only is sufficiently important as evidencing the views of good and worthy men who figured in that great work to justify its statement. It is really a mere word playing now. Whose memory as to those proceedings is good or bad, and with which one time has dealt most hardly, is of no consequence. Both from the plain reading of the Constitution itself, as well as from the journal and from the newspaper account (treating it as verity) it appears that "cause" of removal was required. "Cause" which must be specified to the accused or "proceeded against" official, and to which he must have ten days to get ready, and against which he could defend. This is all clear. It only makes it

the more so, and the more materially so on the construction that can alone be properly placed upon it, that none of the Constitution makers undertook to eliminate the word " cause " or " causes " of removal already in the section. No amendment was offered to change or strike it out. The Convention refused to specify or provide for the specification of particular causes, and rejected all efforts to do so, by amendments, because there would be many covering possibly impeachable, and certainly nonimpeachable offenses, and other faults and conditions not susceptible of easy enumeration, and for the same reason not deemed proper to be reduced by special classification or limitation on the general terms employed. Having said that the officials might be removed for "cause," and only for "cause" as is absolutely implied as shown, and having set forth that it was to be for cause assigned in a proceeding against the official, where there was to be a triable issue, which could be met by defense; and to get ready for which he was to be notified sufficiently in advance, and having set forth that in that proceeding or trial, and upon the causes for removal charged and entered of record, there were to be votes in both houses for and against the official on these charges, the convention manifestly deemed it had done enough to require a proceeding on personal causes of removal, and as there might be a great many of them, would not and did not limit them in number or character by

indication or enumeration of a few, or by a specific limitation on a general statement. This is all there was of it, and it is matter of surprise that it should be used for more, or to prove the very thing it in fact disproves.

But the argument is made that this wholly baseless view finds support in the fact that the removal clause of our Constitution is borrowed from the English law, under which a Judge might be removed on address of Parliament, and that in States where this unlimited consequence is not to follow, it has been guarded against by specifying for what "causes" removals may be made.

It is not true, in the first place, that the proceeding is so borrowed. It is not the English proceeding. There, on such "address" the King could remove. In some of the American States this was almost immediately copied. The Legislature could address the Governor and he could remove, as the King in England. But no such course was taken in our Constitution. The Governor has nothing to do with removal. Again, in England the removal might be with or without cause (if Parliament, which was omnipotent, so willed, and addressed) because Acts of Parliament practically make what is farcically called the Constitution of England, for they have no Constitution in the sense that we have, or in any other except theoretically, but our Constitution, which is written, fixed, and permanent, left no such scope for the removal of Judges. It gave only

the power of removal to the Legislature, coupled with condition that it must be for cause, for cause of which notice must needs be given, and to which there could be defense, and, of course, successful defense, interposed, for no . American lawmaking body ever yet went through the form of calling a citizen to a trial, requiring that he should have notice, and yet cut him off from a trial or defense that might be successful, that was intended to be successful, if made out. It is therefore not true that any support of this legislative resolution is derived from its English semi-prototype or the contemporary constitutions of this country. Some of the latter in terms specified what the "causes" should be. Some said for any or certain ones not sufficient to amount to impeachable causes, but no single one ever required a "cause" to be assigned, as ours does, which did not mean one personal to the Judge to his acts, habits, or character. No one ever did recognize as "cause" anything over which he had no control, or which did not have personal relation to his discharge of duty, and no single case can be found to the contrary.

Having devoted so much space to this question because of its supposed serious and final effect on what was concededly a doubtful result, so far as the Acts abolishing the office of Judges were concerned (for the resolution of removal was treated, legislatively, as a method to "clinch," as was there said in argument, the abolishing Act), we come to

that question and proceed to its consideration with
the elaboration it deserves, at the risk of being
tedious, for the question is one of the most impor-
tant that ever arose for final decision in this State,
and upon its determination hangs, as we think, not
only the independence but the existence of the ju-
dicial department of the State government. As al-
ready stated, our government, State and national, is
divided into three distinct and independent depart-
ments, legislative, executive, and judicial. Such, too,
is, in substance, the divisions of all the other State
governments, and it may well be practically termed
the form which republican governments have taken
in these United States, and which the Constitution
thereof guarantees to every State in the Union.
(Art. IV., Sec. 4.) Our own Constitution, based on
that, and substantially that original of 1796, which
had Mr. Jefferson's commendation as one of the best
ever framed, after providing that "all power is in-
herent in the people," proceeded to declare how the
people would have it exercised, to distribute into
departments and to vest in each such as the people
wished each to exercise, and to put upon each the
limitation which was deemed essential to confine it
within the scope of the authority the people vested,
and beyond which they intended to restrain. It is
sometimes said that the Legislature is omnipotent and
its authority unlimited, except when restrained by the
Constitution of the State or the Federal government.
It is treated as a great residuum of power not other-

wise constitutionally disposed of or restrained. This is *sub modo* true, generally, in the cases in which it has been uttered, but it is wholly inaccurate when given the general application to which its formulation would lead. All that is meant by it is that, following the English rule as to parliamentary power, the Parliaments or Legislatures of the States of the Union, as legislative representatives of the people, have all legislative power, not expressly or by necessary implication limited, that the English Parliament did. *Smith* v. *Normant*, 5 Yer., 272–3. So far as this question is involved here, it may be dismissed with a mere suggestion. The power of creating or abolishing Judges never did, and does not now, abide in the Parliament of England. The English theory was that the King was the Judge in England. Later this kingly power was delegated by him to others appointed by him. They existed with him (subject to his power of removal) and officially died with him, if not before removed. Yet later, on recommendation of the King, the last feature was changed by Act of Parliament, and the tenure of the office of each incumbent was extended beyond the death of the King, and the office was ultimately held during good behavior, which, of course, meant during life, if not forfeited by misconduct. But still to this was added a right of removal by the King upon what was termed an address of both houses of Parliament, and which, it

is said, was made in the form of a resolution.
Enc. Br. (9th Ed.), Vol. 13, 763.

Never, therefore, did the power of appointment
or removal of a Judge vest in the Parliament of
England. It was not a legislative power there, and
is not here, unless the people have made it so. If
it was a legislative power, and was not constitu-
tionally limited, it would remain a legislative power.
If it was not, and was never made so constitution-
ally, it would remain in our system one of the
powers. amid those all of which are "inherent in
the people," and not to be exercised except as they
organically will it to . be.

It is necessary, therefore, to see what our Con-
stitution provides on that subject, and how it regu-
lates the creation and abolition of. Courts. Without
going on this question beyond our present Constitu-
tion, except for the purpose of illustrating the view
of the public, we would call attention to other
utterances of the people as indicative of the purpose
they had and the proper construction of the view
expressed in that Constitution. It will be remem-
bered by all students of history that the course of
dependent Judges, rendered. truculent by control and
made infamous by subservience, had created for the
English people a more insupportable condition of
legal tyranny and authorized oppression than had
ever found existence in the wildest usurpation of
pretenders or the most abominable license of estab-
lished despots. This, among all the grievances which

caused revolution and advanced the cause of freedom there, and gave it absolutely here, was the result of such disregard of popular rights and liberties by dependent creatures of the Crown called Judges. It is to be remembered that one of the complaints of the American colonies against the King was that "he has obstructed the administration of justice by refusing his assent to laws for the establishment of judiciary powers. He has made Judges dependent on his will alone for the tenure of their offices, and the amount and payment of their salaries." Dec. Ind., 8th and 9th complaints. When the struggle for independence under this declaration was successful, and a form of government came to be adopted, these evils complained of were remedied.

An independent judiciary, in an independent government, was secured by constitutional provisions giving a fixed tenure of office and prohibiting a reduction of salary. In the federal government the tenure was for life (or what may be the same thing, and must be, to a faithful and irreproachable official), during good behavior, and there was a provision against decreasing judicial salaries. In the Constitution of this State the same course was taken, with an improvement, at least in one respect. The tenure was fixed, not for life, but fixed at eight years, and the provision against decreasing was extended to prevent increase of salaries. Specifically our Constitution provided on this subject that "the powers of the government shall be divided into three

distinct departments, the legislative, executive, and judicial.'' Art. II., Sec. 1. "No person or persons belonging to one of these departments shall exercise any of the powers properly belonging to either of the others, except in the cases herein directed or permitted.'' Sec. 2.

After thus distributing the powers of government into these three distinct and independent departments, the people in this Constitution proceeded to vest them, so far as the question now involved is concerned: ''The judicial power of the State is vested in one Supreme Court and in such Circuit, Chancery, and other inferior Courts as the Legislature · shall from time to time ordain and establish, in the Judges thereof and in Justices of the Peace. The Legislature may also vest such jurisdiction in corporation Courts as may be deemed necessary. Courts to be holden by Justices of the Peace may also · be established.'' .Art. VI., Sec. 1. "The Judges of the Supreme Court shall be - elected by the qualified voters of the State. Term of service shall be eight years.'' Section 3. ''The Judges of the Circuit and Chancery Courts and of other inferior Courts shall be elected by the qualified voters of the district or circuit to which they are to be assigned. Term of service shall be eight years.'' Section 4.

''The Judges of the Supreme or inferior Courts shall, at stated times, receive a compensation for their services, to be ascertained by law, which shall

not be increased or diminished during the time for which they are elected." Section 7.

This fixed tenure of office and unchangeable salary were the methods devised to secure judicial independence, as they have ever been in the American Constitutions. The provision vesting judicial power, among other Courts, in Circuit and Chancery Courts, was intended to preserve (whatever else might be added) the system of Circuit and Chancery Courts. So was and is its plain purport. In like manner it has been held to be the constitutional object to preserve the County Court as a part of our Court system upon like recognition, but in yet other sections of the Constitution. *Pope* v. *Phifer*, 3 Heis., 683.

These three Courts thus recognized as preserved by the Constitution, in addition to the Supreme Court, have been protected in theory since the adoption of the Constitution, always and in all opinions. They have been in fact protected in all the cases up to 1875, notably and powerfully in the Pope case in 3 Heis., 683. Like other constitutional offices, it has been held that legislative control of their existence must be denied, and that, even as to duration of their terms, the legislative power could not be exercised.

In 1875 it was held that, though true in theory that Circuit Courts and Chancery Courts must be maintained, it was not so in fact—the Legislature could abolish any it chose. *Coleman* v. *Campbell*,

3 Shan., 355. Of course if it could abolish any, it could abolish all, as it was not and is not pretended that any one or more of them enjoyed a special immunity from legislative control.

This case was based upon the theory that the power to establish involved necessarily the power to abolish—a theory wholly inconsistent with the constitutional provision for the establishment and continuance of the Circuit and Chancery Court system. For if one or both is "established" it can and "shall" exist or have jurisdiction vested in it under the Constitution, and thus be kept alive and preserved, against legislative power, as a part of the Court system, as a constitutional Court, but if the power to establish includes the power to destroy, such cannot be the result, and there is no protection to either Circuit or Chancery Court system thus recognized and attempted to be preserved and protected by the Constitution. It happened that in the particular case cited (*Coleman* v. *Campbell*) and case heard with it (*Verene* v. *Williford*) the Courts, as well as those preceding them, Circuit and Chancery, had been created by special Acts, so that, dealing with them, Judge Nicholson said: "If the Legislature had the power to enact the law, it must be either because the ordaining or establishing of Courts is a legitimate legislative power necessarily involving the power to abolish as well as to ordain and establish, and that the Constitution has placed no restriction upon the exercise of this power in-

consistent with the action of the Legislature in the present case, or because the Constitution, expressly or ' by necessary implication, has vested in the Legislature the power to ordain and establish Courts, and that this power carries with it the power of abolishing existing Courts.''

Taking this proposition, which was the question in issue, for granted, the Judge delivering the opinion proceeded to the conclusion that necessarily the Legislature could abolish and could establish, but, by the Constitution of 1870, it was prohibited from disregarding the provision to establish Circuit and Chancery Courts, and must keep those systems in existence in connection with any other inferior Courts it might establish. That this conclusion is so incorrect, not to say transparently erroneous, as to be perfectly demonstrable, appears from the simplest statement. If the Legislature must preserve Circuit and Chancery Courts and yet may abolish them; if it is true also, as it constitutionally is, that it may also establish other inferior Courts and vest in them such jurisdiction as it chooses, why could it not abolish all Circuit and Chancery Courts and then establish other inferior Courts in whom it might vest all inferior jurisdiction? Who would say, and what (but the Constitution) could say how many, if any, Circuit Courts or how many Chancery Courts, if any, it should preserve? It is so clear that the power to establish does not include, as against this preservative provision of the Constitution, the

power to destroy any or all of them, that it is wonderful to us that the contrary view could have ever prevailed for a moment. To say nothing of the provisions which make constitutionally the term of all the Judges of all these Courts eight years, and prevent changing their salaries during the time for which they were elected, it seems so manifest that the power to destroy one or all of those Courts, when created, is against the preservative clause of the Constitution respecting the Circuit and Chancery Courts as only to need suggestion to demonstrate its nonexistence. If the Legislature can abolish one, it can abolish all. Which shall it re-establish, and how can it be required to re-establish any one of them, and if so, which, especially in view of its power to establish other inferior Courts and vest them with any jurisdiction it pleases?

It is a vain thing to say it can abolish as it pleases, but must retain or recreate the same tribunals. The concession of the power to abolish one, coupled with the declaration of constitutional necessity for the retention of the system (which the Court holds in that case must be done), is a patent impracticability, not to say absurdity.

The only argument for the preservation of the system is its constitutional establishment over and against the power of the Legislature to abolish it when established during the existence of any term. It is not a question of trusting the Legislature not to do it; it is a question of its power to do it

against the positive provision that these Courts must exist by the preservative clause vesting in them the jurisdiction when created. No other conclusion meets this difficulty, and no argument has been made or could be made which obviates it. We would just as well say it must exist, but may not exist, as to assert the proposition contended for, or put two and two together and say they shall not make four, as to assert that the Constitution preserves this system of Courts against the power of the Legislature, and then say it may destroy it by destroying the Courts severally or *in toto*. The principle herein contended for was conceded by the same Court which decided the Coleman case, and still that case was in part adhered to in *Halsey* v. *Gaines*, 2 Lea, 316, 319. In that case it was conceded (page 326) that an Act abolishing a circuit with intent to destroy a Judge would be void.

This concession can mean nothing else than that an Act destroying a Judge by abolishing a circuit or division, would be void, because it had been before, and has repeatedly since been, decided that the personal motive or intent of the Legislature in passing an Act cannot be inquired into, and the only intent which can be considered is the legal one determined by the effect of the Act. If the Act is to destroy the Judge, the intent appears and the Act is void. If this is not so, the concession is meaningless and misleading, not to say frivolous.

For almost the same reasons are the other infe-

18 P—40

rior Judges protected from legislative interference. They are to be men of the same age, the same term of service, with the same unchangeable compensation, and elected by the same voters in the same district or circuit where they serve. Art. VI., Sec. 4. The word "district," it must be remembered, was once (and then) used for the county or counties embraced in a section where one Court was held for one or more counties. Hence our old statutes referred to a chancery district, one of them providing that certain bills should be filed in the chancery "district," etc. The manifest constitutional object was to permit the establishment of Courts for any circuit, division or district composed of one or more counties, or specific territory, and then make their existence during a term equally inviolable for such term, and to secure both and in the same way the compensation of the Judge was to be unchangeable, not during any "term of service," but "during the time for which he was elected." To this conclusion this Court came in the case of *State* v. *Leonard*, 2 Pickle, 485, and we used language there which we thought could by no possibility be misconstrued. In this connection we said:

"The Constitution, in fixing the terms of the Judges of inferior Courts elected by the people, at eight years, intended not only to make the judiciary independent, and thereby secure to the people the corresponding consequent advantages of Courts free

from interference and control, and removed from all necessity of being subservient to any power of the State, but intended also to prevent constant and frequent experimenting with Court systems, than which nothing could be more injurious or vexatious to the public.

"It was intended when the Legislature established an inferior Court, that it should exist such a length of time as would give opportunity for mature observation and appreciation of its benefits or disadvantages, and that the extent of its duration might discourage such changes as were not the result of most mature consideration. Realizing that a change, if made so as to constitute an inferior Court, would fix that Court in the system for eight years, a Legislature would properly consider and maturely settle the question as to the propriety and desirability of such change or addition to our system, and conscious of the impropriety and the hazard of leaving the judicial department of the government at the mercy and whim of each recurring Legislature, itself elected but for two years, the framers of the Constitution wisely guarded against these evils by the section referred to. Properly construed and enforced it is effectual for that purpose. Disregarded or impaired by such interpretation as leaves it to exist in form, without force or substance, and we have all the evils and confusion of insecure, changing and dependent Courts, frequent and constant experimenting with systems, provided in haste, tried in

doubt, and abolished before their merits or demerits
are understood.  It would be a mortifying reflection
that our organic lawmakers intended any such .
result in their avowed effort to make a government
of three distinct and independent departments,· and
still more humiliating if we were driven to the con-
clusion that, while they did not intend it, they had
been so weak and inapt in phraseology adopted as
to have accomplished it.''  When a Court whose
Judge is· elected by the people of one or more coun-
ties in a district or circuit is constituted by the
Legislature, and an election had, and the officer
commissioned and qualified, it is not in the power
of the Legislature to take from him the power and
emoluments of office during the term of eight years
by devolving them intact upon another, or other-
wise.  If it can abolish in this way the office
of County Judge, it can abolish the office of any
inferior Judge, as all are protected, or not pro-
tected, by the clause of the Constitution referred to
(Art. V).  For the honor of the framers of our
Constitution, the best interests of our people, the
independence of the judiciary, and the security and
order of our Court system against rash and constant
experiments of legislation, it affords us much satis-
faction to give the Constitution its plain, natural,
and unobscure effect to invalidate legislation of this
character, and to be able to say that nothing as
yet decided by our Court stands as an obstacle in
the way of our doing so.  But if there ·were, it

would afford us pleasure to remove it." *State* v. *Leonard*, 2 Pickle, 485.

The cases supposed to stand in the way were *Coleman* v. *Cumpbell* and *Halsey* v. *Gaines*, and, after saying that we did not wish to be understood as assenting to the correctness of the conclusion reached in them, and rejecting their reasoning, we showed that, though erroneous, they did not need to be in terms overruled, because the exact question of the Leonard case was not decided there, but we wholly repudiated them, and gave the Constitution an opposite construction.

Giving the Constitution this construction harmonizes the entire section quoted, makes the judiciary department in fact, and not merely in fiction, inde pendent, and harmonizes all the other cases before and since on this subject. See *Smith* v. *Normant*, 5 Yer., 270; *Pope* v. *Phifer*, 3 Heis., 682; *State* v. *McKee*, 8 Lea, 128; *Crass* v. *Mercer*, 16 Lea, 486; *Rembo* v. *Maloney*, 8 Pickle, 68; *State, ex rel.*, v. *Cummins*, 15 Pickle, 674.

It had been before, as was in the Leonard case, decided, that when the Constitution fixed a term, if the Legislature created the office and abridged the term, that part of the Act creating the office was valid, but the abridgment was void. *Brewer* v. *Davis*, 9 Hum., 208; *Keys* v. *Mason*, 3 Sneed, 9. This was repeated in the Leonard case. It was before this, but later than the Coleman case, decided that a legislative Act which might destroy a

Judge's right to hold his office was inoperative, although the Judge was neither a Circuit Judge nor Chancellor. *State, ex rel.*, v. *Ridley*, MS., Nashville.

And yet later it was, we thought, affirmatively and forever settled in the case of *State* v. *Cummins*, 15 Pickle, 674, where we held that if the Constitution merely named an officer (as Sheriff) without defining his duties, it was impossible to destroy his office, or take from him the substantial emoluments and functions of the office and confer them upon another on any pretext whatever. This case proceeds upon the same grounds and cites the same authorities which controvert the view of the Court in *Coleman* v. *Campbell* and *Halsey* v. *Gaines*.

It should be noted here that all the cases in this Court have gone upon the theory generally recognized in the American Courts, that when the Legislature makes or creates an office without a tenure, or independently of constitutional provision, it can abolish it, or change its tenure or its compensation at pleasure, but that when it creates a constitutional office, that is, one directed or authorized under the Constitution or recognized by it, and for which the Constitution has provided a tenure, the Legislature cannot abolish the office, abridge its term, or destroy its substantial functions or emoluments. 12 Am. & Eng. Enc. L., 18, 19. We quote in full:

"It is a general rule that when an office is created by statute it is wholly within the control of the Legislature creating it. The length of term and

mode of appointment may be altered at pleasure, and the office may be abolished and the compensation taken away from the incumbent, unless forbidden by the Constitution. There is no vested right in an office against the public. The Legislature may abolish a judgeship where the right to the office is not secured by the Constitution. Nor do public offices constitute contracts, protected as such from violation. And even though a Judge's office be created by the Constitution, if his tenure and compensation are left to the Legislature they may control and alter in these respects, saving that they cannot virtually abolish the office as under pretense of reducing or taking away compensation. The Legislature in such cases is moreover bound to respect an intendment of the Constitution that Judges shall be elected. It cannot, in effect, do away with this right of the people by making terms of unreasonable length. The Legislature has no more power to enlarge a judicial term fixed by the Constitution than it has to abridge the same.

"Abolition or change of Courts: The tenure of the office, as has been already stated, does not rest on contract, and is not protected by the contract provision in the United States Constitution. The General Assembly cannot, directly or indirectly, abolish any 'constitutional office'—that is, one whose tenure is defined by the Constitution; but it may, directly or indirectly, abolish any 'legislative office'— that is, one created by the General Assembly itself.

But the power of the Legislature to alter the terri-
torial jurisdiction of Justices of the Peace necessarily
arose from the power to create new counties; and
out of the legislative power to reorganize and regu-
late the Courts grows the power to divide a judi-
cial district or to diminish the aggregate duties by
creation of an assistant. But the Legislature can-
not take away altogether the authority of a Judge,
the grant and tenure of whose office are fixed by
the Constitution. Modifying a judicial office in re-
gard to titles and duties and continuing the former
official in the new Court, is not depriving the officer
of his office.'' Citing cases from Virginia, Louis-
iana, Illinois, New York, Pennsylvania, Arkansas,
Minnesota, Ohio, Wisconsin, Nevada, Iowa, Michigan,
Missouri, Massachusetts, and North Carolina.

Nothing is better settled in this State at this
time than this proposition. It is equally well settled
that the Legislature may, as in the Sheriff's case we
held (*State* v. *Cummins*), diminish or increase the
duties, and in the case of Circuit, Chancery, and
other established inferior Courts it may diminish or
increase the jurisdiction, enlarge or contract the ter-
ritory of their work, but it cannot destroy either
the officer or the office *in toto*, and it cannot,
therefore, abolish a circuit or chancery division, be-
cause that would destroy the Judge. The line must
be drawn somewhere. We undertook to draw it in
the Cummins case. We had before decided that
duties could be changed and compensation could be

changed. The Constitution said the office must exist. It gave no salary and defined no duties. If the line was not properly drawn, the constitutional office meant nothing, because we had held it might be made to carry limited or enlarged burdens and be compensated by greater or less fees. If we said it should carry no burden, discharge no duty, and receive no compensation, the constitutional office was a farce which construction had destroyed. There must be a line, a reasonable line, drawn somewhere, which permitted the law to regulate the office but recognized and continued its constitutional existence. We drew the only one possible.

It applies in the same way to the Judges. The legislation has been the same. The Constitution is even more specific as to them, for it directs the vesting of jurisdiction, and requires a fixed territory for service and an unchangeable compensation. The rule is the same—must necessarily be the same; legislation may increase or diminish the jurisdiction of constitutional Judges; it may add territory or take it away, but it cannot take all jurisdiction or all territory away. Enough must be left to preserve the substantial jurisdiction and functions of the office. Nothing less than this is reasonable to the law; nothing more is agreeable to the Constitution. To show how clear this is from another standpoint, we consider what appears in the Constitution as to the Supreme Court and our construction of it. The Constitution says our jurisdiction shall be appellate

only, "under such restrictions and regulations as may be from time to time prescribed by law." Art. VI., Sec. 2.

Under this clause we have recognized the right of the Legislature to take from us and confer on other Courts (notably the Court of Chancery Appeals) certain jurisdiction. But we did not mean, the Constitution could not mean, that the Legislature could take it all away. If so, there need be no Supreme Court. Here, too, the line must be drawn. We must have jurisdiction. The Legislature may reasonably limit; it cannot, therefore, destroy. If so, it can destroy this Court. The Cummins case declares the sound principle on which all constitutional offices must be sustained, and upon it the Courts with all others. There is no principle of general law proportioned according to name or importance of the office. One rule must prevail. We had in this State two cases apparently to the contrary, *Coleman* v. *Campbell* (1875) and *Halsey* v. *Gaines* (1879). During the reconstruction period, from 1865 to 1870, an Act was passed creating certain Courts and another abolishing them. These cases arose on construction of the last Act. They in principle were contrary to preceding cases cited in this opinion, and the reasoning upon which they were based was directly rejected and repudiated in the Leonard case already quoted. In the Leonard case the Court announced that it was not necessary to overrule them, as the Leonard case was not the

same, but every line of it was in hostility to the theory on which they were based, and in conclusion of that case it was announced that if it had been the same they would have been overruled. They were not in terms overruled then, because, not being identical with the case considered, they could not be, but their doctrine was repudiated, as it has been throughout the United States whenever similar constitutional provisions were involved. See cases cited in reference to 12 Am. & Eng. Enc., pp. 18, 19, from many States. And see, especially, *Commonwealth* v. *Gamble* (Pa.), 1 Am. Rep., 422; *Reed* v. *Smoulter* (128 Pa.), 5 L. R. A., 517, 534; *Fant* v. *Gibbs*, 54 Miss., 396; *State, ex rel.*, v. *Friedly* (Ind.), 21 L. R. A., 634; *Foster* v. *Jones*, 52 Am. Rep., 638; *People* v. *Dubois*, 23 Ill., 547; *Attorney-general* v. *Jochim*, 23 L. R. A., 703; *State* v. *Messmore*, 14 Wis., 177; *Ex parte Meredith* (Va.), 778; *Hoke* v. *Henderson*, 25 Am. Dec., 675; *King* v. *Hunter* (N. C.), 6 Am. Rep., 754; *State* v. *De-Gunther* (Wis.), 7 Am. Rep., 89, note; 7 Lawson's Rights & Remedies, Sec. 3817, note; Throop on Public Officers, Secs. 19, 20 (Mr. Throop cites a Louisiana case as authority to the contrary in Sec. 20—*State* v. *Wilts*, 11 La., 438—but this ruling is reversed—38 La., 861—as appears by citation in 1₃ Am. & Eng. Enc. L., p. 19, note 4); Cooley on Con. Lim (6th Ed.), p. 80.

All the cases, so far as they are to be found not herein cited, will be found in notes to sections

in 12 Am. & Eng. Enc. L., cited, and in the briefs of counsel and citations of the Courts and in notes to cases referred to in American Decisions and Lawyers' Reports Annotated. It is confidently asserted that no direct case can be found, outside of Tennessee, on precisely similar constitutional provisions, going as far to sustain legislative action in abolishing Courts as the Tennessee cases of *Coleman* v. *Campbell* and *Halsey* v. *Gaines.*

As supposed to the contrary of this great weight of authority four cases are cited. They are *Aikeman* v. *Edwards*, 30 L. R. A., p. 149; *Crozier* v. *Lyons*, 72 Iowa, 401; *VanBuren Co. Sup.* v. *Mattox*, 30 Ark., 566; *Hoke* v. *Henderson*, 25 Am. Dec., 627.

In the case of *Aikeman* v. *Edwards*, 30 L. R. A., the question as to the power of the Legislature to interfere with a judicial tenure of office was not involved. Butler and Greenwood Counties composed the said twenty-sixth judicial district. The Legislature transferred these counties to the thirteenth district, thereby indirectly abolishing the twenty-sixth district. The Act providing for transfer of jurisdiction also provided that it should not be construed so as to deprive any Judge of his salary. After the passage of this Act, Aikeman was nominated in a party convention as a candidate for the office of Judge of the said twenty-sixth district, which had been abolished by said transfer of its jurisdiction. A certificate of his nomination was given him by the chairman and secretary of the convention, which was by him pre-

sented to the Secretary of State, with the request to file the same. This request was refused by the Secretary of State, on the ground that the said two counties composing the twenty-sixth district had been by said Act transferred to the thirteenth district. Thereupon, Aikeman sued out a writ of mandamus to compel the issuance of the certificate. The relator had no claim or right to the office. His contention was based upon the broad proposition that the Legislature had no power to abolish a circuit by transferring its jurisdiction to another circuit, and that, this being so, the office of Judge of said circuit was still in existence. Upon this contention he claimed the right to become a candidate.

The salary of the Judge incumbent having been preserved by the Act, and said incumbent Judge making no contention, the sole question before the Court was whether the Legislature had the power, under the Constitution, to abolish said circuit, by transferring the counties composing it to another circuit. The Court, in its opinion, distinguished the case from one involving the right of an incumbent Judge, saying: "We might say, in this connection, that the plaintiff in this does not claim any vested right in an office, and that no question is presented by the record before us as to the right of the Legislature to deprive a district Judge of the compensation allowed by law. In the Act under consideration, the Legislature has seen fit to provide that the Act shall not be construed to deprive any Judge

of his salary for the full term for which he was elected. The claim of the plaintiff in this case rests on the broad proposition that the Act in its entirety is void. We need not discuss the question, argued at some length in the brief, whether there can be a Judge without a district, or without a Court over which to preside, as the plaintiff in this case has no interest in that question." 30 L. R. A., 153, 154.

The Act in question abolished four districts by transferring their jurisdiction to other districts. As is shown in the opinion of the Court, this was done upon economical grounds, and to dispense with extravagant and useless Courts. The fact that, under these circumstances, the Legislature reserved to the Judges of the abolished Courts their salaries for their full terms of office, furnishes the evidence that the Legislature considered that the Act would be unconstitutional unless such reservation was made. The Constitution referred to in this case provided that Judges should hold their offices for a term of four years. But it must be admitted that the opinion of the Court indicates that it intended to maintain the view for which it is cited. We have pointed out, however, the facts and different constitutional provisions.

The case of *Crozier* v. *Lyons*, 72 Iowa, 401, has no bearing upon the question in the case at bar. The Constitution of Iowa (1857) provided that the judicial power should be vested in a Supreme Court,

District Court, and such other Courts inferior to the Supreme Court as the General Assembly may from time to time establish. It further provided for a fixed term of office as to the Judges of the Supreme Court and District Court, and for an undiminished compensation during the term for which they were elected. It further provided for the reorganization by the Legislature of judicial districts and an increase of Judges of the Supreme Court, but that this should be done so as not to remove a Judge of said Court from office. As to inferior Courts which were not embraced in the classes of Courts before named, said Constitution contained no provisions for a fixed tenure of office, nor for an undiminished compensation during continuance in office, nor any prohibition against removal from office. In law the prohibition in said Constitution against removal from office of one class of Judges conferred the implied power to remove the other class—the Judges of the inferior Courts constituting said class. It will be seen from said Constitution that the class of Courts designated in the same as inferior Courts were intended to be creatures of the Legislature, subject to its will, and for this reason no constitutional limitations were thrown around such Courts. It is obvious, from the terms of said Constitution, that no question of legislative interference with a constitutional tenure of office arose in said case. Iowa Const., Art. V., p. 382.

The case of *VanBuren County Supers.* v. *Mattox*,

30 Ark., 566, was grounded upon express provisions of the Arkansas Constitution, and is not in point. The Constitution of Arkansas (1868) provides, n Sec. 5, Art. VII., as follows: "The inferior Courts of the State, as now constituted by law, except as hereinafter provided, shall remain with the same jurisdiction as they now possess, provided that the General Assembly may provide for the establishment of such inferior Courts, changes of jurisdiction, or abolition of existing inferior Courts, as may be deemed requisite. The Judges of the inferior Courts herein provided for, or of such as may hereafter be established by law, shall be appointed by the Governor, by and with the advice and consent of the Senate, for the term of six years, and, until such time, the General Assembly shall not interfere with the term of office of any Judge." Hough Amer. Const., Vol. 1, p. 101. In this case an inferior Court was abolished by an Act of the Legislature, and the Judge of the Court instituted a mandamus proceeding to compel the payment of his salary. The Court holding adversely to the contention, said: "Where the Court is abolished, as was the case in this instance, there was no longer an office to fill, no officer, no service to render, and no fees due." It will be seen that said Constitution expressly conferred upon the Legislature the power to abolish inferior Courts. The constitutional limitation upon the Legislature that it should not interfere with the term of office of a Judge is to be construed in connec-

tion with the provision conferring the power to abolish. This limitation was construed by the Court —that while the office existed only during this time, the term of office should not be interfered with. It is therefore evident that the Court based its conclusion upon the theory that said limitation did not control the provision conferring the express power to abolish, and that the limitation was subordinate to this provision. So, therefore, the case is grounded on an express constitutional provision conferring upon the Legislature the power of abolition, this power of abolition necessarily carrying with it the power of deprivation of office.

The case of *Hoke* v. *Henderson*, 25 Am. Dec., 677, involved the tenure of office of a clerk—an office recognized by the Constitution of the State, but as to which there was no tenure of office prescribed in that instrument, such tenure being left to the will of the Legislature. 25 Am. Dec., 684. Chief Justice Ruffin, in that case, said: "There is no reason why a public office should not be given during good behavior. The services are what concern the country, and they may be expected to be best done by those whose knowledge of them from time and experience is most extensive and exact. Some offices can, under the Constitution, be granted or conferred for no other term but that of good behavior. Such is the provision respecting the office of a Judge and Justice of the Peace. Certainly that is not introduced solely for the benefit of the

18 P—41

persons holding those offices, but upon the great
public consideration that he who is to decide contro-
versies between the powerful and the poor, and es-
pecially between the government and an individual,
should be independent, in the tenure of his office,
of all control and influence which might impair his
impartiality, whether such control be essayed through
the frowns of a bad man or through the adulation
of an artful one, or such influence be produced by
the threats of the government to visit nonconformity
to its will by depriving him of office or rendering
it no longer a means of livelihood. For these rea-
sons the Constitution has fixed the tenure of the
judicial office to be during good behavior. The peo-
ple have said that the liberty and safety of the
citizen required that it should not be held upon any
other tenure. □ It is clear, therefore, that our ances-
tors did not entertain the notion that such a tenure
was not consistent with our Constitution generally.
It is true that it does not put clerks upon the same
basis. There was not the same reason for it. The
public interest did not require that any law should
be laid down to the Legislature as to the tenure of
those offices, but it was left to their discretion as
expediency might, from time to time, require it to
be altered.'' 25 Am. Dec., 694, 695.

Notwithstanding these declarations of the Court in
that case, it is cited in the brief of the Attorney-
general, in this, as sustaining his contention, that
the Judges of our inferior Courts are mere legisla-

tive creatures, to be dealt with as the Legislature pleases. In his brief he sets out a quotation, taken from an isolated portion of the case, which he italicizes. It is as follows: "So also it is yielded, for the like reason, that the office itself, when it ceases to be required for the benefit of the people, may be abolished. There is no obligation on the Legislature or the people to keep up an useless office, or pay an officer who is not needed. He takes the office with the tacit understanding that the existence of the office depends on the public necessity for it, and that the Legislature is to judge of that."

As this quotation omits the language of the Court immediately following the same, we add this language to the quotation, viz.: "But, while these postulates are conceded, the conclusion drawn from them cannot be admitted. They are, that there cannot be private property in the public offices, and if there be that the officer may be discharged at the discretion of the Legislature. Neither of these propositions is believed to be · correct." 25 Am. Dec., 693.

The language quoted from that case in the brief of the Attorney-general, was, as will appear from an examination of the case, intended to apply only to offices which were subject to legislative will, and not to offices the tenures of which are constitutionally defined. On the contrary, the case expressly declares that the Legislature is powerless to interfere with offices the tenure of which is constitution-

ally prescribed. The case is a direct authority against the proposition contended for, and sustains the view herein taken, and so is the case of *State* v. *Jordan*, 33 S. E. Rep., 139, subsequently dedided in the same State.

Having shown that the two Tennessee cases (out of line with former and subsequent cases on the same principle), directly against the holding in *Pope* v. *Phyfer*, 3 Heis., 682, repudiated by three cases since, precisely in point (*State, ex rel.*, v. *Ridley*, *State, ex rel.*, v. *Leonard*, *State, ex rel.*, v. *Cummins*), never should have been controlling, I wish to present the original question against the merit of these opinions *per se*, and in this connection I would refer, first, to their inherent want of weight, by reason of the fallacious doctrine upon which they are rested. It is, first, the assumption that "whatever the Legislature could establish it could destroy." The authorities already cited and quotations made wholly overturn this assumption. It is clear that when a thing is established by the Legislature, and exists only by virtue of that authority, the authority may be withdrawn and the thing itself destroyed. It is equally clear in reason, and we think we have demonstrated it to be so in authority, that when it is established by virtue of constitutional direction, and to exist and take power and duration, with unchangeable salary, from the Constitution, it is imbedded in the Constitution and beyond legislative control. This principle is · enunciated and

argued, we may say established, in so many of the cases cited that to repeat them here would be not only superfluous but inexcusably tedious.

The second fallacy upon which it was based was the lack of independence of the judicial department. The republican form of government, which we, in common with other States, had adopted, in theory embraced three independent departments, the legislative, executive, and judicial, each supreme in its own sphere and independent of the others. This theory had been assumed to be correct, and this condition of independence actually existing in fact from the adoption of our earliest Constitution, until the case of *Halsey* v. *Gaines*, in 1879, when it was announced, in words, by this Court that the independence of the judicial department was only "a fiction of law," and that it could not exist without the assent of the Legislature. We quote the language of the opinion on this point: "Much has been said as to the necessity of maintaining the independence of the judiciary, especially to maintain the Courts free from legislative interference. There are provisions of the Constitution intended to promote, in some degree, their independence; and those provisions should be upheld, but independence in fact is 'a fiction of law.' While the Legislature cannot rightfully subvert the judicial department, it possesses many powers against which the Courts have no protection except the integrity of the Legislature itself and of the people. The taxing power belongs

to the Legislature, and if that body refuses to levy the necessary taxes to support the government, the Courts would be powerless." *Halsey* v. *Gaines*, 2 Lea, 826.

This fallacious argument, based on supposed revolutionary action of the Legislature, is so fully met and overthrown by Chief Justice Ruffin, in the case of *Hoke* v. *Henderson*, 25 Am. Dec., 698, that we cannot forbear quoting. He said:

"The argument is, therefore, unsound in this, that it supposes (what cannot be admitted as a supposition) the Legislature will designedly violate the Constitution in utter disregard of their oaths and duty. To do indirectly, in the abused exercise of an acknowledged power, not given for, but perverted to, that purpose, that which is expressly forbidden to be done directly, is a gross and wicked infraction of the Constitution, and the more so because the means resorted to deprive the injured person, and are designed to deprive him, of all redress, by preventing the question becoming the subject of judicial cognizance. But that is not the only test of the constitutionality of an Act of the Legislature. There are many laws palpably unconstitutional which never can be the subjects of legal controversies. Not to allude to the causes which have been recently the themes of the bitterest political controversies, several instances of much simplicity may be adduced from our State government. The Constitution of this State provides that the Governor, At-

torney-general, Treasurer, and other officers shall
be elected by the General Assembly by ballot, and
that certain of them shall have adequate salaries
during their continuance in office. Suppose the
Legislature to refuse to elect these officers or to
give them salaries, or, after assigning them salaries
in a statute, to refuse to levy taxes or to collect
a revenue to pay them. All these would be plain
breaches of constitutional duty, and yet a Court
could give no remedy, but it must be left to the
action of the citizens at large to change unfaithful
for more faithful representatives. Yet no one will
say that the Legislature can by law remove the
Governor, or a Judge, or any other head of a de-
partment, because they can unconstitutionally refuse
to provide salaries for them and the Courts cannot
compel the raising of such salaries. Nor can it be
said because there cannot be such compulsion, that,
therefore, the law is constitutional. All that can
be said is that such is the imperfection of all
human institutions, that it is not possible to antici-
pate and provide against all vices of the heart more
than all errors of the head, and that after every
precaution much reliance must be placed in the in-
tegrity of our fellow-men, and that such confidence
is liable to be abused. But I think it may safely
be assumed, as is done in the Constitution, with all
the responsibilities of the legislative representatives
to their constituents under frequent elections, with
all the clear declarations of the rights of the citizens

in that instrument, with the division of the powers of government made in it, whence arise the powers and the. duties of the judiciary to ascertain the conformity of a statute with the Constitution, that with all these guards against· abuse, the danger of a willful and designed violation is never to be apprehended. No arguments, therefore, in favor of · the necessity of executing a particular Act, apparently inconsistent with the Constitution, can be drawn from any supposed ability of the Legislature to effect the same end by indirect means which are beyond the cognizance and control of the judiciary."

The Halsey case had been preceded, in 1875, by that of *State, ex rel. Coleman,* v. *Campbell* (MS. Jackson, now .reported in 3 Shannon, 355), in which it had been held that a Court, Circuit or Chancery, established under the Constitution, might be abolished by the Legislature. The first named case was never published until after the present controversy arose, but the last referred to and was based upon · it, going no further in fact, but broadly announcing the principle upon which it was based to be the want of independence of the judicial department under our Constitution. These cases were presented and decided when the question seemed practically to be of minor importance, because they involved but the little interest and the few dollars of the salary of a single Judge, and though apparently earnestly considered and decided after a division and dissenting opinion, we think the scope,

importance, and vicious extent of the ruling was never properly appreciated by the Court or the bar at that time, and is hardly so now, when we have only the destruction of eleven constitutional judicial offices and officers (counting Judges and District Attorneys), before us, and never will be perhaps until some less envied successors of ours shall have before them the destruction of the entire judicial department. We are sure the extent and consequence of such a construction was never contemplated then. They were faintly perceived in the last case, and an intimation given that legislation to abolish a circuit or division, for the purpose of destroying a Judge, would be unconstitutional, but the Court dealt with this great question like it was to be disposed of on fictions, and, if correct, struck a death blow to the department of the government on whose security and independence the best interests, the lives, liberty, and property of the citizens have always rested in pride, and heretofore in security. The Legislature, however, never deemed it wise until recently to follow this invitation and invade the department which the Constitution made the permanent administrator of justice. In a minor case or two, never of consequence and never noticed until the Leonard case, the Legislature may have asserted the right so conceded, but that department seemed not to desire to adopt the construction given the Constitution. It let Judges go, as they had always gone, uncontrolled by any

assumption or assertion of general legislative power
or control. When the Leonard case arose to
again test the power to abolish and establish Courts,
it was upon the passage of a County Court bill
abolishing the Judge of a single county, about which
the majority of the Legislature could care little and
know less. It was a local matter, purely, affecting
only a single officer in one county. Naturally, it
attracted no general notice from the Legislature or
from others. It passed under these conditions. When
it came before this Court, we then recognized in it
a great question, and we treated it as such. We
distinctly and in the most unmistakable terms rejected
and repudiated the principle and the argument on
which the Coleman and the Halsey cases were
founded. We dissented most earnestly from the
statement formulated in the last case, that judicial
independence is a fiction of law, and asserted our
rejection of the whole doctrine of those cases in
terms so clear that we did not think them suscep-
tible of misapprehension or misconstruction, and we
asserted that judicial independence was a constitutional
fact, plainly existent in the Constitution, and not to
be construed away on any pretext whatever. We
asserted that when a Court, under the Constitution,
was created, it was to be for the full constitutional
term, and could not be abolished. We said this was
intended to prevent experimenting with Courts; to
cause the Legislature to be careful in creating them,
because they could not be destroyed sooner. We

said it was to give the people opportunity to try them on their merits that the term must be so long. We said it was to make the Judges independent of all apprehension of loss of office by legislative or other interference. We said everything that could be said to mean all this, and thought nobody could mistake it. We said, additionally, that while the Coleman and Halsey cases, with which we did not concur, were not in the way, and could not be overruled because not so, we would overrule them if this case had been like them, and they had therefore required overruling. There can be no doubt of what we then said and meant. We are not the same individuals now, and may not agree, but let us not find differences which do not exist, and which all the world will say do not exist. The same is true of the Cummins case. In principle it is with the Leonard case, and inconsistent with the other two. We can make nothing else out of it, and nothing else can be made out of it. We propose in this dissent to stand by them. They are right, and always were, as the others which they repudiated never were.

Now, as to the object of making three independent departments, and of giving fixed tenures and salaries, it is agreed throughout the United States that this was to secure judicial independence. On this question, and its importance, I cannot forbear some quotations, though, to the legal profession at least, they may be regarded as trite and superfluous.

The subject is well presented in the able brief of defendant's counsel, in argument and citation, and we can state it no better than by liberal extracts there-from:

"To secure the independence of the judicial department, the Constitution provides that the term of the service of a Judge should be for eight years, and that his salary should not be diminished during his term of office, this being the only method by which such independence could be preserved to those who exercise the functions of this department. These constitutional provisions guarding the tenure of office and salary of the judiciary, were expressly intended as limitations upon the power of any other department to disturb these safeguards of an independent department. They were intended to be fixed and unalterable, subject alone to one limitation—that is, by the removal of a Judge from office for causes of his own creation, or arising from his personal condition. This limitation is expressed in the provisions for an impeachment or removal from office for cause by a two-thirds vote of both houses. To intefere with the judicial department by any other mode than under the grant of power to remove by impeachment or by a two-thirds vote of both houses, violates the limitations expressed in the provisions securing the judicial tenure of office. There can be no intermediate ground for implication or construction.

"The Legislature can only act under this grant

of power of removal; any other mode is prohibited. This grant of power of removal by impeachment, or for cause by two-thirds vote, precludes the idea of removal by any other method—abolition or reorganization of Courts or otherwise. If the power of removal by abolition or reorganization of Courts was intended, there was no need of these methods of removal. Removal could be accomplished by the simple and easier method of a majority vote abolishing or reorganizing Courts, and the establishment of new Courts or circuits. The constitutionally defined methods of removal of themselves afford conclusive evidence of the intendment that no other mode could be exercised. 'When the means for the exercise of a granted power are given, no other or different means can be implied as being more effectual or convenient.' The granted power must be exercised in the prescribed manner. Every other mode of executing the power is prohibited. *Norment* v. *Smith*, 5 Yer., 272; Cooley Const. Lim. (6th Ed.), p. 78.

"'The affirmation of a distinct policy upon any specific point in a State Constitution implies the negation of any power in the Legislature to establish a different policy. Every positive direction contains an implication against anything contrary to it, or which would prevent or disappoint the purpose of that provision.' *State* v. *Halleck*, 33 Am. Rep., p. 551; Cooley on Con. Lim., 6th Ed., 80.

"That the tenure of office provisions of the Constitution were expressly intended to secure the term

of office and the Judge the office during the tenure, subject alone to the defined grant of power of removal, is firmly established in the light of history and the conditions which led to the establish-ment of our Federal and State forms of government. When we look to these, we find the full import of the framers of our organic law 'hammered and crystallized' in the few brief words which define and secure judicial independence by a fixed tenure of office, and an undiminished compensation during that tenure.

"The struggle for judicial independence has been a long and eventful one. In England the appointment of Judges was a prerogative of the Crown, and their tenure of office at the pleasure of the Crown. Prior to the reign of James II. this prerogative had been abused by the Stuarts to some extent, but it was abused by James II. so largely and arbitrarily that it became one of the causes of the revolution. Macaulay gives this account of his arbitrary removals of Judges: "Judge after Judge had been stripped of the ermine for declining to give decisions opposed to the whole common law and statute law. Decisions at variance with the spirit of the Constitution had been obtained from these tribunals by turning out Judge after Judge until the bench had been filled with men ready to obey implicitly the directions of the government."

"These many abuses of power are too numerous to detail. They were characterized by judicial mur-

der, emphasized by tyranny, corruption, and oppression. History was made odious with the bloody assizes of Jeffreys and the execution of Sydney; with the revival of the Star Chamber and the oppression of the High Commission. The efforts of the King to secure from his pliant tools upon the High Commission the conviction of the bishops who dared to disobey his will set England aflame. Then came the revolution, and with it it was made a part of the unwritten Constitution of England that the Judges should hold *quamdiu se bene gesserit*—that is, during life or good behavior, instead of *durante placito*—that is, at the discretion of the Crown, and that they should not be removed from office except upon the address of two-thirds of both houses of Parliament. This establishment of the judicial tenure was first secured, though imperfectly, in the bill of rights following the revolution; then by the statute of 13 William III., defining the judicial tenure in the terms stated, and prohibiting removal from office by the Crown except upon the addresses of two-thirds of both houses of Parliament. But, under the laws, the office of the Judge expired with the demise of the King. Afterward, by statute in the reign of George III., it was provided that the Judges should hold during good behavior, notwithstanding the demise of the King; and also by this statute their full salaries were secured during their continuance in office. In recommending this Act, the King said "he looked upon the independence and uprightness

of the Judges as essential to the impartial adminis-
tration of justice; as one of the best securities of
the rights and liberties of his subjects, and as most
conducive to the honor of the Crown." Story on
Const., Secs. 1608, 1623, 1624; Hallum's Const.
His., 391, 401; 12 Green's Hist. of Eng., Haw-
thorne Ed. Nations of the World, 80; 2 Macaulay's
Hist. of Eng., 62–65, 160, 208, 209, 210, 261,
287, 319, 320, 262 *et seq.*, Vol. 4, p. 147; Im-
peachment Williams, 336.

" ' In England the complete independence of the
judiciary has been considered, and has been found
the best and surest safeguard of true liberty, secur-
ing a government of known and uniform laws, act-
ing alike upon every man.' Judge Hopkinson, De-
fense of Chase; note Story Const., Sec. 1619.

" ' Indeed, since the independence of the Judges
has been secured by this permanent duration of
office, the administration of justice has, with one
exception, flowed on in England with an uninter-
rupted, pure, and unstained current. It is due to
the enlightened tribunals of that nation to declare
that their bearing, integrity, and impartiality have
commanded the reverence and respect of Europe as
well as America.' Story on Const., Sec. 1608.

" ' Such was the memorable history of the struggle
for the establishment of the independence of Judges
in England, and its engraftment into the unwritten
Constitution of that country. This independence can
now only be terminated by ' an address from both

The Judges' Cases.

houses of Parliament, as the most regular, solemn, and authenticate way by which the dissatisfaction of the people can be expressed.' Dr. Paley (Story on Const., note, Sec. 1609).

"While the Parliament of England is omnipotent, the necessity of judicial independence as a protection of life, liberty, and property, is so firmly imbedded in the English mind that no Parliament has assumed to interfere with the tenure of office of a Judge except upon the gravest of reasons, and only in matters personal to the Judge. The adequate salaries paid the Judges of England, in view of the purposes for which they are paid—to secure the best of judicial service—the salaries can have no place in the consideration of Parliament as a cause to address to the Crown for removal.

"Arbitrary removal by the King of Judges from office in the colonies was one of the causes which led to the declaration of our independence. In that instrument it is recited: 'He has made Judges dependent on his will alone for the tenure of their offices, and the amount and payment of their salaries.' In the light of this antecednt history the Constitution of the United States was framed by the Convention of 1787. In addition to its intelligence this body was characterized by thorough knowledge, information, and research, as to political economy, the government of republics, democracies, and the institutions of the mother country. Its purpose was to frame a written instrument to control a great

18 P—42

people upon the theory of three separate, independent, and co-ordinate departments of government, the executive, judicial, and legislative. Judicial independence was intended to be secured by the provision that 'the Judges of both the Supreme and inferior Courts shall hold their offices during good behavior, and shall at stated times receive for their services a compensation, which shall not be diminished during their continuance in office.' Art III., Sec. 1. This Convention was held with closed doors, and there seems to be no record of its debates, except a few brief minutes of Mr. Yates. After the formation of the Constitution, it was submitted to the respective Conventions of the States for adoption. The records of the debates in some of these Conventions have been preserved, and have been compiled by Mr. Elliott.

"These debates establish beyond controversy that said clause of the Federal Constitution was intended to put the tenure of office of the entire Federal judiciary beyond any legislative interference whatever, except by impeachment. In fact, this was urged upon the State Conventions as one of the main reasons why the Constitution should be adopted. There were objections urged to the provisions as to the judiciary on other grounds, but none upon the matter of independence of the judiciary as secured by a fixed tenure of office. It is clear from these debates that the Constitution was considered as intending that the tenure of office and salaries of

Judges should not be disturbed during good behavior, and that a breach of the condition of good behavior should only be considered by means of an impeachment. We quote pertinent extracts from the debates in the State Conventions:

" ' MASSACHUSETTS CONVENTION—MR. THACKER.

" ' In this proposed form each branch of power is derived either immediately or directly from the people. The lower houses are elected directly by those persons who are qualified to vote for the Representatives of the State, and at the expiration of two years these become private men, unless their past conduct entitles them to a future election. The Senate is elected by the Legislature of the different States, and represents their sovereignty.

" 'These powers are a check on each other, and can never be made either dependent on one another or independent of the people. The President is chosen by the electors, who are appointed by the people. The High Courts of Justice arise from the President and the Senate, but yet the ministers of them can be removed only upon bad behavior. The independence of Judges is one of the favorable circumstances to public liberty, for when they become the slaves of a venal, corrupt Court, and the hirelings of tyranny, all property is precarious and personal security at an end.' Elliott's Debates, Vol. 2, 153, 154.

" ' CONNECTICUT CONVENTION—MR. ELSWORTH, A MEM-
BER OF THE FEDERAL CONVENTION.

" ' This Constitution defines the extent of the pow-
ers of the general government.  If the General Legis-
lature should at any time overlap its limits, the
judicial department is a constitutional check.  If the
United States go beyond their powers, if they make
a law which the Constitution does not authorize, it
is void, and the judicial power, the national Judges
who, to secure their impartiality, are to be made
independent, will declare it to be void.  On the
other hand, if the States go beyond their limits, if
they make the law which is an usurpation upon the
general government, the law is void, and upright,
independent judges will declare it to be so.' *Ibid.*,
198, Vol. 2.

. " ' PENNSYLVANIA CONVENTION—MR. WILSON, A MEMBER
OF THE FEDERAL CONVENTION.

" ' Sir, it has often been a matter of surprise, and
frequently complained of even in Pennsylvania, that
the independence of the Judges is not properly se-
cured.  The servile dependence of the Judges in
some of the States that have neglected to make
proper provisions on this subject, endangers the
property and liberty of the people, and I apprehend
that whenever it has happened the appointment has
been for a less period than during good behavior—
for if every five or seven years the Judges are
obliged to make court for their appointment to office,

they cannot be styled independent. This is not the case with regard to those appointed under the general government. For the Judges shall hold their offices during their good behavior.' *Ibid.*, Vol. 2, 446.

" ' Now, I proceed to the judicial department, and here, Mr. President, I meet an objection I confess I had not expected, and it seems it did not occur to the honorable gentleman (Mr. Finley) who made it, until a few days ago. He alleges that the Judges, under this Constitution, are not rendered sufficiently independent, because they may hold other offices, and though they may be independent as Judges, yet their other offices may depend upon the Legislature. I confess, sir, this objection appears to me to be a little wire drawn. In the first place the Legislature can appoint to no office, therefore the dependency could not be on them for the office, but rather on the President and the Senate; but, then, these cannot add the salary, because no money can be appropriated but in consequence of a law of the United States. No sinecure can be bestowed on any Judge but by the concurrence of the whole Legislature and the President, and I do not think this an event likely to occur.' *Ibid.*, Vol. 2, p. 475.

" ' VIRGINIA CONVENTION—EDMOND RANDOLPH, A MEMBER OF THE FEDERAL CONVENTION.

" ' If Congress wish to aggrandize themselves by oppressing the people, the judiciary must first be

corrupted; no man says anything against them; they are more independent than in England.'

### " ' VIRGINIA CONTINUED—PENDLETON.

" ' It will make no difference as to the principles on which the decisions will be made, whether it will come before the State Court or Federal Court. They will be both equally independent, and ready to decide in strict conformity to justice. I believe the Federal Courts will be as independent as the State Courts. I shall no more hesitate to trust my liberty and property to the one than to the other. Whenever, in any country in the world, the Judges are independent, there property is secure. The existence of Great Britain depends on that purity with which justice is administered.

" ' This clause also secures an important point— the independency of Judges both as to tenure of office and fixing salary. I wish the restraint had been applied to increase as well as to diminish.' *Ibid.*, Vol. 3, pp. 290, 472.

### " ' VIRGINIA CONTINUED—JOHN MARSHALL.

" 'Gentlemen have gone on the idea that the Federal Courts will not determine the causes which may come before them with the same fairness and impartiality with which the other Courts decide. What are the reasons of this supposition ? Do they draw them from the manner in which the Judges are chosen, or the tenure of their office ? What is .it

that makes us trust our Judges? Their independence in office and manner of appointment. Are not the Judges of the Federal Court chosen with as much wisdom as the Judges of the State government? Are they not equally, if not more, independent? Though it may not in general be absolutely necessary, a case may happen, as has been observed, in which a citizen of one State ought to be able to recur to this tribunal to recover a claim from the citizen of another State. What is the evil which this can produce? Will he get more than justice there? The independence of the Judges forbids it. But, says the honorable member, laws may be executed tyrannically. Where is the independence of your Judges? If a law be exercised tyrannically in Virginia, to what can you trust; to your judiciary? What security have you for justice; their independence? Will it not be so in Federal Courts?' Vol. 3, pp. 501, 502, 505, 508.

" 'VIRGINIA CONTINUED—MR. MADISON, A MEMBER OF THE FEDERAL CONVENTION.

" 'Having taken this general view of the subject, I will now advert to what has fallen from the honorable gentleman who presides. His criticism is that the judiciary has not been guarded from an increase of the salary of the Judges. I wished myself to insert a restraint on the augmentation, as well as diminution, of their compensation, and supported it in the Convention. But I was overruled. I must

take the reasons which were urged. They had great weight. The business must increase. If there was no power to increase their pay according to the increase of business, during the life of the Judges, it might happen that there would be such an accumulation of business as would reduce the pay to a most trivial consideration.' *Ibid.*, Vol. 3, p. 489.

### " ' VIRGINIA CONTINUED—MR. HENRY.

. " ' I consider the Virginia judiciary as one of the best []barriers against strides of power; against the power which, we are told by the honorable gentlemen, has threatened the destruction of liberty. Pardon me for expressing my extreme regret that it is in their power to take away· that barrier. Gentlemen will not say that any danger can be expected from the State Legislatures. So small are the barriers against the encroachments and usurpations of Congress, that when I see this latter barrier, the independency of the Judges, impaired, I am persuaded I see the prostration of all our rights. In what situation will your Judges be when they are sworn to preserve the Constitution of the State and of the •general government? If there be a concurrent dispute between them, which will prevail? They cannot serve two masters struggling for the same object. The laws of Congress being paramount to those of the States, and to their Constitutions also, whenever they come in competition, the Judges must decide in favor of the former. This, instead.

of relieving or aiding me, deprives me of my only comfort, the independency of the Judges. The judiciary are the sole protection against a tyrannical execution of the laws. But if by this system we lose our judiciary, and they cannot help us, we must sit down quietly and be oppressed.' *Ibid.*, Vol. 3, p. 591.

### " ' VIRGINIA CONTINUED—MR. GRAYSON.

" ' Something has been said of the independency of the Federal Judges. I will only observe that it is on as corrupt a basis as the art of man can place it. The salaries of the Judges may be augmented. Augmentation of salary is the only method that can be taken to corrupt a Judge.' *Ibid.*, Vol. 3, pp. 511, 512.

### " ' VIRGINIA CONTINUED—MR. GEORGE NICHOLAS.

" ' It has been observed, sir, that the Judges appointed under the British Constitution are more independent than those to be appointed under the plan on the table. This, sir, like other assertions of honorable gentlemen, is equally groundless. May there not be a variety of pensions granted to the Judges in England so as to influence them, and cannot they be removed by a vote of both houses of Parliament? This is not the case with our Federal Judges—they are to be appointed during good behavior, and cannot be removed, and at stated

times are to receive a compensation for their serv-
ices.' *Ibid.*, Vol. 3, p. 526.

" 'NORTH CAROLINA CONVENTION—MR. STEELE.

" ' Will the members of Congress deviate from
their duty without any prospect of advantage to
themselves? What interest can they have to make
the place of elections. inconvenient? The judicial
power of the government is so well constructed as
to be a check. There was no check in the old
confederation. Their power was, in principle and
theory, transcendent. If the Congress make laws
inconsistent with the Constitution, independent Judges
will not uphold them, nor will the people obey
them.' *Ibid.*, Vol. 4, pp. 93–94.

" ' The intention of permanency in the judicial ten-
ure of office is also conclusively shown by articles of
Alexander Hamilton in advocacy of the adoption of
the Federal Constitution by States. These articles
of Mr. Hamilton (a member of the Convention)
published in the *Federalist*, set out the intention of
the Convention in adopting the judicial tenure of
office clause, and in them he shows conclusively that
this clause was framed expressly to secure the Fed-
eral judiciary from any interference, direct or indi-
rect (except by impeachment), on the part of any
co-ordinate department of the government. These
articles (approved by Story) are too lengthy to quote
in full, and we therefore refer the Court to them
for the full context, all bearing with great force

upon the question of judicial independence. Mr. Hamilton says:

" 'According to the plan of the Convention, all the Judges who may be appointed by the United States are to hold their offices during good behavior, which is conformable to the most approved of the State Constitutions, among the rest, that of this State. The standard of good behavior for the continuance in office of the judicial magistracy is certainly one of the most valuable of the modern improvements in the practice of government. In a monarchy it is an excellent barrier to the despotism of the prince; in a republic it is a no less excellent barrier to the encroachments and oppressions of the representative body. And it is the best expedient which can be devised in any government to secure a steady, upright, and impartial administration of the laws.

" ' Whoever attentively considers the different departments of power, must perceive that in a government in which they are separated from each other, the judiciary, from the nature of its functions, will always be the least dangerous to the political rights of the Constitution, because it will be least in a capacity to annoy or injure them. The executive not only dispenses the honors, but holds the sword of the community; the Legislature not only commands the purse, but prescribes the rules by which the duties and rights of every citizen are to be regulated; the judiciary, on the contrary, has no influ-

ence over either the sword or purse; no direction
either of the strength or the wealth of society, and
can take no active resolution whatever. It may
truly be said to have neither force nor will, but
merely judgment, and must ultimately depend upon
the aid of the executive for the efficacious exercise
even of this faculty. This simple view of the mat-
ter suggests several important consequences. It
proves incontestably that the judiciary is, beyond
comparison, the weakest of the three departments of
power; that it can never attack with success either of
the other two, and that all possible care is requisite
to enable it to defend itself against their attacks.

" 'It proves, in the last place, that as liberty can
have nothing to fear from the judiciary alone, but
would have everything to fear from its union with
either of the other departments; that as all the
effects of such an union must ensue from a depend-
ence of the former on the latter, notwithstanding a
nominal and apparent separation; that as from the
natural feebleness of the judiciary it is in continual
jeopardy of being overpowered, awed, or influenced
by its co-ordinate branches; that as nothing can con-
tribute so much to its firmness and independence as
permanency in office, this quality may, therefore, be
justly regarded as an indispensable ingredient in its
constitution; and, in a great measure, as the citadel
of the public justice and of the public security, the
complete independence of the Courts of justice is
peculiarly essential in a limited Constitution.

" ' If, then, the Courts of justice are to be con-sidered as the bulwarks of a limited Constitution against legislative encroachments, this consideration will afford a strong argument for the permanent tenure of judicial offices, since nothing will contrib-ute so much as this to that independent spirit in the Judges which must be essential to the faithful performance of so arduous a duty.

" ' This independence of the Judges is equally requisite to guard the Constitution and the rights of individuals from the effects of those ill humors which the arts of designing men, or the influence of par-ticular conjunctures, sometimes disseminate among the people themselves, and which, though they speedily give place to better information and a more delib-erate reflection, have a tendency in the meantime to occasion dangerous innovations in the government and serious oppressions of the minor party in the com-munity, for it is easy to see that it would require an uncommon portion of fortitude in the Judges to do their duty as faithful guardians of the Constitu-tion where legislative ·invasions of it had been instigated by the major voice of the community.

" ' That inflexible and uniform adherence to the rights of the Constitutions and of individuals, which we perceive to be indispensable in the Courts of justice, can certainly not be expected from Judges who hold their offices by temporary commission.

" ' There is yet a further and weighty reason for the permanency of judicial offices, which is deducible

from the nature of the qualifications they require. It has been frequently remarked, with great propriety, that a voluminous code of laws is one of the inconveniences necessarily connected with the advantages of a free government. To avoid arbitrary discretion in the Courts, it is indispensable that they should be bound down by strict rules and precedents, which serve to define and point out their duty in every particular case that comes before them, and it will readily be conceived, from the variety of controversies which grow out of the folly and wickedness of mankind, that the records of these precedents must unavoidably swell to a very considerable bulk, and must demand long and laborious study to acquire a competent knowledge of them. Hence it is that there can be but few men in the society who will have sufficient skill in the laws to qualify them for the station of Judges; and making the proper deductions for the ordinary depravity of human nature, the number must be still smaller of those who unite the requisite integrity with the requisite knowledge. These conditions apprise us that the government can have no great option between fit characters, and that a temporary duration in office, which would naturally discourage such characters from quitting a lucrative line of practice to accept a seat on the bench, would have a tendency to throw the administration of justice into hands less able and less well qualified to conduct it with ability and dignity.

" 'Upon the whole, there can be no room to doubt that the Convention acted wisely in copying from the models of those Constitutions which have established good behavior as the tenure of judicial offices in point of duration, and that so far from being blamable on this account, their plan would have been inexcusably defective if it had wanted this important feature of good government. The experience of Great Britain is an illustrious comment on the excellence of the institution.'' Federalist, Nos. 78 and 79, p. 362 to 371.

''Another evidence of this purpose of the Federal Constitution is to be found in the rejection, by the Convention framing the same, of two propositions. One of these propositions was to make the Judges removable by the President upon the application of the Senate and House of Representatives; the other to authorize the removal of Judges on account of their disability to discharge the duties of their offices. That these propositions were rejected for the reason that they might effect judicial independence is shown by Mr. Story in his work on Constitutions. Story on Con., Secs. 1622, 1623, 1624, 1625, 1626.

'' The judicial tenure of office clause in the Constitution of 1796 is to be interpreted in connection with antecedent history. It was in the light and knowledge of the fierce struggle which took place in England to secure judicial independence; of the solemn protest of the Declaration of Independence against the interference of the King with the tenure

of officials, the colonial Judges and their salaries; and of the history of the formation and adoption of the Federal Constitution and the engraftment into the same of a fixed tenure of office paramount (except by impeachment) to any legislative will, that the first Constitution of the State was framed in 1796. This Constitution provided that Judges should 'hold their offices ·during their good behavior.' The meaning of these words is to be interpreted in the light of the history and conditions preceding the formation of the Constitution. So interpreted, it seems beyond controversy that this provision was intended to secure to the Judges a tenure of office safe from any legislative interference or abridgment, direct or indirect, except for causes for which the Judge might become responsible by ·breaching the condition of good behavior, this being provided for by impeachment. Cooley on Cons. Lim., 6th Ed., p. 80.

"It is evident that the judicial tenure of office provided for in the Constitution of 1796 was modeled after the Federal Constitution, and was intended to bear the same meaning and construction.

"Under these conditions, and with these preceding events in the knowledge of the Convention, it seems wholly unreasonable to suppose this tenure of office clause was intended to be in any way abridged or limited by the clause in said Constitution providing that the judicial power of the State 'shall be vested in such superior and inferior courts of law and

equity as the Legislature shall from time to time direct and establish.' If the tenure of office clause in said Constitution of 1796 was intended to be paramount to said last clause, the tenure of office clause in the Constitution of 1870 must also be construed as paramount to the clause providing that the Legislature shall 'ordain and establish inferior courts.'

"The Convention of 1796 framed an organic law (said by Jefferson to be 'the least imperfect and most republican' of any then framed) to govern a free people. Its every intent and purpose must have been to erect every barrier to oppression and to provide every possible safeguard for the protection of the people. With the dangers which attended a judiciary dependent upon the King, and the protest of the Declaration of Independence in its knowledge, it seems incredible that this Convention intended to submit judicial independence to abridgment and destruction by legislative will, thus transferring dominion from an executive power to a legislative power—a change from one to many masters. The authority of said Convention given to the Legislature to 'ordain and establish courts,' viewed in the light of history, could not have been intended to permit the destruction of the judicial tenure expressed in terms, and thus by a mere implication permit the power to interfere with judicial independence by the abolition of courts.

"Story, Tucker, and Kent fully sustain the con-

18 P—43

tentions we make. These masters of constitutional law forcefully, clearly, and exhaustively give conclusive reasons why the judicial tenure of office expressed in the terms 'during good behavior,' expressly protect against all legislative interference except by impeachment. They are too lengthy to quote in full; only extracts can be given, and the Court cited to the full version. 1 Kent's Com., 13 Ed., 293 to 295; Story Const., Secs. 1607 to 1613.

" Mr. Kent, after referring to the importance of judicial independence, so that the Judges might stand against all improper influences, says:

" ' To give them the courage and the firmness to do it, the Judges ought to be confident of the security of their salaries and station. The provision for the permanent support of the Judges is well calculated, in addition to the tenure of their office, to give them the requisite independence. It tends also to secure a succession of learned men on the bench, who in consequence of a certain undiminished support, are enabled and induced to quit the lucrative pursuits of private business for the duties of that important station." 1 Kent, 294–5.

"Mr. Story:

" ' The reasons in favor of the independence of the judiciary apply with augmented force to republics, and especially to such as possess a written Constitution with defined powers and limited rights. It is obvious that, under such circumstances, if the tenure of office of the Judges is not permanent,

they will soon be rendered odious, not because they do wrong, but because they refuse to do wrong; and they will be made to give way to others who shall become more pliant tools of the leading demagogues of the day. There can be no security for the minority in a free government, except through the judicial department.

"'In the next place, the independence of the judiciary is indispensable to secure the people against the intentional as well as unintentional usurpation of the executive and legislative departments. It has been observed with great sagacity that power is perpetually stealing from the many to the few; and the tendency of the legislative department to absorb all the other powers of the government has always been dwelt upon by statesmen and patriots as a general truth, confirmed by all human experience.

"'Thus, in the free government of Great Britain, an Act of Parliament, combining as it does the will of the Crown and of the Legislature, is absolute and omnipotent. It cannot be lawfully resisted or disobeyed. The judiciary is bound to carry it into effect at every hazard, even though it should subvert private rights and public liberty. But it is far otherwise in a republic like our own, with a limited Constitution, prescribing at once the powers of the rulers and the rights of the citizens. This very circumstance would seem conclusively to show that the independence of the judiciary is absolutely

indispensable to preserve the balance of such a Constitution. In no other way can there be any practical restraint upon the acts of the government, or any practical enforcement of the rights of the citizens.

" 'Does it not follow that to enable the judiciary to fulfill its functions it is indispensable that the Judges should not hold their offices at the mere pleasure of those whose acts they are to check, and if need be to declare void? Can it be supposed for a moment that men holding their offices for the short period of two or four or even six years, will be generally found firm enough to resist the will of those who appoint them and may remove them?

" 'The truth is, that even with the most secure tenure of office during good behavior, the danger is not that the Judges will be too firm in resisting public opinion and in defense of private rights or public liberties, but that they will be too ready to yield themselves to the passions and politics and prejudices of the day. In a monarchy the Judges in the performance of their duties with uprightness and impartiality, will always have the support of some of the departments of the government, or at least of the people. In republics they may sometimes find the other departments combined in hostility against the judicial; and even the people for a while, under the influence of party spirit and turbulent factions, ready to abandon them to their fate. Few men

possess the firmness to resist the torrent of popular opinion, or the content to sacrifice present ease and public favor in order to earn the slow rewards of a conscientious discharge of duty, the sure but distant gratitude of the people, and the severe but enlightened award of posterity.

" ' The considerations above stated lead to the conclusion that in republics there are in reality stronger reasons for an independent tenure of office by the Judges, a tenure during good behavior, than in a monarchy. Indeed, a republic with a limited Constitution, and yet without a judiciary sufficiently independent to check usurpation, to protect public liberty, and to enforce private rights, would be as visionary and absurd as a society organized without any restraints of law.

" ' In human governments there are but two controlling powers—the power of arms and the power of laws. If the latter are not enforced by a judiciary above all fear and above all reproach, the former must prevail, and thus lead to the triumph of military over civil institutions. The framers of the Constitution, with profound wisdom, laid the cornerstone of our national republic in the permanent independence of the judicial establishment. Upon this point their vote was unanimous.

" ' The main security relied on to check an irregular or unconstitutional measure, either of the executive or the legislative department, was, as we have seen, the judiciary. To have made the Judges,

therefore, removable at the pleasure of the President and Congress, would have been a virtual surrender to them of the custody and appointment of the gurdians of the Constitution. It would have been placing the keys of the citadel in the possession of those against whose assaults the people were most strenuously endeavoring to guard themselves. It would be holding out a temptation to the President and Congress, whenever they were resisted in any of their measures, to secure a perfect irresponsibility by removing those Judges from office who should dare to oppose their will. Such a power would have been a signal proof of a solicitude to erect defenses round the Constitution for the sole purpose of surrendering them into the possession of those whose acts they were intended to guard against. Under such circumstances, it might well have been asked where could resort be had to redress grievances or so overthrow usurpations?

" 'The next clause of the Constitution declares that the Judges of the Supreme and inferior Courts shall, at stated times, receive for their services a compensation which shall not be diminished during their continuance in office. Without this provision the other, as to the tenure of office, would have been utterly nugatory, and, indeed, a mere mockery.

" 'It is almost unnecessary to add that although the Constitution has, with so sedulous a care, endeavored to guard the judicial department from the overwhelming influence or power of the other co-

ordinate departments of the government, it has not conferred upon them any inviolability or irresponsibility for an abuse of their authority. On the contrary, for any corrupt violation or omission of the high trusts confided to the Judges, they are liable to be impeached (as we have already seen), and, upon conviction, removed from office. Thus, on the one hand, a pure and independent administration of public justice is amply provided for, and, on the other hand, an urgent responsibility secured for fidelity to the people.' Story Const., Secs. 1610, 1612, 1613, 1614, 1619, 1621, 1624, 1628, 1635.

" He further says, quoting from Mr. Justice Wilson: 'In the United States this independence extends to Judges in Courts inferior as well as supreme. This independency reaches equally their salaries and their commissions. In England the Judges of the superior Courts do not now, as they did formerly, hold their commissions and their salaries at the pleasure of the Crown, but they still hold them at the pleasure of the Parliament; the judicial subsists, and may be blown to annihilation, by the breath of the legislative department. In the United States the Judges stand upon the sure basis of the Constitution, the judicial department is independent of the department of the Legislature. No Act of Congress can shake their commission or reduce their salaries. The Judges, both of the supreme and inferior Courts, shall hold their offices during good behavior, and shall, at

The Judges' Cases.

stated times, receive for their services a compensation which shall not be diminished during their continuance in office.' Story Const., Sec. 1632.

"See also the remarks of Judge Hopkinson upon the independence of the judiciary, made in defense of Mr. Chase upon his impeachment (Story Const., Sec. 1619, note 3), and see Mr. Tucker's views, expressed in his Commentaries on Blackstone, in which he says, among other cogent expressions: 'This absolute independence of the judiciary, both of the executive and the legislative departments, which I contend is to be found both in the letter and spirit of our Constitutions, is not less necessary to the liberty and security of the citizen and his property in a republican government than in a monarchy. Such an independence can never be perfectly attained but by a constitutional tenure of office, equally independent of the frowns and smiles of the other branches of the government. And herein consists one of the greatest excellencies of our Constitution, that no individual can be oppressed whilst this branch of the government remains independent and uncorrupt, it being a necessary check upon the encroachments or usurpation of power by either of the other. And as from the natural feebleness of the judiciary, it is in continual jeopardy of being overpowered, awed, or influenced by its co-ordinate branches, who have the custody of the purse and the sword of the confederacy, and as nothing can contribute so much to its firmness or independence

as permanency in office; this quality, therefore, may be justly regarded as an indispensable ingredient in the Constitution, and in a great measure as the citadel of the republic, justice, and the public security.' 1 Tuck. Black. Com. App., 354–356 to 360.

" 'Whatever, then, has been said by Baron Montesquieu, De Lolme, Judge Blackstone, or any other writer, on the security derived to the subject from the independence of the judiciary of Great Britain, will apply at least as forcibly to that of the United States. We may go still further. In England the judiciary may be overwhelmed by a combination between the executive and the legislative. In America (according to the true theory of our Constitution) it is rendered absolutely independent of, and superior to the attempts of both to control or crush it: first, by the tenure of office, which is during good behavior; these words (by a long train of decisions in England, even as far back as Edward III.) in all commissions and grants, public or private, importing an office or estate for the life of the grantee, determinable only by his death or breach of good behavior. Secondly, by the independence of the Judges in respect to their salaries, which cannot be diminished.' Story on Cons., Sec. 1620, note 2; Sec. 1627, note 1.

But it is said by the majority that if the Coleman and Halsey cases in Tennessee, the cases referred to, be not overruled in terms, they are *stare decisis*, and should be adhered to. The answer to that, in the first place, is that they have

not been adhered to. The Leonard case and the Cummins case directly overturn them—that is, they repudiate them in principle. It is not necessary that they be declared overruled. It is sufficient if later cases be inconsistent with them in principle. In some Courts this is the only practice of overruling. It is so in the Supreme Court of the United States. That Court never says it overrules a case. It merely proceeds on an antagonistic principle to decide some other. But the cases never were *stare decisis*. "Erroneous decisions under the Constitution as to the tenure of a Judge's office will be overruled as not within the doctrine of *stare decisis*, which does not apply to questions of constitutional law." 12 Am. & Eng. Enc. L., 18. I quote literally; the cases are cited in the notes. But it is said some other statutes like this in exceptional cases may have been passed. To this I wish to answer in the language of a great Judge of this State deciding a similar case. He said:

"It is said by counsel that the Legislature has passed many statutes similar to this, and various cases are referred to. I acknowledge the force of the authority of adjudication upon analogous cases. It sometimes presents a forcible and conclusive argument. But it is a sufficient answer to the argument upon this point to say that the cases and decisions referred to, though analogous, were not made in this precise case, and I can never follow precedent in the line of analogy when it leads to an infraction of the

Constitution. Hence the necessity of a frequent re-currence to first principles. If we follow precedent and move on according to the analogy of cases, we shall be led from step to step until the Constitution itself will be lost amid the subtleties of the law. When precedent is established in the construction of statute or common law, I concede the propriety of following it, unless flatly absurd or unjust. But every Judge, and other public officer, when called on to do an official act, must judge of the Constitution for himself, for no precedent however grave and no adjudication however respectable can warrant a violation of that sacred instrument." *Bank* v. *Cooper*, 2 Yer., 622.

This was the language of a Judge who, in utter-ing it, denied his right to sit upon another Court and take another salary.

The truth is, the judiciary is marked for sacrifice. The Constitution established three, and only three, great departments—the legislative, the executive, and the judicial. The other two have remained intact. Other departments, boards, bureaus, and commissions, with consequent great expense, have been grafted on the government. Schools, asylums, and State insti-tutions generally, have called for more and more. Tax-bearing has become a grievous burden, and the people are to be taught that the judicial department is its cause. The attention of the country is turned to the Courts, and the abolition of one of the con-stitutional departments demanded. Three departments

are too many for the Constitution. Five or six may not be for government, but three are too many there. One must, therefore, be destroyed. The judicial is singled out for destruction. If this Act is valid it is gone, and with what resultant benefits to the people? The saving of one and a half cents each to our population, or of five cents annually to each voter of the State, and not the hundredth part of a cent on the taxable valuation of its property. This, it would seem, is a poor return for the destruction of constitutional Courts, and constitutional Judges and District Attorneys, and confusion of public business and the general impediment of public justice, and the deprivation of eleven citizens of constitutional rights they had spent their lives in acquiring fitness to exercise and years of struggle in acquiring the positions from which they are ejected. No other constitutional department has ever been assailed or impaired. The executive has been fostered and protected. The legislative has been honored and preserved. No legislative representative has ever been denied his legal tenure of office, and in all the legislative redistricting the membership has been increased, but never has one been denied the right to his office during his constitutional tenure. We solemnly protest against this invasion of the judicial department as the establishment of a ruinous precedent, and that this Court should be constrained to lend its sanction to that destruction and see prostrate before it the wreck of its department.

It is finally said, however, we have a legislative precedent in the Federal Government of long standing, and it should be looked to. In 1801 the Federal Congress created sixteen circuit judgeships. The Act passed to enable him to do so, and Mr. Adams made the appointments of the Judges on the last day of his term. When Mr. Jefferson came in, with the Congress of 1802, attention was called to this Act in his message, and ready partisans offered bills to repeal it. It was repealed during the session of 1802 by a partisan vote, after one of the greatest debates ever made in Congress, in which the notable device of "taking the office from the Judge," when the Constitution did not permit you to "take the Judge from the office" was invented. It worked, and served its purpose, and the Courts were never invoked to test its constitutionality. It made a bad precedent, which no Congress has followed, and the invalidity of it, in consequence of the indisposition of the Judges at that early day to enter into a struggle with the other departments of the government, and who retired without contest, was, therefore, never embalmed in judicial records. But it was in judicial disesteem and disapprobation. It was condemned by all the great Judges and law authors. I append a few of them, worthy to be perpetuated, and which should always be recalled whenever and wherever a controversy on the same question arises.

Mr. Story, speaking of it, says: "But, unfortu-

nately, a measure was adopted, in 1802, under the auspices of President Jefferson, which, if its constitutionality can be successfully vindicated, prostrates in the dust the independence of all inferior Judges, both as to the tenure of their office and their compensation for services, and leaves the Constitution a miserable and vain delusion. In the year 1801 Congress passed an Act reorganizing the judiciary and authorizing the appointment of sixteen new Judges, with suitable salaries, to hold the Circuit Courts of the United States in the different circuits created by this Act. Under this Act the Circuit Judges received their appointments and performed the duties of their offices until the year 1802, when the Courts established by the Act were abolished by general repeal of it by Congress, without in the slightest manner providing for the payment of the salaries of the Judges, or for any continuation of their offices. The result of this Act, therefore, is (so far as it is a precedent) that notwithstanding the judicial tenure of office of the Judges of the inferior Courts is during good behavior, Congress may at any time, by a mere act of legislation, deprive them of their offices at pleasure, and with it take away their whole title to their salaries. How this can be reconciled with the terms or the intent of the Constitution is more than any ingenuity of argument has ever, as yet, been able to demonstrate. The system fell, because it was unpopular with those who were then in possession of power, and the vic-

tims have hitherto remained without indemnity from the justice of the government.

"Upon this subject a learned commentator has spoken with a manliness and freedom worthy of himself and of his country. To those who are alive to the just interpretation of the Constitution; those who, on the one side, are anxious to guard against the usurpation of power injurious to the State, and those who, on the other side, are equally anxious to prevent a prostration of any of its great departments to the authority of the others, the language can never be unseasonable, either for admonition or instruction, to warn us of the facility with which public opinion may be persuaded to yield up some of the barriers of the Constitution under temporary influences, and to teach the duty of an unsleeping vigilance to protect that branch which, though weak in its powers, is yet the guardian of the rights and liberties of the people. It was supposed," says the learned author, "that there could not be a doubt that those tribunals in which justice is to be dispensed according to the Constitution and laws of the confederacy; in which life, liberty, and property are to be decided upon; in which questions might arise as to the constitutional powers of the executive, or the constitutional obligation of an Act of the Legislature, and in the decision of which the Judges might find themselves constrained, by duty and by their oaths, to pronounce against the authority of either, should be stable and permanent, and

not dependent upon the will of the executive or Legislature, or both, for their existence; that, without this degree of permanence, the tenure of office during good behavior could not secure to that department the necessary firmness to meet unshaken every question, and to decide as justice and the Constitution should dictate, without regard to consequences. These considerations induced an opinion, which, it is presumed, was general, if not universal, that the power vested in Congress to erect from time to time tribunals inferior to the Supreme Court, did not authorize them at pleasure to demolish them. Being built upon the rock of the Constitution, their foundation was supposed to partake of its permanency, and to be equally incapable of being shaken by the other branches of the government. But a different construction of the Constitution has lately prevailed. It has been determined that a power to ordain and establish, from time to time, carries with a discretionary power to discontinue and demolish; that although the tenure of office be during good behavior, this does not prevent the separation of the office from the officer by putting down the office, but only secures the officer his station upon the terms of good behavior, so long as the office itself remains. Painful, indeed, is the remark that this interpretation seems calculated to subvert one of the fundamental pillars of free government, and to have laid the foundation of one of the most dangerous political schims that has ever

happened in the United States of America." Story's Const., Secs. 1633–4.

The commentator here referred to was Mr. Tucker, who, in his commentaries, says: "The Act gave rise to one of the most animated debates to be found in the annals of Congress, and was resisted by a power of argument and eloquence which has never been surpassed. These debates were collected and printed in a volume at Albany, in 1802, and are worthy of the · most deliberate perusal of every constitutional lawyer. The Act may be asserted, without fear of contradiction, to have been against the opinion of a great majority of all the ablest lawyers at the time, and probably now, when the passions of the day have subsided, few lawyers will be found to maintain the constitutionality of the Act. No one can doubt the perfect authority of Congress to remodel their Courts, or to confer or withdraw their jurisdiction at their pleasure. But the question is whether they can deprive them of the tenure of their office and their salaries after they once become constitutionally vested in them." See Tuck. Black Comm., 22–25.

The judiciary is the weakest of all the departments of the government. "The legislative is the greatest and the overruling power in all free governments. It has been generally recognized by the students of our constitutional law that the danger to judicial independence lies in the legislative department. · The safeguards against legislative power are

only two—tenure of office and a fixed compensation while in office. Destroy these, especially the first, and the inevitable result is judicial dependence, with its evils.'' Story Const., Secs. 531–542.

This danger must have been known and recognized by the authors of our Constitutions. Therefore every constitutional limitation upon legislative power must be given the fullest force and expression, and must have been so intended. It is argued that, prior to the Constitution of 1870, our Court, though not deciding the question, has used expressions which acquiesce in the power of the Legislature to deprive a Judge of his office by the abolition of his Court. This proposition cannot be maintained. No case can be found prior to the Constitution of 1870 which invoked any judicial declaration, either directly or indirectly, as to the·legislative power to abridge or terminate a judicial tenure of office. The cases in which expressions have been used as to the power of the Legislature to abolish Courts in nowise involved the tenure of office of·a Judge. The Legislature has the power to add to or withdraw a part of the territory or jurisdiction of an inferior Court, provided the office of the Judge is left intact. It may also abolish an inferior Court, to take effect at the end of the judicial term of office. The expressions used in the case relied on to show such acquiescence are referable to the legislative power of reorganization or abolition, when such action may be legitimately exercised without

interference with any constitutional limitation, but the legislative power to abolish a Court so as to destroy the tenure of office of the Judge is a different question. We refer to the cases above, upon which said claim is based. They are three in number, viz.: In the case of the *Bank* v. *Cooper* (1831) the Court used the expression that the Legislature may abolish a Court. In that case no question of the judicial tenure of office was in issue, nor anything to direct the attention of the Court to the same, the question involved being the constitutionality of an Act constituting existing Judges a special tribunal for the disposition of suits commenced by the Bank of Tennessee. 2 Yer., 600, 601. But in this very case there are words used by the Court which of themselves carry the implication that the legislative department could not interfere with the judicial department, so as to affect the independency of this department. The Court says: "The framers of the Constitution never dreamed of admitting the arbitrary exercise of power of any department of the government. The legislative, executive, and judicial departments are three lines of equal length, balanced against each other, and the framework becomes stronger the more its parts are pressed." If the tenure of office is destroyed, that destroys the triangle.

In the case of *Miller* v. *Conlee* (1858), 5 Sneed, the Court held as unconstitutional an Act transferring cases from the Chancery Court to the Supreme

Court, when they had been twice continued on account of the incompetency of the Chancellor. The Court, in holding that the Supreme Court was an appellate Court established by the Constitution, uses these words: "The people have trusted to this department supreme judicial power, and placed it and its jurisdiction beyond the legislative power. Neither one can interfere with or control the other in the proper discharge of its functions. Under the old Constitution this was not so. This department was by that entirely the creature of the Legislature." The Legislature may destroy its judicial creation by the exercise of power not limited by the Constitution, and in this sense inferior Courts are its creatures, but this does not mean that in the exercise of legislative power a constitutional office may be destroyed and its incumbent removed from office. 5 Sneed, 432.

In *Moore* v. *State* (1857), the question was whether the Legislature had the power to create the office of County Judge for particular counties without the law applying to all the counties in the State. In deciding this case the Court used this language: "It was with the Legislature to determine how many and what kinds of Courts are required for the administration of justice, and what shall be the character and limits of the jurisdiction of each." The expression "to determine how many Courts are required in the administration of justice, and what shall be the character and jurisdiction of each," is not

to be construed as meaning that the Legislature had the power to lessen the number of Courts by abolishing the same, when to do so would operate to abridge the tenure of office.    None of said cases bear the construction that the Legislature may exercise the power of abolition or reorganization of Courts where the tenure of office of the incumbent would thereby be affected.    5 Sneed, 510, 511.

But there are cases in Tennessee, decided prior to the Constitution of 1870, which substantially declare that the Legislature has no power to abridge the term of office of a Judge or a constitutional officer, and as we have seen, there are four decided since, declaring that the Legislature has no power to destroy a constitutional Court (*Pope* v. *Phifer*, 3 Heis., 683), or a constitutional Judge (*State* v. *Ridley*, *State* v. *Leonard*, 2 Pickle, 485), or a constitutional officer (*State* v. *Cummins*, 10 Pickle, 667).

The Constitution of 1834 provided Justices of the Peace should be elected for the term of six years.    Davis in 1852 was elected a Justice of the Peace, to fill a vacancy occasioned by resignation from office of an incumbent whose term would have expired on February 2, 1854.    On that day Davis ran for Justice of the Peace and was defeated.    In 1833 an Act had been passed providing in case of vacancies an election should be held to "fill out the time for which his predecessor was elected, and no longer."    Davis, though defeated in said election, claimed the office; that said Act was void under said

Constitution providing his term of office as a Justice of the Peace should be for six years, and that the Legislature had no power to shorten the term by said Act. The Court so held, saying, with reference to the Constitution: "The term is there fixed at six years, under all circumstances and without exception, and no power is given to the Legislature to abbreviate it, but only to provide for the mode and manner of keeping the office filled. This is the extent of the power delegated, and it does not reach the term of service; that is unalterably fixed at six years by the highest law, and it is not competent for the Legislature to shorten any more than it is to lengthen it." This case was decided in 1855. *Keys* v. *Mason*, 3 Sneed, 8, 10.

If a constitutional term of office cannot be shortened by the Legislature in advance of the term, can it shorten it after the term begins? "It is not competent for the Legislature to shorten the term of an office prescribed by the Constitution, and any enactment to that effect is void." *Rambo* v. *Maloney*, 8 Pickle, 68; *Brewer* v. *Davis*, 9 Hum., 213; *Powers* v. *Hurst*, 2 Hum., 24.

In 1827 an Act was passed providing that the Governor should appoint a special Judge to hold Courts in case the regular Judge should, on account of disability, be unable to hold his Courts. The Supreme Court (1833) held this Act unconstitutional, on the ground that the Constitution of 1796 having provided the tenure of office of Judges should be

"during good behavior," said Act was in violation of this constitutional provision, and that the Legislature was by the same prohibited from interfering with this tenure. The Court says: " Why was it provided by the Constitution that the Judges appointed should hold their respective offices during their good behavior ? Our Declaration of Independence tells us, when enumerating the usurpations of the British King authorizing the separation, 'he has made Judges dependent on his will alone for the tenure of their offices, and the amount of their salaries.' Of course dependent upon his pleasure, and subject to be used as instruments so long as they were obedient, and, when they were otherwise, subject to be turned off and more pliant ones put in place. Were this commission sanctioned, we might presently fall on the old evil. The Legislature has just as little right to change the appointing power of one of its own members." Here we have an express judicial declaration that the constitutional tenure of office shall not be interfered with, even though the public interest required it. *Smith* v. *Norment*, 5 Yer., 273, 274.

These two cases expressly decide the tenure and term of office fixed by the Constitution to be unalterable constitutional limitations, which prohibit any legislative violation of the limitations. The case of *Pope* v. *Phyfer*, 3 Heis., 682, expressly decided that the Legislature could not abolish a constitutional Court. The office of Judge of an inferior Court, the Judges

selected to exercise and enforce the judicial power invested in the Court, and the term of office, are all constitutional creations which form a constitutional part of the Court, and are not subject to legislative control other than by a constitutional grant of power authorizing legislative control. In the absence of any constitutional limitation, the Legislature would have the power to create Courts, to abolish such Courts, abridge terms of office, and deprive Judges of their offices. Therefore, whenever such legislative power is made the subject of constitutional provisions, such provisions are necessarily to be construed as intended to be a limitation upon or regulation of the legislative power. In such cases, to qualify or abridge such limitation requires a constitutional grant of power.

The Legislature, under the Constitution, has the power to ordain and establish inferior Courts—that is, to designate the same, and define their jurisdiction, and regulate the salary of the incumbent previous to his incumbency. But when this power is exercised— the power to either create the office of Judge, or fix the term of office, or to designate the mode of selection of the incumbent, or to regulate his salary during his incumbency, or to invest him with judicial power—all these are constitutional creations, and derive their existence solely from the Constitution.

These constitutional creations are guarded by express provisions of the Constitution limiting legislative power, viz.: (1) Term of office shall be eight years. (2) The Judge shall hold the office for

eight years. Shall hold his office until his successor is elected or appointed and qualified. (3) His salary shall not be diminished during his continuance in office. Const., Art. VI., Sec. 4–7; Art. VII., Sec. 5.

These limitations on legislative power were made a part of the Constitution to secure judicial independency. "When once we know the reason which determined the will of the lawmakers, we ought to interpret and apply the words used in a manner suitable and consistent to that reason, and as will be best calculated to effectuate the intent." Cooley Const. Lim. (6th Ed.), p. 80.

The intention of these provisions is not disputed, but they are sought to be evaded on the theory that they were not intended to cover cases of the abridgment of the term of office, or destroying the office, or depriving the Judge of his office and diminishing his salary, where the same is effected by abolishing a Court. The proposition is, that while a Judge cannot, by an Act, be constitutionally removed from office, the office may be, by an Act, constitutionally removed from a Judge, and that, by removing the office from the Judge, no constitutional limitation is violated. If this be true, these constitutional creations, which form a constituent part of the Court, are made subservient to legislative control, implied from the power to designate and establish Courts, the judicial powers of which, with the office of Judge, his term of office, and his compensation, are derived from the Constitution.

"An Act repealing *in toto* a statutory provision for the salary of an Assistant Clerk of a separate orphan's Court, appointed by the Clerk of such Court pursuant to authority conferred upon him by the State Constitution, without making other provisions for such salary, is unconstitutional, its effect being to abolish the office of Assistant Clerk." The Legislature cannot, except by constitutional authority, remove a constitutional officer, "because the power to remove is limited to the power to create." The proposition contended for, if sustained, not only deprives a constitutional officer of his salary, but also of his office. *Reed* v. *Smoulter* (Pa.), 5 La. Ann., 517, 518; *Attorney-general, ex rel. Jochim,* 25 L. R. A., 703.

The constitutional clause providing that inferior Courts should be "ordained and established" by the Legislature, was intended to meet conditions which might arise and require the establishment of tribunals necessary to the administration of justice. It was impracticable, in framing a Constitution, to create such Courts and define their jurisdiction. These were the reasons for leaving this matter to the Legislature. But in doing so it was not intended to make Courts created by the Legislature, under said provisions, sole creatures of the Legislature, which it might at its pleasure, and without regard to constitutional limitations, destroy, under the theory that the power to create conferred the power to destroy.

The Legislature cannot confer judicial power upon a Court. When it creates a Court it is the Con-

stitution which invests the Court and Judge with judicial power, and makes the Court a constitutional tribunal.     As soon as the Court thus becomes a constitutional tribunal, the Constitution intervenes and imposes a barrier to any legislative interference with the term of office, its tenure, or the salary of the Judge, and this barrier is intended to be a prohibition of any legislative exercise of power, except by the constitutional grant of the power of removal by impeachment, or a two-thirds vote for cause.

If this is not the correct theory of our Constitution, the provisions securing the independency of the Judge, and the constitutional grant of the power to remove Judges by methods expressed in the Constitution, are all made subordinate by implication to a clause which was merely intended to provide for needs which might arise in the administration of justice, and not intended to be construed as conferring the power to abolish Courts when such exercise of power would operate to destroy prescribed constitutional limitations.

Regretting our inabilty to avoid the result reached in this case, Judge Beard and I dissent from the views of the majority, and respectfully but earnestly insist that they are in error.